UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CORNELL HOLDEN and MIGUEL MEJIA, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>-against-<br><br>THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY; THE PORT AUTHORITY POLICE DEPARTMENT; and MICHAEL OPROMALLA, SHAUN KEHOE, JOHN TONE, JORDAN ESPOSITO, MICHAEL DEMARTINO, RICHARD AYLMER, PAUL MILLER, JOHN FITZPATRICK, PAUL O'DELL and OFFICERS JOHN DOE 1-97, sued in their individual capacities and official capacities as officers of the Port Authority Police Department.<br><br>Defendants. | No. 1:17-CV-02192-JGK-RWL<br><br><br>**DEFENDANTS' 56.1  STATEMENT** |

Defendants, The Port Authority of New York and New Jersey, The Port Authority Police Department, Michael Opromalla, Shaun Kehoe, John Tone, Jordan Esposito, Michael DeMartino, Richard Aylmer, Paul Miller, John Fitzpatrick and Paul O'Dell, respectfully submit the  their statement of undisputed facts pursuant to Fed R. Civ P. 56.1 in support of their motion for partial summary judgment as follows:

## GENERAL FACTS

1. The Port Authority of New York and New Jersey (the Port Authority) is a bi-state government agency created by compact between the States of New York and New Jersey for the development of the port district. NY Unconsol. Laws § 6401 *et seq*.

2. The Port Authority "shall be regarded as the municipal corporate instrumentality of the two states for the purposed of developing the port..." NY Unconsol. Law § 6459

1

3. The Port Authority has a Public Safety Department (PAPD) that employs police officers with statewide jurisdiction in New York. N.Y. Unconsol. Laws § 6401 *et seq.*

4. The Port Authority owns and operates a Bus Terminal (PABT) at 625 Eight Avenue in New York, New York which is patrolled by Port Authority police. N.Y. Unconsol. Laws § 6401 *et seq.*

5. The Port Authority has its own police academy where officers are trained in the penal laws of New York and New Jersey as well as in sensitivity and diversity policing, including the LGBTQ community. (Scott Benoit deposition transcript, ("tr") pp. 43, 53, 72, 81, 105-107) (Exhibit ("Ex") A to the Declaration of Thomas Brophy dated May 29, 2020 ("Brophy Decl."))

6. Public Lewdness is a misdemeanor crime under N.Y. Penal Law § 245.00.

7. Exposure of a Person is a crime under N.Y. Penal Law § 245.0.

8. Masturbation in a public place is a crime under N.Y. Penal Law § 245.00 and 245.01. (John Fitzpatrick deposition tr. p.86) (Ex B to Brophy Decl.)

9. The Port Authority did not have arrest quotas in 2014. (Michael Opromalla tr. pp. 124,292, (Ex C to Brophy Decl.); Shaun Kehoe tr. pp. 58-60) (Ex D to Brophy Decl.)

10. Promotion to the rank of sergeant in PAPD is based on an examination. (Opromalla tr. p. 51) (Ex. C to Brophy Decl.)

11. Quality- of- life crimes are low levels offenses or violations such as: open container, spitting, loud music, public intoxication. (Michael Demartino tr. p. 77) (Ex E to Brophy Decl.), (Opromalla tr. p. 127) (Ex C to Brophy Decl.), (Fitzpatrick tr. P. 174-176) (Ex B to Brophy Decl), (John Tone deposition tr. p. 106) (Ex F to Brophy Decl.))

12. Public Lewdness is a misdemeanor and is not considered a quality-of-life crime. (Fitzpatrick tr. p. 61) (Ex B to Brophy Decl.), (Tone tr. p104) (Ex F to Brophy Decl.), (Paul Miller deposition tr. p.144) (Ex G to Brophy Decl.))

13. The men's bathrooms at the PABT were patrolled by police as part of the patrol of the Tactical Patrol Unit (TPU), which consisted of police officers in plain clothes. (DeMartino tr. p. 36, 69) (Ex E to Brophy Decl.), (Kehoe tr. p. 61) (Ex D to Brophy Decl.), (Opromalla tr. p. 284) (Ex C to Brophy Decl.))

14. Crimes observed in the men's bathrooms at the PABT in 2014 included drugs, public fighting and public lewdness. (Kehoe tr. p.72) (Ex D to Brophy Decl.), (PA Statistics Bates 986-987) (Ex H to Brophy Decl.)).

