**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CORNELL HOLDEN and MIGUEL MEJIA, on : 
behalf of themselves and all others similarly :
situated, :
 :
                         Plaintiffs, :
 :
     -against- :
 :           **1:17-cv-02192-JGK-RWL**
THE PORT AUTHORITY OF NEW YORK AND :
NEW JERSEY; THE PORT AUTHORITY :
POLICE DEPARTMENT; and MICHAEL :
OPROMALLA, SHAUN KEHOE, JOHN TONE, :
JORDAN ESPOSITO, MICHAEL DEMARTINO, :
RICHARD AYLMER, PAUL MILLER, JOHN :
FITZPATRICK, PAUL O'DELL and OFFICERS :
JOHN DOE 1-99, sued in their individual capacities :
and official capacities as officers of the Port :
Authority Police Department, :
 :
                         Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**<u>MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR
PARTIAL SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS .............................................................................................. 2

    I.      General Background ........................................................................... 2

    II.     Arrest of Cornell Holden ................................................................. 4

    III.    Arrest of Miguel Mejia .................................................................... 5

ARGUMENT .................................................................................................................. 6

    I.      Summary Judgment Standard ........................................................... 6

    II.     Plaintiffs' Claims Against the Port Authority Are Supported by Evidence of An Unlawful Pattern and Practice ................................. 6

    III.    The Port Authority Failed to Train, Supervise, or Discipline PAPD Officers Such that Unlawful Policing Tactics Were Permitted to Continue ......... 9

          a.     Despite Being On Notice That PAPD Plainclothes Officers Conduct False Public Lewdness Arrests in Men's Restrooms, PAPD Does Not Train Its Officers on Protecting The Rights of Patrons .......... 10

          b.     Despite Being On Notice That PAPD Plainclothes Officers Conduct False Public Lewdness Arrests in Men's Restrooms, PAPD Supervisors Failed to Determine that Arrests Were Actually Supported by Probable Cause ................................. 13

    IV.    Plaintiffs Properly State Claims of Fourteenth Amendment Violations Involving Discrimination/Selective Enforcement .................................... 13

          a.     PAPD Defendants Are Not Entitled to Qualified Immunity ................... 13

          b.     Plaintiffs Were Subject to Intentional Discrimination and Selective Enforcement ......................................................... 14

    V.     All Fourth Amendment Claims Against PAPD Officers Should Stand. .............. 17

          a.     PAPD Officers Failed to Supervise and Prevent Fourth and Fourteenth Amendment Violations. .......................................... 17

    VI.    Invasion of Privacy & Entrapment ...................................................... 19

          a.     Plaintiffs have a Reasonable Expectation of Privacy in Public Restrooms ................................................................. 19

          b.     Plaintiffs Never Asserted a Claim for "Entrapment" and Defendants Purposefully Misconstrue Plaintiffs' Claims .......... 21

CONCLUSION .................................................................................................... 21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*A.V.E.L.A., Inc. v. Estate of Monroe*,
  34 F. Supp. 3d 311 (S.D.N.Y. 2014) ....................................................................................19

*Amnesty Am. v. Town of W. Hartford*,
  361 F.3d 113 (2d Cir. 2004) ..................................................................................................9

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ...............................................................................................................6

*Board. of Cty. Comm'rs v. Brown*,
  520 U.S. 397 (1997) .............................................................................................................10

*Bostock v. Clatyon Cty.*,
  590 U.S.____, No. 17-1618, 2020 WL 3146686 (June 15, 2020) ........................................14

*Bridgeport Music, Inc. v. Universal Music Grp., Inc.*,
  248 F.R.D. 408 (S.D.N.Y. 2008) .........................................................................................19

*Chin v. The Port Authority of New York and New Jersey*,
  685 F. 3d 135 (2d Cir. 2012) .................................................................................................9

*City of Canton v. Harris*,
  489 U.S. 378 (1989) ........................................................................................................9, 11

*Collins v. City of New York*,
  923 F. Supp. 2d 462 (E.D.N.Y. 2013) ..................................................................................8

*Connick v. Thompson*,
  563 U.S. 51 (2011) ..........................................................................................................9, 10

*Doninger v. Niehoff*,
  642 F.3d 334 (2d Cir. 2011) ..................................................................................................6

*Fiacco v. City of Rensselaer*,
  783 F.2d 319 (2d Cir. 1986) ..................................................................................................9

*Flaherty v. Massapequa Pub. Sch.*,
  752 F. Supp. 2d 286 (E.D.N.Y. 2010) ................................................................................14

*Henry v. County of Shasta*,
  132 F.3d 512 (9th Cir. 1997) .................................................................................................8

*Howard v. City of New York*,
  602 F. App'x 545 (2d Cir. 2015) ........................................................15

*Johnson v. Killian*,
  680 F.3d 234 (2d Cir. 2012).............................................................2

*Kroehler v. Scott¸*
  391 F. Supp. 1114 (E.D. Pa. 1975) .............................................20, 21

*Martinez v. Port Authority*,
  No. 01 Civ. 721 (PKC), 2005 WL 2143333 (S.D.N.Y. Sept. 2, 2005), *aff'd
  sub nom. Martinez v. The Port Auth. of New York & New Jersey*, 445 F.3d 158
  (2d Cir. 2006)................................................................. *passim*

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007).............................................................6

*Miteva v. Third Point Management Company, L.L.C.*,
  219 F.R.D. 64 (S.D.N.Y. 2003) .......................................................19

*Naumovski v. Norris*,
  934 F.3d 200 (2d Cir. 2019)............................................................14

*Obergefell v. Hodges*,
  135 S. Ct. 2584 (2015).............................................................13, 14

*Okin v. Vill. of Cornwall-On-Hudson Police Dep't*,
  577 F.3d 415 (2d Cir. 2009)............................................................10

*People v. Trigg*,
  506 P.2d 232 (1973).....................................................................21

*Rodriguez v. City of New York*,
  No. 16 Civ. 744 (KPF), 2018 WL 1276831 (S.D.N.Y. Mar. 5, 2018) ....................9