15. In 2014, there were arrests for public lewdness at locations in the PABT other than men's bathrooms, but lewd behavior occurred more often in the bathrooms. (Tone tr pp. 60-61, 224) (Ex F to Brophy Decl.), (Miller tr. p. 51) (Ex G to Miller Decl.)).

16. In 2014, there were 732 reported crimes at the PABT of which 69 were arrests in the men's bathroom for Public Lewdness. (PA Bus terminal Crime Statistics, Bates 10496-10498) (Ex I to Brophy Decl.))

17. In 2014, there were 7 arrests for Public Lewdness in men's bathrooms at the PABT before plaintiff Cornell Holden's arrest on May 12, 2014, but none of these individuals has been identified as a witness who is gay /bisexual, gender non- conforming, or a man who has sex with men, and who was acquitted of all charges. (PAPD Statistics Bates 986-987) (Ex. H to Brophy Decl.), (Plaintiffs Rule 26 witness list) (Ex J to Brophy Decl.))

18. In 2014, there were 32 arrests for Public Lewdness in the men's bathroom at the PABT before Plaintiff Miguel Mejia's arrest on July 9 2020, but other than plaintiff Cornell

Holden, none of these individuals has been identified as a witness who is gay/bisexual, gender non-conforming, or a man who has sex with men, and who was acquitted of all charges. (PAPD Statistics, Bates 986-987) (Ex I to Brophy Dec.), (Plaintiffs' Rule 26 witness list) (Ex J to Brophy Decl.))

19. In 2013, there were 749 arrests, including 9 arrests for public lewdness, which are not identified by location of arrest, but none of those arrestees has been identified as a witness who is gay, bisexual, gender non-conforming or a man who has sex with men and who was acquitted of all charges. (PAPD statistics Bates no 008865-8872) (Ex K to Brophy Decl.) (Plaintiffs' Rule 26 witness list) (Ex J to Brophy Decl.)

20. The only person plaintiffs have identified as someone who was previously falsely arrested for public lewdness is Alejandro Martinez, who was arrested on February 1, 2000 at the World Trade Center men's bathroom as part of a sweep to make quotas. He was acquitted of the charges and brought a lawsuit for false arrest and malicious prosecution that resulted in a verdict in his favor. See *Martinez v. The Port Authority* of *New York and New Jersey* No. 01 cv 721, 2005 WL 214333 (S.D.N.Y. Sept 2, 2005) (Second Amended Complaint ¶¶ 71-78).

## HOLDEN'S ARREST

21. On Monday, May 12, 2014, Cornell Holden was arrested at the PABT between 9:05-9:25 am. (Criminal Complaint Report, Holden Arrest file Bates 1-49) (Ex L to Brophy Decl.))

22. Holden was arrested shortly after he exited the men's bathroom on the second floor of the PABT by Opromalla, and charged with Public Lewdness under N.Y. Penal Law 245.0 and Exposure of a Person under N.Y. Penal Law 245.01. (Holden arrest file, Bates Nos. 1-49) (Ex L to Brophy Decl.), (Cornell Holden deposition tr. pp. 135,150) (Ex M to Brophy Decl.))

23. Opromalla was working in plain clothes in the in the TPU at the time of Holden's arrest. (Opromalla tr. p. 284) (Ex C to Brophy Decl.), (Holden arrest file, Bates No. 17) (Ex L to Brophy Decl.))

24. Holden is a black male, age 27, height of 5'11," weighing about 170 pounds, who resided in the Bronx and was employed at Panera Bread at the time of his arrest. (Holden Arrest file Bates No. 9) (Ex L to Brophy Decl.), (Holden tr. pp. 9,13,104) (Ex M to Brophy D<u>ecl.</u>).

25. Holden testified that he was wearing fitted blue jeans, a red fitness shirt, black jacket, black high-top sneakers, a silver chain necklace, a silver name ring, earrings and a beaded bracelet. He was carrying a red duffle bag with a Fred Perry logo and was wearing headphones (Holden tr. pp. 98-106, 170) (Ex M to Brophy Decl.).

26. Holden did not use the PABT as part of his daily commute at the time of his arrest, but he had used the men's bathroom on the second floor about ten times previously that year. (Holden tr. pp. 81,117) (Ex M to Brophy Decl.)).