*Romer v. Evans*,
  517 U.S. 620 (1996)......................................................................13

*Smayda v. United States*,
  352 F.2d 251 (9th Cir. 1965) ..........................................................20

*Soroof Trading Dev. Co. v. GE Microgen, Inc.*,
  283 F.R.D. 142 (S.D.N.Y. 2012) .......................................................19

*Trujillo v. City of Ontario*,
  428 F. Supp. 2d 1094 (C.D. Cal. 2006) .............................................20

*United States v. Delaney*,
    52 F. 3d 182 (8th Cir. 1995) ............................................................................20

*United States v. Windsor*,
    570 U.S. 744 (2013).................................................................................13, 14

*Vann v. City of New York*,
    72 F.3d 1040 (2d Cir. 1995).............................................................................9

*Vivenzio v. City of Syracuse*,
    611 F.3d 98 (2d Cir. 2010)...............................................................................6

*Walker v. City of New York*,
    974 F.2d 293 (2d Cir. 1992)...........................................................................12

*Whitfield v. City of Newburgh*,
    No. 08 Civ. 8516 (RKE), 2015 WL 9275695 (S.D.N.Y. Dec. 17, 2015) ..............10

*Wray v. City of New York*,
    490 F.3d 189 (2d Cir. 2007)...........................................................................12

**Statutes**

42 U.S.C. § 1983 ......................................................................................9, 14

**Other Authorities**

Fed. R. Civ. P. 56(a) ..........................................................................................6

## PRELIMINARY STATEMENT

For twenty years, Defendants have engaged in a policy and practice of arresting men in Port Authority restrooms based on preconceived notions about the men's sexual identity, using the same tactics traditionally used by law enforcement to target gay and bisexual people. These practices are purposefully used in men's only spaces—the public men's restrooms. Although prior litigation brought these unlawful practices to the Port Authority's attention, Defendants failed to remedy their misconduct, which ultimately led to violations of Plaintiffs' constitutional rights, and the cycle of abusive policing by the PAPD continued.

Defendants now claim they are entitled to summary judgment on Plaintiffs' municipal liability claims on the grounds that there is no pattern of prior unconstitutional conduct and that their training and supervision are constitutionally adequate. But this ignores substantial parts of the record. In 2005, a federal court found that the PAPD engaged in a practice of falsely targeting men in the men's restrooms for public lewdness arrests, clearly putting Defendants on notice of a constitutional problem. Nevertheless, Defendants made no efforts to modify their training and supervision to correct this unlawful behavior. Several years later, in 2014, that exact same constitutional pattern repeated. Both Plaintiffs—along with several other gay and bisexual men—were targeted by PAPD officers leading to arrests for public lewdness in the men's restrooms. Despite being on notice of its unconstitutional conduct, the PAPD's training is not only grossly inadequate, it is also outdated, offensive, and perpetuates the very stereotypes and misinformation that leads to the discriminatory law enforcement patterns uncovered in this case. For their part, supervisors merely rubberstamp arrest reports with boilerplate language. For these reasons,

Plaintiffs respectfully request that this Court deny Defendants' motion for partial summary judgment.[1]

## STATEMENT OF FACTS

The Defendants' memorandum of law and accompanying Rule 56.1 statement are materially incomplete and rely on facts that are disputed. When reviewing a motion for summary judgment, it is well established that the court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012). Given this standard, it is the following set of facts that must be accepted as true for purposes of deciding the Defendants' motion for summary judgment.

### I.   General Background

The PAPD have a longstanding pattern and practice of using plainclothes officers to target men in the restrooms based upon perceptions of their sexual orientation. Despite litigation both exposing this unlawful pattern and penalizing the Port Authority for its practices, the Port Authority failed to act. Instead, the Port Authority and PAPD have shown deliberate indifference toward this unconstitutional conduct by failing to implement training or further supervise its officers to prevent the pattern from repeating—as it did in 2014.

In 2005, a jury concluded that the Port Authority engaged in a "pattern or practice" of executing arrests for public lewdness without probable cause in Port Authority men's restrooms. *See Martinez v. Port Authority*, No. 01 Civ. 721 (PKC), 2005 WL 2143333, at *5 (S.D.N.Y. Sept. 2, 2005), *aff'd sub nom. Martinez v. The Port Auth. of New York & New Jersey*, 445 F.3d 158 (2d

---

[1] Plaintiffs' claims asserted under the Fourth and Fourteen Amendments against Officers Michael Opromalla and John Tone are not part of Defendants' Motion for Partial Summary Judgment.

Cir. 2006).  Mr. Martinez, the plaintiff in that case, was arrested outside of a Port Authority restroom by a plainclothes police officer and falsely accused of public lewdness for masturbating. *Id.* at *1-2.  Defendants have offered no evidence indicating their policies, practices, or training were modified because of the court's finding that its practices were constitutionally impermissible.

Nine years after the verdict, Port Authority engaged *in precisely the same conduct*, when the Port Authority Bus Terminal (the "PABT") began plainclothes policing of the PABT, including men's restrooms, through a "Tactical Patrol Unit" ("TPU").  *See* Declaration of Seth E. Spitzer in Support of Plaintiffs' Motion Opposing Partial Summary Judgment ("Spitzer Decl.") Ex.1; *see also* Ex.2 at 98:9-25; 99:8-10.  PAPD assigned recent graduates with no plainclothes training or experience to the TPU.  *See* Ex.3 at 35:16-23; Ex.4 at 26:15-17; Ex.5 at 27:20-22; Ex.6 at 18:2-3.

With the TPU, PAPD instituted its "Quality-of-Life" initiative to focus on public lewdness and indecent exposure offenses in the PABT, particularly inside men's restrooms.[2]  *See also* Spitzer Decl. Ex.7; Ex.8; *see also* Ex.9 at 61:9-62:18; Ex.10. at 145:12-146:1; Ex.11 at ¶ 20-21. As part of the initiative, PAPD utilized "zero tolerance sweeps" in the PABT, the same type of sweeps that led to Mr. Martinez's arrest.  *See id.* at Ex.7; *Martinez*, 2005 WL 2143333 at *5.  Each patrol was to submit daily totals—incentivizing officers to make more arrests.  *See id.* at Ex.7.