27. Holden identifies as a gay male. (Holden tr. p.73) (Ex M to Brophy Decl.), (Ex C to Brophy Decl.).

28. Holden used the only vacant urinal in the bathroom. There were dividers between the urinals, but Holden could not recall the height. (Holden tr. pp. 127-129) (Ex M to Brophy Decl.).

29. Holden observed a bald Caucasian male wearing regular clothes, whom he later identified as Opromalla, at the urinal next to him. (Holden tr. pp. 135, 150) (Ex M to Brophy Decl).

30. Holden observed that the bald Caucasian finished, stepped back, looked at him and then left. (Holden tr. p. 136) (Ex M to Brophy Decl.).

31.    Holden remained in the bathroom for some minutes after Opromalla left before he exited. (Holden tr. pp. 137-138) (Ex M to Brophy Decl), (Opromalla tr. pp. 205-206) (Ex C to Brophy Decl.).

32.    Officers approached Holden after he left the bathroom and told him that he was being arrested for performing a lewd act at the urinal. (Holden tr. pp. 145-146, 151-152) (Ex M to Brophy Decl.).

33.    Opromalla didn't make the arrest in the bathroom because he considered it safer outside the bathroom where it was less crowded. (Opromalla tr. 207, 209, 211) (Ex C to Brophy Decl.).

34.    Holden was taken in handcuffs to the police desk on the first floor where he was fingerprinted, placed in a jail cell and then released at 12:45 pm with a desk appearance ticket for a court date on July 1, 2014. (Holden tr. pp. 148, 152-153) (Ex M to Brophy Decl.).

35.    Opromalla prepared the arrest paperwork including the Criminal Complaint (CCR), On-Line Booking Sheet, criminal case and affidavit. (Opromalla tr. pp. 186-201, 234, 237) (Ex C to Brophy Decl.), (Holden arrest file, Bates Nos.1-49) (Ex L to Brophy Decl.).

36.    The CCR prepared by Opromalla states in part 83: "observed the defendant in Post 3 public men's room expose his naked penis at the urinal and manipulate it in a back and forth motion in full public view." (Holden arrest file, CCR Bates No. 18 (Ex L to Brophy Decl.).

37.    Opromalla asked a senior officer for advice on the wording of the report. (Opromalla tr. p. 261) (Ex C to Brophy Decl.).

38.    While he was in the cell, Holden heard individuals jokingly refer to Opromalla as the "Gay Whisperer." (Holden tr. pp. 150-161) (Ex M to Brophy Decl.)).

39. Opromalla had never heard of himself referred to as the "Gay Whisperer" around the precinct and he didn't know what the term meant. (Opromalla tr. pp 272, 277) (Ex C to Brophy Decl.).

40. Lt Paul O'Dell was not present at Holden's arrest, but signed CCR report for Holden's arrest on May 12 as the Tour Commander. (Holden arrest file Bates Nos. 1-49) (Ex L to Brophy Decl.).

41. Sgt. Paul Miller was not present at Holden's arrest. He signed the Desk Appearance Ticket Investigation form, which indicated that the warrant check had been done and that Holden was a New York resident. As the desk officer, he would review and approve paperwork for accuracy. (Desk Appearance Ticket Investigation Bates 4), (Ex L to Brophy Decl.), (Miller tr. pp. 139-140) (Ex G to Brophy Decl.).

42. Sgt. Michael DeMartino was not present at Holden's arrest, but issued the Desk Appearance Ticket. (Holden arrest file Bates No 3) (Ex L to Brophy Decl.).

43. Sgt. Jordan Esposito was not present at Holden's arrest. He signed the On-line Booking Sheet as part of his supervisory duties to review paper work to verify that probable cause was articulated. (Holden arrest file Bates No.15) (Ex L to Brophy Dec.), (Jordan Esposito tr. p. 105) (Ex N to Brophy Decl.).

44. Holden never mentioned to the officers that he was gay. (Holden tr. p. 206) (Ex M to Brophy Decl.)

45. The arresting officer, Opromalla, did not make any references to Holden's sexuality during his arrest. (Holden tr. p. 207) (Ex M to Brophy Decl.).

46. The charges against Holden were dismissed by the court on December 9, 2014. (Holden tr. p. 181) (Ex M to Brophy Decl).