These sweeps coincided with a massive spike in public lewdness arrests.  In 2014 alone, PAPD officers arrested at least 69 individuals on public lewdness charges.  *See* Spitzer Decl. at Ex.12 at ¶9 ("[T]he spike in public lewdness arrests was the result of intentional policy choices[.]").  Everyone arrested, including Plaintiffs, was accused of masturbating in the PABT restroom and allegedly observed by plainclothes officers from an adjacent urinal.  *See id.* at Ex.13.

---

[2] Defendants assert that public lewdness was not a quality of life offense.  This is disputed by the testimony of their own officers. It is Plaintiffs' evidence that must be accepted as true for the purposes of this motion.

Despite Defendants' claim that no other gay or bisexual man was caught up in these sweeps, evidence reveals that at least seven men had precisely the same experiences as Plaintiffs.  *See id.* at Ex.14.  Importantly, the individual officers Kehoe, Opromalla, and Tone, were primarily responsible for the majority of public lewdness arrests during this period.  *See id.* at Ex.12 at ¶32.

Not surprisingly, to effect these arrests, PAPD officers engaged in the very type of enticement tactics historically used to target, arrest, and prosecute gay and bisexual men—men often too humiliated to speak out and contest their unfair treatment.  *See id.* at Ex.11 at ¶¶ 8, 13.[3] Plainclothes PAPD officers stood at urinals, as if they were urinating, peered around dividers, made eye contact with their targets, and made suggestive facial expressions at them.  *See e.g.*, *id.* at Ex.15 at 135:25-136:9; Ex.16 at 126:21-127:8; Ex.11 at ¶¶ 9, 17, 19, 29.  After Plaintiffs looked back at the officers, they were arrested upon leaving the PABT restroom and charged with Public Lewdness (N.Y.P.L. § 245.00) and/or Exposure of a Person (N.Y.P.L. § 245.01).

After each Plaintiff's arrest, the officers signed boilerplate affidavits, provided by the prosecutor, using identical or nearly identical language that each man was "exposing his naked erect penis" and "manipulating it in a back and forth motion in full public view."  *Id.* at Ex.17; Ex.18.  Supervisors, before signing off on arrest paperwork, did not question these allegations. *See id.* at Ex.10 at 132:22-133:23; Ex.19 at 217:15-217:24.

## II.  Arrest of Cornell Holden

On May 12, 2014, Mr. Holden was arrested after using the PABT restroom on his way to work.  Mr. Holden testified he was wearing fitted clothing and jewelry.  *See id.* at Ex.15 at 98:12-106:25.  While Mr. Holden was urinating, Officer Opromalla, in plainclothes, stepped back from

---

[3] Many witnesses who experienced the exact same behavior as Plaintiffs did not wish to come forward for the same reasons.

an adjacent urinal, turned his head around the privacy wall between the urinals to look at Mr. Holden's hands and genitals, and left the restroom.  *Compare id*. at 135:25-136:9; *with* Def. Opening Br. ("Def. Br."), Dkt. 229 at 3 ("[Mr. Opromalla] observed the defendant in the Post 3 public men's room expose his naked penis at the urinal and manipulate it in a back and forth motion in full public view.").  As Mr. Holden exited the restroom, two plainclothes PAPD officers arrested and handcuffed him in view of numerous PABT patrons.  They charged him with Public Lewdness and Exposure of a Person.

In a holding cell, Mr. Holden overheard PAPD officers congratulating his arresting officer and referring to him as "the gay whisperer."  *See* Spitzer Decl*.* at Ex.15 at 155:15-158:21.  Mr. Holden, who is gay, later testified that he felt extremely humiliated and stressed throughout this process.  *See id.* at Ex.19 at ¶ 6.  Following his arrest, Mr. Holden pleaded not guilty and staunchly maintained his innocence.  As a result, he was forced to make several court appearances and refused all plea deals.  Finally, on December 9, 2014, the court dismissed all charges against Mr. Holden.

### III. Arrest of Miguel Mejia

On July 9, 2014, Mr. Mejia was arrested after using a urinal in a PABT restroom while on his way to New Jersey.  Mr. Mejia testified that on the day of his arrest he was wearing jewelry and a tank top.  *See id.* at Ex.16 at 26:20-33:11.  While at the urinal, Mr. Mejia noticed a person, later revealed as PAPD Officer John Tone in plainclothes, was watching him.  The man "smirked" at Mr. Mejia and left the restroom.  *Id.* at Ex.16 at 126:21-127:5; Def. Br. at 4 (Defendants do not refute this fact, stating "[Mr. Mejia] noticed a short man at adjacent urinal who looked at him, 'smirked,' and then left the bathroom.").

5

When Mr. Mejia exited the restroom, he was arrested by three plainclothes PAPD officers—including Officers Tone and Kehoe.  He was handcuffed in view of numerous PABT patrons, and charged with Public Lewdness.  Following his arrest, Mr. Mejia pleaded not guilty, staunchly maintained his innocence, and refused several plea deals and had to make several court appearances.  Mr. Mejia was acquitted after trial.

## ARGUMENT

### I.        Summary Judgment Standard

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir.  2011) (quoting Fed. R. Civ. P. 56(a)).   "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists."  *Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010) (internal quotation marks and citations omitted).  A fact is material if it "might affect the outcome of the suit under the governing law" (*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)) and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *McCarthy v.  Dun & Bradstreet Corp*., 482 F.3d 184, 202 (2d Cir. 2007) (*quoting Anderson*, 477 U.S. at 248).