.	47.	Opromalla was told by Captain Fitzpatrick, the Commanding Officer at the PABT to enforce the public lewdness laws, but Fitzpatrick never mentioned gay men, and never said to target gay men. (Opromalla tr. pp.149-152,161) (Ex C to Brophy Decl.).

48.	Sgt. Miller advised Opromalla to enforce the lewdness law and that there was public lewdness in the men's bathrooms, but he did not mention gay men in connection with lewdness. (Opromalla tr. 100, 134, 170-173) (Ex C to Brophy Decl.).

49.	Opromalla attended the Port Authority Police Academy in 2013 where he was trained in the N.Y. & N.J. Penal Law, sensitivity policing, behavioral science and dealing with individuals who have mental issues, medical issues.  He graduated in January 2014 and was assigned to the PABT, where he received in-service training. (Opromalla tr. pp 30-34,43, 48, 54) (Ex C to Brophy Decl.).

50.	Opromalla has never been disciplined. (Opromalla tr. p. 292) (Ex C to Brophy Decl.).

51.	Opromalla's plain clothes assignment ended after six months. (Opromalla tr. p. 146) (Ex C to Brophy Decl.).

52.	Opromalla made a total of 14 arrests for lewd conduct at PABT, and none of these arrestees, except Holden, has come forward claiming that the arrest was unlawful. (Opromalla tr. p. 75) (Ex C to Brophy Decl.).

53.	Opromalla holds a BA from Wagner College and a Master's Degree in School Counseling from Brooklyn College. He worked as a guidance counselor at Fort Hamilton High School for four years before joining PAPD. (Opromalla tr. pp.19-25) (Ex C to Brophy Decl.).

## MEJIA'S ARREST

54. Miguel Mejia was arrested on July 9, 2014 at approximately 5:06 pm at the PABT and charged with Public Lewdness (N.Y. Penal Law 245.00) and Exposure of a Person (N.Y. Penal Law 245.01). (Mejia's arrest file, Bates Nos. 50-85) (Ex O to Brophy Decl.).

55. At the time of his arrest, Mejia was 43 years old, a white male Hispanic, 5' 11" tall, weighing 225 lbs.  He resided in Manhattan and was employed at the Family Help Living Center. (Miguel Mejia tr. pp.12, 16-18) (Ex P to Brophy Decl.).

56. On the date of the arrest, he had a shaved head, facial hair and tattoos on his arms and legs. He was wearing an orange jersey with a basketball emblem, grey cargo pants, black and grey sneakers, rings, including a wedding band, a gold necklace and a virgin pendant. He was carrying a burgundy messenger bag and a blue bag with a box. (Mejia tr pp. 26-29, 31-32, 41-43, 61-64), (Ex P to Brophy Decl.).

57. He was at the PABT to catch the 5:12 bus to New Jersey where he planned to meet Oscar, his tattooist, at his home in Clifton at 6:00 pm. (Mejia tr. pp. 65-67,74) (Ex P to Brophy Decl.).

58. Mejia had taken buses from the PABT prior to the date of his arrest to visit Oscar, to go to Ikea, and to Atlantic City. (Mejia tr. pp. 67-68, 91-92) (Ex P to Brophy Decl.).

59. The arresting police officer was Police Officer John Tone, who was working in TPU and patrolling the third level to the bus ramps. (Tone tr. pp 112-115) (Ex F to Brophy Decl.).

60. Tone was patrolling with Police Officer Shaun Kehoe, whom he left waiting outside when he entered the men's bathroom to patrol. (Tone tr. p 117) (Ex F to Brophy Decl.), (Kehoe tr. pp. 21-24) (Ex D to Brophy Decl.).

61. Tone does not stand at a urinal when on patrol. On July 9, he observed Mejia at the urinal from where he was standing at the sink area. (Tone tr. pp. 78, 119, 126-133) (Ex F to Brophy Decl.).

62. When Tone entered the bathroom, he first checked under the stalls for drunks. He observed Mejia, as he was leaving, looking at a man to his right who was wearing sweatpants and a tank top. (Tone tr. pp. 113-119, 126, 127-128) (Ex F to Brophy Decl.).

63. Mejia entered the restroom and went to the only empty urinal, which was on the left side of the room. (Mejia tr. pp 123-125) (Ex P to Brophy Decl.).