### II.       Plaintiffs' Claims Against the Port Authority Are Supported by Evidence of An Unlawful Pattern and Practice

Defendants misrepresent the record in this case by limiting it to two isolated incidents involving Plaintiffs.  Def. Br. at 8-9.  Yet, Port Authority's longstanding pattern of unlawful practices related to public lewdness arrests in public restrooms traces back nearly two decades and was exposed in *Martinez v. Port Authority*.  In *Martinez*, the jury concluded that the Port Authority engaged in a pattern or practice of executing arrests for public lewdness without probable cause.

*See Martinez*, 2005 WL 2143333, at *5. Nevertheless, Defendants put forward no evidence that they modified their policies, practices, or training in response to this disturbing finding.

In *Martinez*, the jury drew its conclusion from evidence that the PAPD conducted intensive sweeps that resulted in high numbers of public lewdness arrests during short bursts of time. *Id.* at *6. Here, Plaintiff's statistical expert, Dr. John F. Pfaff, noticed the same patterns from reviewing the 2014 arrest data. While public lewdness arrests in the months preceding Plaintiffs' arrests were relatively low, "2014 saw a sharp spike in arrests for public lewdness." Spitzer Decl. at Ex.12 at ¶12. Specifically, "[t]here were 9 arrests for public lewdness in 2013 (1.2% of 750 total arrests), but then at least 60 in 2014 (13% of 448)." *Id.* Dr. Pfaff further noted that the arrests for public lewdness were "idiosyncratic" and that "[t]hey appear[ed] to take place at different times of the day than other arrests—at times when one would expect public masturbation to be *less* frequent, not more (morning and evening rush hours)." *Id.* at ¶¶9,16, 20-24. (emphasis in the original). Dr. Pfaff, like the jury in *Martinez*, concluded that "the spike in public lewdness arrests was the result of intentional policy choices, not incidental to routine police patrols and stops." *Id.* at ¶9.

Indeed, there was such a policy choice. The PAPD started the Quality-of-Life Initiative which included targeting public lewdness. *See* Spitzer Decl. at Ex.9 at 61:9-62:18; Ex.10 at 145:12-146:1. PAPD used this initiative to "combat…quality of life offenses inside and surrounding the bus terminal" by using "plainclothes police officers on patrol." *See id.* at Ex.9 at 62:13-18. Officers were commended for their high Quality-of-Life Initiative arrest numbers. *See id.* at Ex.1 (Officer Opromalla arrested four men in restrooms in two days). The PAPD paired the emphasis on public lewdness with "zero tolerance sweeps." *See id.* at Ex.9 at 118:11-119:4; Ex.11 at ¶9 ("Arrests in 2014 were driven by a 'quality-of-life' initiative in the Port Authority."). The implementation of "Quality-of-Life" sweeps, similar to "broken windows" policing, often results

in discriminatory targeting of particular groups.  *See id.* at Ex.11 at ¶¶15-16.  Similar initiatives in other states revealed to have a disproportionate effect on men perceived as gay or bisexual.  *Id.* at 16-17.

Here, the PAPD Initiative had that same result.  Plaintiffs identified at least seven other men who were: (1) arrested outside the PABT restroom in 2014; (2) maintain that they were falsely arrested for public lewdness or indecent exposure; and (3) assert that they were targeted because of their sexuality.  *See* Spitzer Decl. at Ex.21, Ex.22, Ex.23, Ex.24, Ex.25.  These men's accounts follow the same pattern described above and, like Plaintiffs, these men are also gay, bisexual or gender non-confirming.  *See id.* at Ex.24 at ¶14; Ex.25 at ¶12.[4]

In addition to Defendants' omission of this substantial body of evidence, they make several additional legal arguments that have no merit.  First, Defendants set forth a feeble argument that Martinez's arrest for public lewdness is not relevant because the "arrest is too remote in time and too different in terms of location and operational factors."  *See* Def. Br. at 9.  Yet, Martinez was falsely arrested outside of a Port Authority restroom by a plainclothes officer during rush hour and accused of masturbating as he used a urinal.  *See Martinez*, 2005 WL 2143333, at *2.  That is *precisely the same experience* of the Plaintiffs here.  *See* Spitzer Decl. at Ex.15 at 123:20-124:5; Ex.16 at 111:5-19.

---

[4] Some of these arrests occurred after the arrests of Mr. Holden and Mr. Mejia.  While Respondents are correct that this evidence cannot provide notice of an unconstitutional pattern (Def. Br. at 9), it is still probative of the existence of a pattern.  *See Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) (recognizing that "post-event evidence is not only admissible for the purposes of proving the existence of a municipal defendant's policy…but it is highly probative) (citing *Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997).

Second, Defendants argue that Plaintiffs "cannot maintain a distinct claim for pattern and practice discrimination without having been certified as a class." Def. Br. at 8 (citing *Chin v. The Port Authority of New York and New Jersey*, 685 F. 3d 135, 150 (2d Cir. 2012)). This is wrong as a matter of law. *Chin* was a case brought under Title VII, a statute with specific statutory requirements, and did not involve constitutional claims. Defendants fail to cite any case barring an individual plaintiff from bringing a pattern and practice claim for unconstitutional conduct against a municipality and Plaintiffs are aware of none.

### III. The Port Authority Failed to Train, Supervise, or Discipline PAPD Officers Such that Unlawful Policing Tactics Were Permitted to Continue

Under well-settled law, the PAPD is liable under 42 U.S.C. § 1983 because it failed to supervise, discipline, and train its police officers to ensure lawful enforcement of the Department's Quality-of-Life Initiatives. *See City of Canton v. Harris*, 489 U.S. 378, 388 (1989) (failure to train); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 127-29 (2d Cir. 2004) (failure to supervise); *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (failure to discipline). Each failure independently establishes the PAPD's deliberate indifference to Plaintiffs' constitutional rights to privacy and freedom from unreasonable searches and seizures. *See City of Canton*, 489 U.S. at 388; *Vann*, 72 F.3d at 1049; *Fiacco v. City of Rensselaer*, 783 F.2d 319, 327 (2d Cir. 1986).