64. Mejia sensed a short man on his right looking at him and when Mejia looked at the man, he smirked and then left. (Mejia tr. pp. 125-127, 139-140) (Ex P to Brophy Decl.).

65. Mejia was arrested after he exited from the bathroom by Tone, who showed him his badge and escorted him the police desk on the second floor. (Mejia tr. pp. 156-160) (Ex P to Brophy Decl.) (Tone tr. p 141) (Ex F to Brophy Decl.).

66. The officer whom Mejia describes as tall and blond (Tone) placed him in the jail cell, then photographed and fingerprinted him and arranged for him to make a phone call. (Mejia tr. pp. 190-191) (Ex P to Brophy Decl.).

67. Mejia had no interaction with the little officer during his arrest processing. (Mejia tr. p. 190) (Ex P to Brophy Decl.).

68. In ¶ 83 of the CCR prepared by Tone, he wrote: "At TPO while working in the Tactical Plain Clothes Unit the undersigned was patrolling the third-floor men's bathroom. The undersigned did observe the defendant manipulating his naked erect penis in a back and forth motion in full public view in a public place." (Mejia arrest file, CCR Bates No. 66) (Ex O to Brophy Decl.).

69. The language Tone used to describe the act of masturbation is the language preferred by the ADA. (Tone tr. pp. 163-168) (Ex F to Brophy Decl.).

70. Sgt. DeMartino was not present at Mejia's arrest, but he signed the CCR Worksheet, the Desk Appearance Investigation Worksheet and the On-Line Booking Arrest Worksheet, which he reviewed to make sure they were complete, that the arrestee was correctly charged, and that probable cause was stated. (Mejia's arrest file, Bates Nos. 53, 57, 81, 84) (Ex O to Brophy Decl.), (DeMartino tr. pp 54-57) (Ex E to Brophy Decl.).

71. Lt. Richard Aylmer was not present either Holden or Mejia's arrest. He is listed as a Tour Commander in Holden's arrest paperwork, but did not sign anywhere. When he signs the Criminal Complaint Report as the Tour Commander, he relies on the sergeants to have check the accuracy of the arrest. (Lt. Richard Aylmer deposition tr. pp. 126-130) (Ex Q to Brophy Decl.), (Holden arrest file, Bates nos. 1-49) (Ex. L to Brophy Decl.).

72. Mejia was issued a desk appearance ticket and released at 8:23 pm on July 9, 2014. (Mejia arrest file, Bates No.60) (Ex O to Brophy Decl.).

73. Tone, who is identified by Mejia as the tall blond officer, was the only officer who testified at Mejia's criminal trial. (Mejia tr. p. 180) (Ex P to Decl.).

74. Mejia was acquitted after a bench trial in criminal court on November 17, 2014. (Criminal Court verdict sheet) (Ex R to Brophy Decl).

75. Mejia, who is now divorced, was married to a woman for ten years, and has had relationships with men, but does not identify as gay or bisexual (Mejia tr. pp 31, 97-98, 258) (Ex P to Brophy Decl.).

76. Tone attended the PAPD academy in 2013 and was trained in anti-bias policing. He has never been disciplined or the subject of an internal investigation. (Tone tr. 15-17, 218) (Ex F to Brophy Decl.).

77. The Port Authority 's Rule 26 Voluntary Disclosure listing witnesses and providing plaintiffs' arrest records was served by overnight Federal Express mail on July 6, 2017. (Defendants' Rule 26 Voluntary Disclosure and Fed. Ex. receipt) (Ex. S to Brophy Decl.).

Dated: May 29, 2020
New York, New York

                                          The Port Authority Law Department

                                          By ___/S/_____
                                            Kathleen Gill Miller
                                           Thomas R. Brophy, Esq
                                           Attorneys for Defendants
                                           4 World Trade Center, 24th Floor
                                           New York, New York 10007
                                           (212) 435-3434
                                           (212) 435-3492

TO:    Winston & Strawn, LLP
          Attorneys for Plaintiffs Cornell Holden and Miguel Mejia
          35 W. Wacker Drive
          Chicago, Illinois  60601
          Attn:  Daniel R. McNeely, Esq.
          Via ECF

cc:    The Legal Aid Society
          Co-counsel for Plaintiffs Cornell Holden and Miguel Mejia
          199 Water Street
          New York, NY  10038
          Attn:  Cynthia Conti-Cook, Esq.
          Via ECF