"A municipality may [] be deliberately indifferent, and thus liable, where 'city policy makers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights.'" *Rodriguez v. City of New York*, 16 Civ. 744 (KPF), 2018 WL 1276831, at *15 (S.D.N.Y. Mar. 5, 2018) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). Further, "[a] pattern of similar constitutional violations by untrained employees is 'necessary' to demonstrate deliberate indifference for purposes of failure

to train." *Connick*, 563 U.S. at 62 (quoting *Board. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 408 (1997)).

As to a failure to discipline, "'[a] municipality may be found to have a custom that causes a constitutional violation' if the city has been 'faced with a pattern of misconduct,' but 'does nothing, compelling the conclusion that [it] has acquiesced in or tacitly authorized its subordinates' unlawful actions.'" *Whitfield v. City of Newburgh*, 08 Civ. 8516 (RKE), 2015 WL 9275695, at *28 (S.D.N.Y. Dec. 17, 2015) (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 439 (2d Cir. 2009).

> a.  *Despite Being On Notice That PAPD Plainclothes Officers Conduct False Public Lewdness Arrests in Men's Restrooms, PAPD Does Not Train Its Officers on Protecting The Rights of Patrons*

Defendants assert that Plaintiffs failed to make out a failure to train claim for lack of evidence that plainclothes officers require different training than uniformed officers and because the PAPD provides an anti-bias policing training. *See* Def. Br. at 10-11. This argument has no merit. As set forth above, PAPD was on notice that its plainclothes officers were arresting men without probable cause in the men's restrooms. Nevertheless, there is no evidence that PAPD trained its plainclothes officers to discontinue this unlawful conduct. Instead, it is undisputed that plainclothes officers did not receive instruction on how to constitutionally enforce the public lewdness law. *See* Spitzer Decl. at Ex.9 at 72:1-12; *see e.g.*, Ex.4 at 35:9-36:16, 85:25-86:4; Ex.3 at 26:9-11, 119:20-120:3; Ex.26 at 70:13-18, 82:4-24, 201:7-25; Ex.27 at 59:3-60:23; Ex.28 at 55:16-56:5; Ex.29 at 68:3-18; Ex.30 at 28:21-29:3.

Even more strikingly, the PAPD failed to instruct its officers how to avoid profiling men perceived to be gay or bisexual. The PAPD's training is wholly inadequate both in length and substance. Taking up a mere three slides of the 63-slide profiling presentation, it uses terms that

are not only outdated ("transvestite," and "transsexual"), but also offensive to the LGBTQ community ("transgendered"). *See id.* at Ex.11 at ¶26. Nor is being gay or transgender "an alternative lifestyle," a phrase used to introduce the section on how to interact with LGBTQ communities. This phrase perpetuates the notion that being gay or nonconforming is a choice and not normal. *Id.* at ¶25. As explained in detail by Plaintiffs' expert, this training is not only wholly contrary to contemporary standards for cultural competency and humility when interacting with LGBTQ people, it actively "reinforces and replicates" a disregard for the very community the training is intended to protect. *Id.* at ¶¶25-26; *see City of Canton*, 489 U.S. at 388 (inadequacy of police training may serve as a basis for liability where "the failure to train amounts to deliberate indifference to the rights with whom the police come into contact").

Notably absent from the PAPD training is any discussion of prior problematic police actions targeting LGBTQ individuals or any evaluative measure to determine if PAPD officers retain any information about how to combat bias-based policing. In light of these numerous deficiencies, Dr. Pierceson opined that the training was "woefully inadequate." *See* Spitzer Decl. at Ex.31 at 272:22-23. Moreover, he testified in his deposition that "had PAPD been trained in the very history that I narrate in the report leaders may have known how problematic it is in their enforcement efforts to aggressively target men's rooms as opposed to other areas where heterosexuals might be having sex." *Id.* at 261:5-10.

Dr. Pierceson explained the historical trend of law enforcement officers instituting sweeps of men's restrooms to specifically target gay and gender non-conforming men. *See id.* at Ex.11 at ¶¶8, 14, 16. This trend is reflected in the demographics of those targeted by PAPD in 2014. As Dr. Pfaff noted in his report, those arrested for public lewdness in 2014 tended to be older and were less likely to be Black, as compared to the typical pool of individuals arrested by the PAPD

each year—indicating that PAPD officers were targeting a different group of individuals specifically in restrooms. *See id.* at Ex.12 at ¶¶27-28. Pfaff further noted that "[g]iven the history of police targeting gay men it is possible that this reflects an effort by the PAPD to profile those who they believe are gay." *Id.* at ¶29.

Nevertheless, when asked how PAPD trains officers to recognize and mediate their own internal biases, Officer Benoit multiple times flatly denied that any PAPD officer harbored any subconscious biases or that such biases would have any effect on their police work. *See id.* at Ex.30 at 54:7-12; 57:6-59:9. Other officers refused to acknowledge that they had ever assumed someone's sexual orientation, going so far as to claim they never assumed their own spouses' sexual orientation. *See id*. at Ex.32 at 207:22-209:10.

In short, the PAPD was put on clear notice from the *Martinez* decision that the practices of its plainclothes officers when enforcing the public lewdness law in men's restrooms were constitutionally infirm. Nevertheless, plainclothes officers were not provided training on this deficiency and the anti-bias training they received was actively harmful in its treatment of sexual orientation and gender identity. This is a textbook example of deliberate indifference standard. *See Wray v. City of New York*, 490 F.3d 189, 196-7 (2d Cir. 2007) (quoting *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992)) ("To establish 'deliberate indifference,' a plaintiff must show that [i] a policymaker knows 'to a moral certainty' that city employees will confront a particular situation; [ii] the situation either presents the employee with 'a difficult choice of the sort that training or supervision will make less difficult' or 'there is a history of employees mishandling the situation'; and [iii] 'the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.'").

  *b. Despite Being On Notice That PAPD Plainclothes Officers Conduct False Public Lewdness Arrests in Men's Restrooms, PAPD Supervisors Failed to Determine that Arrests Were Actually Supported by Probable Cause*

  The evidence demonstrates that PAPD supervisors failed to examine arrest reports and confirm that arrests were lawfully executed.  Defendants testified that supervising officers at PAPD review arrest paperwork to ensure that it is filled out but rarely—if ever—press the arresting officer on the factual circumstances surrounding an arrest.  *See* Spitzer Decl. at Ex.27 at 59:3-61:11; Ex.28 at 55:16-56:5; Ex.29 at 68:3-18, 149:18-21.  Officer testimony, in fact, revealed that supervisors do not see it as their job to question the officer reporting the arrest, even if the underlying facts might suggest that the alleged conduct could not possibly have occurred in public view.  *See id.* at Ex.10 at 132:22-133:23; Ex.19 at 217:15-24.  Arrest records produced in this litigation all contained nearly identical generic descriptions of events—making it impossible to determine whether individualized suspicion and circumstances showed probable cause to support an arrest.

  By failing to train its officers, supervise the officers making the false arrests, or correct officer behavior when it was brought to the attention of the Port Authority in 2005—the Port Authority sanctioned a pattern and practice of conduct that resulted in the false arrests of both Mr. Holden and Mr. Mejia and in the process violated their Fourth and Fourteenth Amendment rights.

**IV. Plaintiffs Properly State Claims of Fourteenth Amendment Violations Involving Discrimination/Selective Enforcement**

  *a. PAPD Defendants Are Not Entitled to Qualified Immunity*

  As early as 1996, the Supreme Court ruled that it violated the Equal Protection Clause to single out people for disfavored treatment on the basis of their sexual orientation.  *See Romer v. Evans*, 517 U.S. 620 (1996); *see also United States v. Windsor*, 570 U.S. 744 (2013) (striking down the Defense of Marriage Act under the Equal Protection Clause); *Obergefell v. Hodges*, 135 S. Ct.

2584 (2015).  This precedent—and *Windsor* which followed in 2013—establishes that sexual orientation is covered by the Equal Protection Clause and that it was established by 2014.[5]

Defendants rely solely on *Naumovski v. Norris*, 934 F.3d 200 (2d Cir. 2019) to support their position that sexual orientation is not cognizable under the Equal Protection Clause.  But Defendants' discussion of this case is misleading.  *Naumovski* involved alleged discriminatory conduct *in 2010. Id.* at 208-09.  Because that conduct predated *Obergefell* and *Windsor*, the court concluded the plaintiff could not bring a claim for sexual orientation discrimination in public employment under Section 1983.  The Court did not foreclose bringing such a claim today.[6]

> b.  *Plaintiffs Were Subject to Intentional Discrimination and Selective Enforcement*

Every day, thousands of people use the PABT restrooms.  Plaintiffs, like the overwhelming majority of these men, did not engage in lewd conduct, however, unlike the majority of these men, Plaintiffs were unjustly singled out.  The PAPD specifically targeted Plaintiffs, and other men PAPD suspected as being gay, and treated them differently than the thousands of other users of the PABT restrooms.  This disparate treatment is evidence of discrimination and selective enforcement.

Mr. Holden and Mr. Mejia never masturbated in the men's restrooms at the PABT, as evidenced by dismissal of the charges against Mr. Holden and Mr. Mejia's acquittal.  *See* Spitzer

---

[5] The Supreme Court's recent decision in *Bostock v. Clatyon Cty.*, No. 17-1618, 2020 WL 3146686 (U.S. June 15, 2020), while postdating the conduct at issue in this case, establishes once and for all that "it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual on the basis of sex."

[6] The only other case cited by Defendants is an even earlier district court case.  Def. Br. at 11-12 (citing *Flaherty v. Massapequa Pub. Sch.*, 752 F. Supp. 2d 286 (E.D.N.Y. 2010).

Decl. at Ex.15 at 41:11-42:2; Ex.33 at 126:3-7.  Defendants, moreover, tacitly acknowledge in their statement of facts that neither Plaintiff was engaged in public masturbation.  Thus, to explain the actions of the PAPD officers, we must accept that either the PAPD was engaging in random arrests of individuals in the restroom without any probable cause, or they were deliberately targeting men with characteristics like the Plaintiffs in this case for an improper reason.

But Plaintiffs' arrests were not random—these men were deliberately targeted because of their sexual orientation or gender identity.  We know this for several reasons.  First, several other gay men, or gender non-conforming men came forward to discuss their experiences after being arrested in the PABT men's restrooms.  Yet, because of the sensitive nature of this litigation, these men did not want to enter their names into the record.

Second, Mr. Holden testified that he heard PAPD officers joke about his arresting officer, Officer Opromalla, as being the "gay whisperer."  *See id.* at Ex.15 at 156:2-15.  That fact is neither speculation nor hearsay—it is sworn testimony and relevant evidence in this case.  It is further evidence that PAPD officers had knowledge that the men they were targeting were part of a distinct and protected group.  While the Defendants have attempted to describe the term as a joke, or an "inartful turn of phrase," it cannot mask what was really happening.  The comment occurred during an unlawful arrest—as both Plaintiffs were cleared of any wrongdoing and there has never been a clear statement as to what probable cause the officers had to detain them.  Furthermore, this comment was not an isolated incident uttered by someone who was not a decision maker as in *Howard v. City of New York*, 602 F. App'x 545, 547 (2d Cir. 2015).  Here, the comment was made by another PAPD officer who has the authority to make similar arrests, and importantly, the comment was about the actual decision maker who arrested Mr. Holden.  Ultimately, the very

15

existence of the "gay whisperer" comment presents a material fact in dispute as PAPD's officers claim to have never used such a term.  It is a question of credibility and it must be heard by a jury.

Third, it is a material question of fact reserved for trial whether PAPD assumed that plaintiffs were gay or gender non-conforming solely based on their appearance.  Both Plaintiffs assert that they present themselves in a manner that does not conform to the heterosexist norms of how men are expected to dress in public.  For example, Mr. Holden was wearing fitted clothing, jewelry, and was carrying a designer duffle bag.  *See* Spitzer Decl. at Ex.15 at 170:13-22. Likewise, Mr. Mejia was wearing a sleeveless basketball jersey, jewelry, and carrying a burgundy messenger bag.  *See id.* at Ex.16 at 26:20-32:15, 47:8-14.

While Defendants present Plaintiffs' arrests as isolated events of two men that simply happened to be gay or non-conforming, this is not so.  This factual presentation obscures the long and disturbing history of law enforcement officers targeting public restrooms to arrest and prosecute gay and non-conforming men.  *See id.* at Ex.11 at ¶¶8,13.  The PAPD employs precisely the same tactics historically used by officers to draw out and target gay, bisexual or gender non-conforming men: pretending to be using urinals next to the profiled target, sometimes for extended periods of time, and making eye contact or facial expressions to get the profiled target to respond in some way.  *Id.* at ¶¶17, 19, 29; Ex.15 at 135:25-136:9; Ex.16. at 126:21-127:5.  Consistent with these historical practices, the public lewdness arrests carried out by the PAPD targeted the men's restrooms—not other areas where lewdness or exposure occurred.  *See id.* at Ex.11 at ¶20.  Not surprisingly, it is precisely in men's only spaces where the drawing out of men who may be sexually attracted to other men is likely to occur through the questionable tactics employed by PAPD officers.  *Id.* at ¶23.

**V.     All Fourth Amendment Claims Against PAPD Officers Should Stand.**

    *a.  PAPD Officers Failed to Supervise and Prevent Fourth and Fourteenth Amendment Violations.*

As discussed above, the PAPD's pattern and practices related to public lewdness arrests explicitly violates Plaintiffs' constitutionally protected rights under both the Fourth Amendment and Fourteenth Amendments.  As such, liability to all of the supervising officers should stand because, in violation of probable cause requirements, they failed to: (1) ensure that the arresting officers had the necessary probable cause to arrest both plaintiffs and (2) supervise their activities in the PAPD restrooms.  Further, the PAPD failed to train, supervise, or discipline its officers adequately to prevent these violations.  Supervising officers did not meaningfully oversee police officers' actions on Port Authority property, which facilitates the officers' unlawful conduct by promulgating unreasonable rules and abdicating its legal obligation to patrol Port Authority transportation facilities.

Notably, Plaintiffs' deposition testimony highlights the unlawful policing tactics occurring in PABT restrooms and none of these supervising officers did anything to prevent it.  *See* Spitzer Decl. at Ex.2 at 101:12-102:2; Ex.26 at 84:24-85:4, 85:18-86:3; Ex.10 at 46:23-49:17.  Arrest statistics reveal that arrests for public lewdness during the relevant time were inflated and that PAPD officers were rewarded for making arrests—evidenced by internal PAPD memorandum congratulating officers for their arrest in restrooms.  Both of these factors put PAPD's supervising officers on notice.  *See, e.g.*, Second Amended Class Action Compl. ¶8 (Dkt. 117) ("SAC") (following his wrongful arrest, "Mr. Holden overheard P.A.P.D. officers congratulating the arresting officer and explicitly referring to him as 'the gay whisperer,' presumably because of the arresting officer's pattern and practice of arresting men that he perceived as gay or bisexual, and/or gender non-conforming, and/or as a man who has sex with men.").

Further, the 2014 Quality-of-Life initiative does present an official policy[7] and evidence furnished by Plaintiffs suggests that its implementation reinforced unconstitutional policing at the PABT.[8]  All elements of the 2014 Initiative reflect historical patterns of discriminatory policing against men perceived to be gay or bisexual, and/or gender non-conforming, and/or men who have sex with men.  Key individuals at PAPD, including Captain Fitzpatrick, include public lewdness in their definition of "Quality-of-Life" crimes.  In addition, Officer Opromalla stated that he was directed to make lewdness arrests in the men's restrooms by Captain Fitzpatrick.[9]  Within PAPD, the Commanding Officer is responsible for implementing official policies and supervising the entire command, as well as tactical and strategic decision-making for police efforts.  Furthermore, the deposition testimony of Officer Opromalla revealed Captain Fitzpatrick to be one of the individuals who instructed officers to make the arrests at issue in this case.[10]  Thus, Captain John Fitzpatrick remains liable.

Finally, these claims are not time barred because the Court has already been briefed on this debate and allowed Plaintiffs to amend their Complaint to include officers identified after the First

---

[7] *See* Spitzer Decl. at Ex.1; Ex.32 at 66-68.

[8] Officer Montero admitted that women's rooms are seldom patrolled and that lewd arrests have occurred in parking areas.  *See* Spitzer Decl. at Ex.32 at 66:13-68:4; Ex.12 at ¶32. "The central issue here is that while nearly 100 PAPD officers made at least 1 arrest in 2014, just 5 officers—Kehoe, Opromalla [sic], Seetaram, Tone, and Trubia (KOSTT)—made 70% of all public lewdness arrests (42 out of 60), despite making only 19% of arrests in total (85 out of 448), and only 11% of all non-lewdness arrests (43 out of 388).  All told, just slightly less than half of all arrests [ ] were for public lewdness (49%), with Opromalla's 73% the most extreme."

[9] *See* Spitzer Decl. at Ex.4 at 85:5-19. "Captain Fitzpatrick. He, he had explained that this [public lewdness] was an ongoing condition and that he wanted us to continue to enforce the laws specifically regarding this condition."

[10] *Id.*

Complaint was filed.  *See* Dkt. 1; Dkt. 117.  Federal courts have consistently granted motions to amend where, as here, "it appears that new facts and allegations were developed during discovery, are closely related to the original claim, and are foreshadowed in earlier pleadings."  *Bridgeport Music, Inc. v. Universal Music Grp., Inc.*, 248 F.R.D. 408, 415 (S.D.N.Y. 2008) (internal citations omitted); *see also Soroof Trading Dev. Co. v. GE Microgen, Inc.*, 283 F.R.D. 142, 149 (S.D.N.Y. 2012) (explaining that additional facts in the proposed second amended complaint that plaintiff did not know and could not have reasonably known before the deadline for amendments demonstrated good cause for failure to meet the deadline).  Indeed, "[w]hether the new claim arises out of the same transaction as the claims in the original pleading [is] central to the determination" of undue prejudice.  *A.V.E.L.A., Inc. v. Estate of Monroe*, 34 F. Supp. 3d 311, 317 (S.D.N.Y. 2014).

Despite delays, courts consistently grant motions to amend where the added claims and parties are sufficiently related to the underlying claims.  *See Miteva v. Third Point Management Company, L.L.C.*, 219 F.R.D. 64, 65 (S.D.N.Y. 2003) (party granted leave to amend complaint where the discovery deadline was set to expire within one week because the new party "was described as so integrally related to [the defendant] and the events underlying the [party's] original claims"); *see supra Bridgeport Music, Inc.*, 248 F.R.D. at 415 (S.D.N.Y. 2008) (judicial efficiency weighs in favor of adding new defendants where the claims are "identical to those against the other defendants.").

## VI.    Invasion of Privacy & Entrapment

### a.  *Plaintiffs have a Reasonable Expectation of Privacy in Public Restrooms*

While the topic has not been explicitly clarified by the Supreme Court of the United States, Plaintiffs have a reasonable expectation of privacy in public restrooms under the Fourth Amendment.  This expectation of privacy derives from Plaintiffs' liberty interests in self-

expression, bodily integrity, and privacy in protecting those choices from being policed as well as in using urinals shielded by privacy dividers outside of government view. Several cases indicate that using a public restroom implies a certain amount of privacy from other individuals who may be present due to the nature of being in a public restroom. *See United States v. Delaney,* 52 F. 3d 182, 188 (8th Cir. 1995) (recognizing that the "occupant of a toilet stall in a public rest room may have a reasonable expectation of privacy."); *Smayda v. United States*, 352 F.2d 251, 257 (9th Cir. 1965) (noting that "every person who enters an enclosed stall in a public toilet is entitled to believe that, while there, he will have at least the modicum of privacy that its design affords."); *Trujillo v. City of Ontario*, 428 F. Supp. 2d 1094, 1104 (C.D. Cal. 2006) (holding that those using a locker room had a reasonable expectation of privacy from covert video surveillance while in the locker room); *Kroehler v. Scott*¸ 391 F. Supp. 1114, 1118 (E.D. Pa. 1975) (finding it objectively reasonable that "[m]ost persons using public restrooms have no reason to suspect that a hidden agent of the state will observe them," when conducting the reasonable expectation of privacy test) (internal citation omitted).

For example, in *Kroehler*, the court mentioned that since "the expectation of privacy is generated by the nature of the activity involved, rather than by the precise physical characteristics of the stall, whether or not the stalls had doors is not a crucially material inquiry." *Id.* at 1118, n.4. There, plaintiffs sought an injunction against the City of Lancaster, Pennsylvania to prohibit police officers from using holes drilled into the ceiling overlooking restroom stalls with and without doors in order to observe potential criminal activity. *Id.* at 1115-16. The police department instituted the surveillance program following complaints of homosexual and drug-related activity in various public men's restrooms. The Court determined that the Defendants' tactics did not comport with the Constitution because the searches were conducted broadly and "swept into the gaze of the

government not only those involved in criminal activity, but also countless innocent and unknowing persons who reasonably expected and were properly entitled to a modicum of privacy." *Id.* at 1119.  In its analysis, the Court favorably cited *People v. Trigg*, which stated that it is objectively reasonable for people to "have no reason to suspect that a hidden agent of the state will observe them."  *Id.* at 1118 (quoting *People v. Trigg*, 506 P.2d 232, 236 (1973)).  Moreover, the Court stated that the practice failed to meet the probable cause standard required by the Fourth Amendment, and that "[s]uch a practice cannot be condoned on the sole ground that the defendants understandably expected to find evidence of criminal activity on the part of certain individuals while simultaneously subjecting all individuals using the facilities to a general 'search.'" *Id.* at 1119.

Here, similar to *Kroehler*, Plaintiffs were not in an open space.  The urinals they used had privacy shields designed to provide them privacy.  Therefore, even though Plaintiffs may not have an explicit right to privacy under the Fourth Amendment, there is an implication of privacy due to the nature of using a public restroom and the specific set-up of the urinals with privacy shields.

>    b. *Plaintiffs Never Asserted a Claim for "Entrapment" and Defendants Purposefully Misconstrue Plaintiffs' Claims*

Defendants erroneously claim that Plaintiffs included a claim for entrapment in the SAC.  *See* Def. Br. at 29.  Plaintiffs have never asserted such a claim and notably do not even use the word "entrapment" in the referenced paragraphs of the SAC.  Defendants' assertion that Plaintiffs created a new cause of action in the SAC is a complete misreading of Plaintiffs' claims and moot argument.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court deny Defendants' motion for partial summary judgment in light of the various material facts that remain in dispute.

June 30, 2020

Respectfully Submitted,

**WINSTON & STRAWN LLP**

By: */s/ Thomas Patrick Lane*
Michael S. Elkin
Thomas Patrick Lane
Seth E. Spitzer
Matthew A. Stark
200 Park Avenue
New York, NY 10166
(212) 294-6700

Daniel R. McNeely (*pro hac vice*)
35 W. Wacker Dr.
Chicago, IL 60601
312-558-5600

**THE LEGAL AID SOCIETY**

By: */s/ Marlen Bodden*
Marlen Bodden
199 Water Street, 6th Floor
New York, NY 10038
(212) 577-3265

*Attorneys for Plaintiffs*

## <u>CERTIFICATION</u>

In accordance with the Individual Practices of Judge John G. Koeltl, I certify that the foregoing brief contains 6,816 words and complies with the formatting rules of Rule 2.D.

<u>*/s/ Thomas Patrick Lane*</u>
Thomas Patrick Lane