**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

CORNELL HOLDEN and MIGUEL MEJIA, on :
behalf of themselves and all others similarly :
situated, :
                            Plaintiffs, :
     :
     -against- :
     :
     :
THE PORT AUTHORITY OF NEW YORK AND : **1:17-cv-02192-JGK-RWL**
NEW JERSEY; THE PORT AUTHORITY :
POLICE DEPARTMENT; and MICHAEL :
OPROMALLA, SHAUN KEHOE, JOHN TONE, :
JORDAN ESPOSITO, MICHAEL DEMARTINO, :
RICHARD AYLMER, PAUL MILLER, JOHN :
FITZPATRICK, PAUL O'DELL and OFFICERS :
JOHN DOE 1-99, sued in their individual capacities :
and official capacities as officers of the Port :
Authority Police Department, :
     :
                           Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

**PLAINTIFFS' RESPONSES TO DEFENDANTS' LOCAL RULE 56.1 STATEMENTS OF**
**UNDISPUTED FACTS IN OPPOSITION TO DEFENDANTS'**
**MOTION FOR PARTIAL SUMMARY JUDGMENT**

Pursuant to Rule 56.1 of the Local Civil Rules of this Court, Plaintiffs submit the following responses to Defendants the Port Authority of New York and New Jersey, the Port Authority Police Department ("PAPD"), Michael Opromalla, Shaun Kehoe, John Tone, Jordan Esposito, Michael DeMartino, Richard Aylmer, Paul Miller, John Fitzpatrick and Paul O'Dell (collectively, "Defendants") Local Civil Rule 56.1 Statement of Undisputed Facts ("Defendants' Statement"). In addition, in accordance with Local Civil Rule 56.1(b), Plaintiffs include a Statement of Additional Material Facts as to which Plaintiffs contend there exists genuine issues to be resolved.

### Plaintiffs' General Objection to Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts

Plaintiffs object to the Port Authority's attempts to avoid the existence of disputes of material fact by asserting that the testimony of a particular witness is a "material fact" in the underlying dispute.  For purposes of this motion, Defendants cannot rely on the testimony of a particular witness when it is rebutted by the testimony of another witness, as such credibility determinations are to be left to a jury.  *Cf. Anderson* v. *Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").  Plaintiffs object to the Port Authority's mischaracterization of deponent's testimony.

**Responses to Defendants'**
**Statement of Facts Pursuant to Local Rule 56.1**

Subject to and without waiver of Plaintiffs' General Objections, Plaintiffs respond to the

specific statements in the City Statement as follows:

1.    The Port Authority of New York and New Jersey (the Port Authority) is a bi-state
      government agency created by compact between the States of New York and New Jersey
      for the development of the port district. NY Unconsol. Laws § 6401 *et seq*.

      **RESPONSE:** Undisputed.

2.    The Port Authority "shall be regarded as the municipal corporate instrumentality of the two
      states for the purposed of developing the port..." NY Unconsol. Law § 6459.

      **RESPONSE:** Undisputed.

3.    The Port Authority has a Public Safety Department (PAPD) that employs police officers
      with statewide jurisdiction in New York. N.Y. Unconsol. Laws § 6401 *et seq*.

      **RESPONSE:** Undisputed.

4.    The Port Authority owns and operates a Bus Terminal (PABT) at 625 Eight Avenue in
      New York, New York which is patrolled by Port Authority police. N.Y. Unconsol. Laws §
      6401 *et seq*.

      **RESPONSE:** Undisputed

5.    The Port Authority has its own police academy where officers are trained in the penal laws
      of New York and New Jersey as well as in sensitivity and diversity policing, including the
      LGBTQ community. (Scott Benoit deposition transcript, ("tr") pp. 43, 53, 72, 81, 105-107)
      (Exhibit ("Ex") A to the Declaration of Thomas Brophy dated May 29, 2020 ("Brophy
      Decl.") (ECF. No. 228-1).

      **RESPONSE:** Disputed to the extent that while there was training with regard to sensitivity

      and diversity policing, including the LGBTQ community, it is grossly inadequate.  For

      example, a PowerPoint slide used by Officer Scott Benoit in his diversity training for PAPD

      officers is entitled, "Policing People with Alternative Lifestyles"—an outdated term

      commonly used by opponents of LGBTQ rights.  (*See* Declaration of Seth E. Spitzer in

      Support of Plaintiffs' Motion Opposing Partial Summary Judgment ("Spitzer Decl.") at

3

Ex.34, Ex.11 at ¶26). The training uses other out-of-date terminology; including, using the term homosexuality instead of sexual orientation, referring to gender-non-conforming individuals as "transvestites," and using the term "transsexuals" instead of transgendered. (*Id*. at Ex.11 at ¶26). Upon review of these materials, Plaintiffs' expert, Dr. Jason Pierceson, concluded that the PAPD training regarding the LGBTQ community is "deeply problematic. . . and reflects a distinct lack of concern with issues of sexual orientation and gender diversity within the PAPD." (*Id.* at ¶28). Moreover, deposition testimony from Officer Scott Benoit, who conducts the training at the PAPD Police Academy, reveals his belief that neither the LGBTQ community is at risk for biased-based policing, nor do recruited officers have implicit biases. (*See id.* at Ex. 30 at 55:5-59:9). Undisputed that the Port Authority Police Academy has minimal sensitivity and diversity training with regard to the LGBTQ community.

6. Public Lewdness is a misdemeanor crime under N.Y. Penal Law § 245.00.

   **RESPONSE:** Undisputed.

7. Exposure of a Person is a crime under N.Y. Penal Law § 245.0.

   **RESPONSE:** Undisputed.

8. Masturbation in a public place is a crime under N.Y. Penal Law § 245.00 and 245.01. (John Fitzpatrick deposition tr. p.86) (Ex. B to Brophy Decl.) (ECF. No. 228-2).

   **RESPONSE**: Undisputed.

9. The Port Authority did not have arrest quotas in 2014. (Michael Opromalla tr. pp. 124,292, (Ex C to Brophy Decl.); Shaun Kehoe tr. pp. 58-60) (Ex D to Brophy Decl.) (ECF. No. 228-3).

   **RESPONSE:** Disputed. In May 2014, Michael A. Fedorko, Port Authority's Head of Public Safety sent an email, in which under "PABT" the email summarized "Achievements/ Initiatives" and listed a number of recent arrests including, "Day tour team

utilized P.O. Opromalla on 4/28/14 and 4/29/14 to apprehend four (4) different male subjects from the men's room on the Suburban Concourse. These subjects were observed performing a lewd act in a public place.  Subjects subsequently charged with Public Lewdness." (*See* Spitzer Decl. at Ex.1).

10. Promotion to the rank of sergeant in PAPD is based on an examination. (Opromalla tr. p. 51) (Ex. C to Brophy Decl.) (ECF. 228-3).

**RESPONSE:** Undisputed that an examination is given to officers seeking promotion. Plaintiffs lack sufficient information to know all of the remaining factors influencing the decision to promote any officer and therefore dispute this statement.

11. Quality-of-life crimes are low levels offenses or violations such as: open container, spitting, loud music, public intoxication. (Michael Demartino tr. p. 77) (Ex E to Brophy Decl.) (ECF No. 228-6), (Opromalla tr. p. 127) (Ex C to Brophy Decl.) (ECF No. 228-3), (Fitzpatrick tr. P. 174-176) (Ex B to Brophy Decl) (ECF No. 228-2), (John Tone deposition tr. p. 106) (Ex F to Brophy Decl.) (ECF No. 228-7).

**RESPONSE:** Disputed to the extent that Quality-of-Life crimes do not encapsulate public lewdness.  Officer Paul Miller testified that "lewd behavior. . . in a transportation center, is a quality-of-life [issue], yes."  (*See* Spitzer Decl. at Ex.10 at 145:22-146:1).  Captain Fitzpatrick also testified that public lewdness or exposure in the restrooms "absolutely" qualifies as a Quality-of-Life offense.  (*See id.* at Ex.9 at 63:5-8).  Officer Opromalla recounted in his testimony that Captain Fitzpatrick discussed the problem of public lewdness in the bathroom with Officer Opromalla and instructed him and other officers "to enforce the laws specifically regarding this condition."  (*See id.* at Ex.4 at 84:12-85:19). Other PAPD officers did not know or flatly denied that public lewdness was a Quality-of-Life crime, which at the very least underscore the lack of training and understanding as to how crimes are categorized or the goals of specific PAPA policies.  (*See id.* at Ex.2 at

94:15-17; Ex.26 at 78:4-21).  Undisputed that Quality-of-Life crimes also include open

container violations, spitting, loud music, and public intoxication.

12.     Public Lewdness is a misdemeanor and is not considered a quality-of-life crime.
        (Fitzpatrick tr. p. 61) (Ex B to Brophy Decl.) (ECF No. 228-2), (Tone tr. p104) (Ex F to
        Brophy Decl.) (ECF. No. 228-7), (Paul Miller deposition tr. p.144) (Ex G to Brophy Decl.))
        (ECF. No 228-8).

        **RESPONSE:** Disputed to the extent that public lewdness is not considered a Quality-of-

        Life crime.  As explained above, there is conflicting testimony regarding whether or not

        public lewdness is a Quality-of-Life crime and this remains a material fact in dispute.

        Undisputed that quality-of-life crimes also include open container violations, spitting, loud

        music, and public intoxication.

13.     The men's bathrooms at the PABT were patrolled by police as part of the patrol of the
        Tactical Patrol Unit (TPU), which consisted of police officers in plain clothes. (DeMartino
        tr. p. 36, 69) (Ex E to Brophy Decl.) (ECF No. 228-6), (Kehoe tr. p. 61) (Ex D to Brophy
        Decl.) (ECF No. 228-5), (Opromalla tr. p. 284) (Ex C to Brophy Decl.)) (ECF No. 228-4).

        **RESPONSE:** Undisputed.

14.     Crimes observed in the men's bathrooms at the PABT in 2014 included drugs, public
        fighting and public lewdness. (Kehoe tr. p.72) (Ex D to Brophy Decl.) (ECF No. 228-5),
        (PA Statistics Bates 986-987) (Ex H to Brophy Decl.) (ECF No. 228-9).

        **RESPONSE:** Undisputed that the PAPD *claims* to have observed these crimes in the

        men's bathrooms at the PABT.  Plaintiffs lack sufficient information to confirm the

        veracity of this statement.  Plaintiffs deny that they engaged in any acts of public lewdness

        as the PAPD has also claimed and Plaintiffs charges were dismissed and acquitted.

15.     In 2014, there were arrests for public lewdness at locations in the PABT other than men's
        bathrooms, but lewd behavior occurred more often in the bathrooms. (Tone tr pp. 60-61,
        224) (Ex. F to Brophy Decl.) (ECF No. 228-7), (Miller tr. p. 51) (Ex. G to Miller Decl.)
        (ECF No. 228-8).

        **RESPONSE:** Undisputed that more arrests for alleged lewd behavior were made in the

        men's bathroom.  Plaintiffs lack sufficient information to confirm that more lewd behavior

actually occurred in the men's bathroom and dispute to the extent.   As stated above, Plaintiffs are only actually aware of false arrests by the PAPD for public lewdness.

16.   In 2014, there were 732 reported crimes at the PABT of which 69 were arrests in the men's bathroom for Public Lewdness. (PA Bus Terminal Crime Statistics, Bates 10496-10498) (Ex I to Brophy Decl.) (ECF. No. 228-10).

**RESPONSE:** Disputed to the extent that there were 660 reported crimes at the PABT in 2014 according to Exhibit I of the Brophy Declaration.   Undisputed that there were 69 arrests in the men's bathroom for public lewdness.   Disputed that any of the arrests for public lewdness were in response to a report by anyone other than PABT employees.   (*See* Spitzer Decl. at Ex.26 at 69:8-12).

17.   In 2014, there were seven arrests for Public Lewdness in men's bathrooms at the PABT before plaintiff Cornell Holden's arrest on May 12, 2014, but none of these individuals has been identified as a witness who is gay /bisexual, gender non- conforming, or a man who has sex with men, and who was acquitted of all charges. (PAPD Statistics Bates 986-987) (Ex. H to Brophy Decl.) (ECF No. 228-9), (Plaintiffs Rule 26 witness list) (Ex J to Brophy Decl.) (ECF No. 228-11).

**RESPONSE:** Disputed to the extent that Cornell Holden is the only individual identified as a witness who is gay/bisexual, gender non-conforming, or a man who has sex with men, and who was acquitted of all Public Lewdness charges.   Further disputed as the Mr. Holden was not acquitted of his charges, his charges were dismissed.   (*See* Spitzer Decl. at Ex.15 at 41:11-18).   During the course of this litigation, Plaintiffs interviewed several potential plaintiffs that also identified as gay/bisexual, gender non-conforming, or a man who has sex with men. (*See id.* at Ex.21, Ex.22, Ex.23, Ex.24, Ex.25; *see also* Ex.14).

18.   In 2014, there were 32 arrests for Public Lewdness in the men's bathroom at the PABT before Plaintiff Miguel Mejia's arrest on July 9 2020, but other than plaintiff Cornell Holden, none of these individuals has been identified as a witness who is gay/bisexual, gender non-conforming, or a man who has sex with men, and who was acquitted of all charges. (PAPD Statistics, Bates 986-987) (Ex I to Brophy Dec.) (ECF No. 228-9), (Plaintiffs Rule 26 witness list) (Ex J to Brophy Decl.) (ECF No. 228-11).

**RESPONSE:** Disputed to the extent that Miguel Mejia's arrest was on July 9, 2020, record evidence contradicts this statement, his arrest was on July 9, 2014. (See Spitzer Decl. at Ex.18). Further disputed to the extent that Cornell Holden is the only individual identified as a witness who is gay/ gay /bisexual, gender non-conforming, or a man who has sex with men, and who was acquitted of all Public Lewdness charges. (*See id.* at Ex.21-Ex.25; *see also* Ex. 14).

19.  In 2013, there were 749 arrests, including 9 arrests for public lewdness, which are not identified by location of arrest, but none of those arrestees has been identified as a witness who is gay, bisexual, gender non-conforming or a man who has sex with men and who was acquitted of all charges. (PAPD statistics Bates no 008865-8872) (Ex K to Brophy Decl.) (ECF. No. 228-12), (Plaintiffs' Rule 26 witness list) (Ex J to Brophy Decl.) (ECF No. 228-11).

    **RESPONSE:** Disputed to the extent that none of the arrestees have been identified as a witness who is gay/ gay /bisexual, gender non- conforming, or a man who has sex with men, and who was acquitted of all Public Lewdness charges. (*See* Spitzer Decl. at Ex.14).

20.  The only person plaintiffs have identified as someone who was previously falsely arrested for public lewdness is Alejandro Martinez, who was arrested on February 1, 2000 at the World Trade Center men's bathroom as part of a sweep to make quotas. He was acquitted of the charges and brought a lawsuit for false arrest and malicious prosecution that resulted in a verdict in his favor. See *Martinez v. The Port Authority* of *New York and New Jersey* No. 01 cv 721, 2005 WL 214333 (S.D.N.Y. Sept 2, 2005) (Second Amended Complaint ¶¶ 71-78).

    **RESPONSE**: Disputed to the extent that Defendants assert that the "**only person** plaintiffs have identified as someone who was previously falsely arrest for public lewdness." (emphasis added). (*See* Spitzer Decl. at Ex.21-Ex.25; *see also* Ex. 14).

## HOLDEN'S ARREST

21.  On Monday, May 12, 2014, Cornell Holden was arrested at the PABT between 9:05-9:25 am. (Criminal Complaint Report, Holden Arrest file Bates 1-49) (Ex L to Brophy Decl.) (ECF No. at 228-13).

    **RESPONSE**: Undisputed.

22.  Holden was arrested shortly after he exited the men's bathroom on the second floor of the PABT by Opromalla, and charged with Public Lewdness under N.Y. Penal Law 245.0 and Exposure of a Person under N.Y. Penal Law 245.01. (Holden arrest file, Bates Nos. 1-49) (Ex L to Brophy Decl.) (ECF No. at 228-13), (Cornell Holden deposition tr. pp. 135,150) (Ex M to Brophy Decl.) (ECF No. 228-14).

**RESPONSE:** Undisputed.

23.  Opromalla was working in plain clothes in the in the TPU at the time of Holden's arrest. (Opromalla tr. p. 284) (Ex C to Brophy Decl.) (ECF No. 228-3), (Holden arrest file, Bates No. 17) (Ex L to Brophy Decl.) (ECF No. at 228-13).

**RESPONSE:** Undisputed.

24.  Holden is a black male, age 27, height of 5'11," weighing about 170 pounds, who resided in the Bronx and was employed at Panera Bread at the time of his arrest. (Holden Arrest file Bates No. 9) (Ex L to Brophy Decl.) (ECF No. at 228-13), (Holden tr. pp. 9,13,104) (Ex M to Brophy Decl.) (ECF No. 228-14).

**RESPONSE:** Disputed to the extent that at the time of the arrest, Mr. Holden weighed 140 pounds; as of 2018 he weighed 160 pounds. (*See* Spitzer Decl. at Ex.15 at103:13-18). Undisputed that he is 5'11", resided in the Bronx and was employed at Panera Bread at the time of his arrest.

25.  Holden testified that he was wearing fitted blue jeans, a red fitness shirt, black jacket, black high-top sneakers, a silver chain necklace, a silver name ring, earrings and a beaded bracelet. He was carrying a red duffle bag with a Fred Perry logo and was wearing headphones (Holden tr. pp. 98-106, 170) (Ex M to Brophy Decl.) (ECF No. 228-14).

**RESPONSE:** Disputed to the extent that Holden was wearing blue jeans. He was wearing jeans however he is "not sure what color they were." (*See* Spitzer Decl. at Ex.15 at 99:23-25).  Holden's earrings were silver hoops.  He was also not sure which color the Fred Perry bag was—he stated it could have been red or black. (*Id.* at 103:8-11).  The black jacket was thin and leather and was a zipper jacket. (*Id.* at 98:12-99:14).  Undisputed that he was wearing a silver chain necklace, a silver name ring, a beaded bracelet, and high-top sneakers.

26.     Holden did not use the PABT as part of his daily commute at the time of his arrest, but he had used the men's bathroom on the second floor about ten times previously that year. (Holden tr. pp. 81,117) (Ex M to Brophy Decl.) (ECF No. 228-14).

   **RESPONSE:** Undisputed.

27.     Holden identifies as a gay male. (Holden tr. p.73) (Ex M to Brophy Decl.) (ECF No. 228-14), (Ex C to Brophy Decl.) (ECF No. 228-3).

   **RESPONSE:** Undisputed.

28.     Holden used the only vacant urinal in the bathroom. There were dividers between the urinals, but Holden could not recall the height. (Holden tr. pp. 127-129) (Ex M to Brophy Decl.) (ECF No. 228-14).

   **RESPONSE:** Undisputed.

29.     Holden observed a bald Caucasian male wearing regular clothes, whom he later identified as Opromalla, at the urinal next to him. (Holden tr. pp. 135, 150) (Ex M to Brophy Decl) (ECF No. 228-14).

   **RESPONSE:** Undisputed.

30.     Holden observed that the bald Caucasian finished, stepped back, looked at him and then left. (Holden tr. p. 136) (Ex M to Brophy Decl.) (ECF No. 228-14).

   **RESPONSE:**  Disputed as to the fact that the bald Caucasian finished, stepped back, looked at him and then left.  Holden testified that he, Holden, had finished urinating when the bald Caucasian "stepped back and looked…looked past the divider at me" and then exited the bathroom.  (*See* Spitzer Decl. at Ex.15 at 136:5-9).

31.     Holden remained in the bathroom for some minutes after Opromalla left before he exited. (Holden tr. pp. 137-138) (Ex M to Brophy Decl) (ECF No. 228-14), (Opromalla tr. pp. 205-206) (Ex C to Brophy Decl.) (ECF No. at 228-3).

   **RESPONSE:** Disputed as to the fact that Mr. Holden remained in the bathroom following his use of the urinal due to a nosebleed.  Holden often gets nosebleeds around that time of the year due to his allergies.  When he finished using the urinal, he noticed he had blood on his hands. He then waited until a restroom stall was open so that he could grab some

tissues to stop the nosebleed and wash his hands.  He then exited the bathroom. (*See* Spitzer

Decl. at Ex.15 at 137:2-20).  Undisputed as to the fact that Holden did remain in the

bathroom for some minutes after Opromalla left before he exited.

32.   Officers approached Holden after he left the bathroom and told him that he was being
      arrested for performing a lewd act at the urinal. (Holden tr. pp. 145-146, 151-152) (Ex M
      to Brophy Decl.) (ECF No. 228-14).

      **RESPONSE:** Disputed.  Holden was on his way to the escalators when two plain clothes

      officers approached him, identified themselves and asked him if he "got the wrong

      impression about anybody in the bathroom" and "what happened in the bathroom."  (*See*

      Spitzer Decl. at Ex.15 at 143:15-144:22).   After Holden said "nothing happened," the

      officers continued to question him about what he was doing in the bathroom.  They then

      put him under arrest and did not tell him why he was under arrested until he asked.  (*Id.* at

      146:3-16).

33.   Opromalla didn't make the arrest in the bathroom because he considered it safer outside
      the bathroom where it was less crowded. (Opromalla tr. 207, 209, 211) (Ex C to Brophy
      Decl.) (ECF No. 228-3).

      **RESPONSE:** Disputed to the extent that Officer Opromalla waited fifteen to twenty

      minutes before arresting Mr. Holden. Further disputed, as both Officer Opromalla and

      Officer Kehoe arrested Mr. Holden outside of the bathroom.   Undisputed that Mr.

      Opromalla stated in his deposition that he thought that that it was "safer to exit before the

      approach."  (*See* Spitzer Decl. at Ex.4 at 213:6-10; 210:23-24).  Undisputed to the extent

      that Officer Opromalla arrested Mr. Holden outside of the bathroom.

34.   Holden was taken in handcuffs to the police desk on the first floor where he was
      fingerprinted, placed in a jail cell and then released at 12:45 pm with a desk appearance
      ticket for a court date on July 1, 2014. (Holden tr. pp. 148, 152-153) (Ex M to Brophy
      Decl.) (ECF No. 228-14).

**RESPONSE:** Disputed to the extent that Mr. Holden asked repeatedly why he was being taken into custody with minimal responses from the arresting officers. (*See* Spitzer Decl. at Ex.15 at 146:3-147:22). Then Officer Opromalla made an appearance at the police desk, positively identified Mr. Holden as the individual he said he saw commit the lewd act. (*See id.* at Ex.15 at 150:17-23). Mr. Holden asked Officer Opromalla what lewd act he committed to which Officer Opromalla stated that Mr. Holden was erect at the urinal. (*See id.* at Ex.15 at 151:7-11). Mr. Holden denied Officer Opromalla's accusation, and Officer Opromalla told Mr. Holden "you know what you did" before walking away. (*See id.* at Ex.15 at 151:15-18). Mr. Holden was also handcuffed to a bench in the jail cell. (*See id.* at Ex.15 at 152:23-24). While in the jail cell, Mr. Holden heard several officers discussing the situation, during which one officer referred to Officer Opromalla as "the gay whisperer." (*See id.* at Ex.15 at 156:11). Mr. Holden understood that as referring to Officer Opromalla's ability "to catch gay guys." (*See id.* at Ex.15 at 157:2-3). Undisputed as to the fact that Mr. Holden was released at 12:45 pm with a desk ticket for a court date on July 1, 2014.

35. Opromalla prepared the arrest paperwork including the Criminal Complaint (CCR), On-Line Booking Sheet, criminal case and affidavit. (Opromalla tr. pp. 186-201, 234, 237) (Ex C to Brophy Decl.) (ECF No. 228-3), (Holden arrest file, Bates Nos.1-49) (Ex L to Brophy Decl.) (ECF No. 228-13).

   **RESPONSE:** Undisputed.

36. The CCR prepared by Opromalla states in part 83: "observed the defendant in Post 3 public men's room expose his naked penis at the urinal and manipulate it in a back and forth motion in full public view." (Holden arrest file, CCR Bates No. 18 (Ex L to Brophy Decl.) (ECF No. 228-13).

**RESPONSE:** Disputed to the extent that Mr. Holden was not masturbating at the urinal, nor was he manipulating his penis in a back and forth motion in full public view. Undisputed that Officer Opromalla stated this in the CCR.

37.     Opromalla asked a senior officer for advice on the wording of the report. (Opromalla tr. p. 261) (Ex C to Brophy Decl.) (ECF No. 228-3).

      **RESPONSE:** Disputed, defendants mischaracterize Officer Opromalla's testimony. Officer Opromalla testified that he "*may* have asked an older officer at some point, you know, what's the best way to articulate this."  (emphasis added) (*See* Spitzer Decl. at Ex.4 at 260:24-261:2).  There is a great deal of conflicting testimony regarding where PAPD officers receive the scripted language that appears in all of their reports.  (*See id.* at Ex.32 at 183:4-11; Ex.19 at 259:5-11).

38.     While he was in the cell, Holden heard individuals jokingly refer to Opromalla as the "Gay Whisperer." (Holden tr. pp. 150-161) (Ex M to Brophy Decl.) (ECF No. 228-14).

      **RESPONSE:** Undisputed.

39.     Opromalla had never heard of himself referred to as the "Gay Whisperer" around the precinct and he didn't know what the term meant. (Opromalla tr. pp 272, 277) (Ex C to Brophy Decl.) (ECF No. 228-3).

      **RESPONSE:** Disputed. Mr. Holden heard Officer Opromalla referred to as the "Gay Whisperer."  (*See* Spitzer Decl. at Ex.15 at 150-161).

40.     Lt Paul O'Dell was not present at Holden's arrest, but signed CCR report for Holden's arrest on May 12 as the Tour Commander. (Holden arrest file Bates Nos. 1-49) (Ex L to Brophy Decl.) (ECF No. 228-13).

      **RESPONSE:** Undisputed.

41.     Sgt. Paul Miller was not present at Holden's arrest. He signed the Desk Appearance Ticket Investigation form, which indicated that the warrant check had been done and that Holden was a New York resident. As the desk officer, he would review and approve paperwork for accuracy. (Desk Appearance Ticket Investigation Bates 4), (Ex L to Brophy Decl.) (ECF No. 228-13), (Miller tr. pp. 139-140) (Ex G to Brophy Decl.) (ECF No. 228-8).

**RESPONSE:** Undisputed.

42.     Sgt. Michael DeMartino was not present at Holden's arrest, but issued the Desk Appearance Ticket. (Holden arrest file Bates No 3) (Ex L to Brophy Decl.) (ECF No. 228-13).

**RESPONSE:** Undisputed.

43.     Sgt. Jordan Esposito was not present at Holden's arrest. He signed the On-line Booking Sheet as part of his supervisory duties to review paper work to verify that probable cause was articulated. (Holden arrest file Bates No.15) (Ex L to Brophy Dec.) (ECF No. 228-13), (Jordan Esposito tr. p. 105) (Ex N to Brophy Decl.) (ECF No. 228-15).

**RESPONSE:** Undisputed to the extent that Sgt. Esposito verified that probable cause was articulated in the On-Line Booking Sheet, but disputed to the extent that Sgt. Esposito had personal knowledge as to whether there was probable cause for Mr. Holden's arrest.

44.     Holden never mentioned to the officers that he was gay. (Holden tr. p. 206) (Ex M to Brophy Decl.) (ECF No. 228-14).

**RESPONSE:** Disputed to the extent that he did not have to mention to the officers the fact that he was gay. Mr. Holden stated that he was arrested because "they thought, must have thought I was gay." (*See* Spitzer Decl. at Ex.15 at 170:2-4). Moreover, Mr. Holden heard the officers refer to Officer Opromalla as the "Gay Whisperer" and Mr. Holden stated that because of his fitted pants, leather jacket, Mohawk haircut, red fitness shirt, and high-top sneakers, "some people might consider that a little bit more out there of what other people would wear." (*See id.* at 170:16-22). Undisputed to the extent that Mr. Holden never specifically mentioned to the officers that he was gay.

45.     The arresting officer, Opromalla, did not make any references to Holden's sexuality during his arrest. (Holden tr. p. 207) (Ex M to Brophy Decl.) (ECF No. 228-14).

**RESPONSE:** Disputed due to the fact that he did not need to, and was known as the "gay whisperer" by fellow officers because of his ability to arrest gay men. (*See* Spitzer Decl.

at Ex.15 at 156:10-12).  Undisputed insofar as he did not literally mention Mr. Holden's

sexuality during the arrest.

46.   The charges against Holden were dismissed by the court on December 9, 2014. (Holden tr.
p. 181) (Ex M to Brophy Decl) (ECF No. 228-14).

**RESPONSE:** Undisputed.

47.   Opromalla was told by Captain Fitzpatrick, the Commanding Officer at the PABT to
enforce the public lewdness laws, but Fitzpatrick never mentioned gay men, and never said
to target gay men. (Opromalla tr. pp.149-152,161) (Ex C to Brophy Decl.) (ECF. No. 228-
3).

**RESPONSE:** Undisputed.

48.   Sgt. Miller advised Opromalla to enforce the lewdness law and that there was public
lewdness in the men's bathrooms, but he did not mention gay men in connection with
lewdness. (Opromalla tr. 100, 134, 170-173) (Ex C to Brophy Decl.) (ECF. No. 228-3).

**RESPONSE:** Disputed to the extent that this was all Sgt. Miller advised Officer Opromalla

about regarding patrolling the men's bathrooms. Officer Opromalla testified that Sgt.

Miller also informed him that, "if you stand at the urinal long enough, you may see

somebody engage in this type of [lewd] behavior." (*See* Spitzer Decl. at Ex.4 at 171:12-

14).

49.   Opromalla attended the Port Authority Police Academy in 2013 where he was trained in
the N.Y. & N.J. Penal Law, sensitivity policing, behavioral science and dealing with
individuals who have mental issues, medical issues. He graduated in January 2014 and was
assigned to the PABT, where he received in-service training. (Opromalla tr. pp 30-34,43,
48, 54) (Ex C to Brophy Decl.) (ECF No. 228-3).

**RESPONSE:** Disputed to the extent that the sensitivity policing training he received was

grossly inadequate.  As discussed above, the training programs implemented at the PAPD

are significantly deficient and do not provide PAPD officers like Officer Opromalla the

proper terminology or resources to understand important distinctions in the LGBTQ

community or how to understand and address implicit bias.  Otherwise, undisputed.

50.     Opromalla has never been disciplined. (Opromalla tr. p. 292) (Ex C to Brophy Decl.) (ECF No. 228-3).

**RESPONSE:** Disputed to the extent that while Officer Opromalla was not actually disciplined, PAPD leadership was considering removing Officer Opromalla from the TPU. For instance, according to Captain Fitzpatrick, "it was suggested maybe to take Opromalla out of plainclothes." (*See* Spitzer Decl. at Ex.9 at 105:2-4). Moreover, once *The New York Times* article regarding Mr. Holden's arrest came out, Officer Opromalla never made another plainclothes arrest. (*See id.* at Ex.4 at 293:8-13). He also was removed from plainclothes duty shortly thereafter. An officer even stated that "[t]he Port Authority is not going to back us," with regard to the plainclothes arrests. (*See id.* at Ex.9 at 109:14-15). Otherwise undisputed.

51.     Opromalla's plain clothes assignment ended after six months. (Opromalla tr. P. 146) (Ex C to Brophy Decl.) (ECF No. 228-3).

**RESPONSE:** Undisputed.

52.     Opromalla made a total of 14 arrests for lewd conduct at PABT, and none of these arrestees, except Holden, has come forward claiming that the arrest was unlawful. (Opromalla tr. p. 75) (Ex C to Brophy Decl.) (ECF No. 228-3).

**RESPONSE:** Disputed. Counsel for Plaintiffs were contacted by numerous individuals who claimed they were falsely arrested for public lewdness but for fear of public embarrassment and ramifications to their personal and professional lives chose not to participate further in this litigation. (*See* Spitzer Decl. at Ex.21, Ex.22, Ex.23, Ex.24, Ex.25; *see also* Ex.14).

53.     Opromalla holds a BA from Wagner College and a Master's Degree in School Counseling from Brooklyn College. He worked as a guidance counselor at Fort Hamilton High School for four years before joining PAPD. (Opromalla tr. pp.19-25) (Ex C to Brophy Decl.) (ECF No. 228-3).

**RESPONSE:** Undisputed.

## MEJIA'S ARREST

54.   Miguel Mejia was arrested on July 9, 2014 at approximately 5:06 pm at the PABT and charged with Public Lewdness (N.Y. Penal Law 245.00) and Exposure of a Person (N.Y. Penal Law 245.01). (Mejia's arrest file, Bates Nos. 50-85) (Ex O to Brophy Decl.).

   **RESPONSE:** Undisputed.

55.   At the time of his arrest, Mejia was 43 years old, a white male Hispanic, 5' 11" tall, weighing 225 lbs. He resided in Manhattan and was employed at the Family Help Living Center. (Miguel Mejia tr. pp.12, 16-18) (Ex P to Brophy Decl.) (ECF No. 228-16).

   **RESPONSE:** Undisputed.

56.   On the date of the arrest, he had a shaved head, facial hair and tattoos on his arms and legs. He was wearing an orange jersey with a basketball emblem, grey cargo pants, black and grey sneakers, rings, including a wedding band, a gold necklace and a virgin pendant. He was carrying a burgundy messenger bag and a blue bag with a box. (Mejia tr pp. 26-29, 31-32, 41-43, 61-64), (Ex P to Brophy Decl.) (ECF No. 228-17).

   **RESPONSE:** Disputed to the extent that Mr. Mejia testified that he was wearing cargo shorts not pants.  (*See* Spitzer Decl. at Ex.16 at 27:9-14).  He also testified that he probably was wearing a belt.  (*See id.* at Ex.16 at 63:23-25, 145:18-20).  He also stated that he had a large tattoo covering his entire back.  (*See id.* at Ex.16 at. 42:21-24; 45:20-46:2).

57.   He was at the PABT to catch the 5:12 bus to New Jersey where he planned to meet Oscar, his tattooist, at his home in Clifton at 6:00 pm. (Mejia tr. pp. 65-67,74) (Ex P to Brophy Decl.) (ECF No. 228-16).

   **RESPONSE:** Undisputed.

58.   Mejia had taken buses from the PABT prior to the date of his arrest to visit Oscar, to go to Ikea, and to Atlantic City. (Mejia tr. pp. 67-68, 91-92) (Ex P to Brophy Decl.) (ECF No. 228-16).

   **RESPONSE:** Undisputed.

59.   The arresting police officer was Police Officer John Tone, who was working in TPU and patrolling the third level to the bus ramps. (Tone tr. pp 112-115) (Ex F to Brophy Decl.) (ECF No. 228-6).

   **RESPONSE:** Undisputed.

60.   Tone was patrolling with Police Officer Shaun Kehoe, whom he left waiting outside when he entered the men's bathroom to patrol. (Tone tr. p 117) (Ex F to Brophy Decl.) (ECF No. 228-6) (Kehoe tr. pp. 21-24) (Ex D to Brophy Decl.) (ECF. No. 228-5).

   **RESPONSE:** Undisputed that Officer Tone was patrolling with Officer Kehoe; however, Officer Tone failed to include that he was patrolling with Officer Shaun Kehoe in Mejia's arrest report. (*See* Spitzer Decl. at Ex.18; Ex.6 at 170:7-21)

61.   Tone does not stand at a urinal when on patrol. On July 9, he observed Mejia at the urinal from where he was standing at the sink area. (Tone tr. pp. 78, 119, 126-133) (Ex F to Brophy Decl.) (ECF No. at 228-6).

   **RESPONSE:** Disputed, testimonial evidence contradicts this statement.  In his deposition, Mr. Mejia testified that a shorter man, later identified as a plainclothes officer, was already standing at the urinal when Mr. Mejia approached the urinal to the left of where he was standing.  The plainclothes officer continued to stand next to Mr. Mejia, staring at him, until Mr. Mejia looked over at him and made eye contact, at which point the officer smirked at Mr. Mejia.  Shortly after the officer exited the bathroom.  (*See* Spitzer Decl. at Ex.16 at 125:11-127:10, 139:17-22).

62.   When Tone entered the bathroom, he first checked under the stalls for drunks. He observed Mejia, as he was leaving, looking at a man to his right who was wearing sweatpants and a tank top. (Tone tr. pp. 113-119, 126, 127-128) (Ex F to Brophy Decl.) (ECF No. 228-6).

   **RESPONSE:** Disputed, record evidence contradicts this statement.  As stated above, Mr. Mejia testified that a shorter man, who was a plainclothes police officer, was already standing at the urinal when Mr. Mejia approached the urinal to the left of where he was standing.  (*See* Spitzer Decl. at Ex.16 125:11-127:10, 139:17-22).

63.   Mejia entered the restroom and went to the only empty urinal, which was on the left side of the room. (Mejia tr. pp 123-125) (Ex P to Brophy Decl.) (ECF No. 228-16).

   **RESPONSE:** Undisputed.

64.     Mejia sensed a short man on his right looking at him and when Mejia looked at the man, he smirked and then left. (Mejia tr. pp. 125-127, 139-140) (Ex P to Brophy Decl.) (ECF No. 228-16).

**RESPONSE:** Undisputed.

65.     Mejia was arrested after he exited from the bathroom by Tone, who showed him his badge and escorted him the police desk on the second floor. (Mejia tr. pp. 156-160) (Ex P to Brophy Decl.) (ECF No. 228-16), (Tone tr. p 141) (Ex F to Brophy Decl.) (ECF No. 228-6).

**RESPONSE:** Disputed, record evidence contradicts this statement. Mr. Mejia testified that he was stopped by three plain clothes officers, including the short man that was next to him in the bathroom, Officer Tone, and Officer Kehoe.  He further stated he was arrested by the escalators on the second floor of the Port Authority.  After each of the three officers showed Mr. Mejia their badge Mr. Mejia asked the officers what was going on, and Officer Tone responded that Mr. Mejia "[knew] what he did."  The officers then told Mr. Mejia that he was under arrest. When Mr. Mejia asked why he was under arrest, Officer Tone responded again saying, "You know what you did."  Mr. Mejia was then told to put the items he was holding on the ground, and was handcuffed by the escalators where he was stopped.  (*See* Spitzer Decl. at Ex. 16 at 156:4-161:13).  He was then lead by an officer to the police precinct. (*See id.* at 181:10-182:9).

66.     The officer whom Mejia describes as tall and blond (Tone) placed him in the jail cell, then photographed and fingerprinted him and arranged for him to make a phone call. (Mejia tr. pp. 190-191) (Ex P to Brophy Decl.) (ECF. No 228-16).

**RESPONSE:** Disputed, defendants mischaracterize the series of events following Mr. Mejia's arrest.  Mr. Mejia testified that before being placed in a jail cell he was handcuffed to a bench for approximately 30-45 minutes.  He tried asking a passing officer if he knew why Mr. Mejia was being arrested, but the Officer stated that he did not know.  (*See* Spitzer Decl. at Ex.16 at 186:5-18; 187:15-188:25).

19

67.  Mejia had no interaction with the officer during his arrest processing. (Mejia tr. p. 190) (Ex P to Brophy Decl.) (ECF No. 228-16).

**RESPONSE:** Disputed, defendants mischaracterize Mr. Mejia's testimony. Mr. Mejia repeatedly asked Officer Tone when he was going to be released, and Officer Tone continuously repeated that they were "gonna get [him] out of [there]." (*See* Spitzer Decl. at Ex.16 at 193:6-17).

68.  In ¶ 83 of the CCR prepared by Tone, he wrote: "At TPO while working in the Tactical Plain Clothes Unit the undersigned was patrolling the third-floor men's bathroom. The undersigned did observe the defendant manipulating his naked erect penis in a back and forth motion in full public view in a public place." (Mejia arrest file, CCR Bates No. 66) (Ex O to Brophy Decl.) (ECF No. 228-15).

**RESPONSE:** Undisputed that Officer Tone wrote the asserted in the CCR of Mr. Mejia's arrest.

69.  The language Tone used to describe the act of masturbation is the language preferred by the ADA. (Tone tr. pp. 163-168) (Ex F to Brophy Decl.) (ECF No 228-6).

**RESPONSE:** Disputed, defendants cannot rely on the testimony of a particular witness when it is rebutted by the testimony of another witness.  While Officer Tone testified that he used language preferred by the ADA (*See* Spitzer Decl. Ex.6 at 161:14-25), other PAPD officers claimed that they were never told what to write in the narrative portions of their reports.  Officer Montero testified that he was "not sure" why he used specific language to describe the act of masturbation, further stating, "it's just a general way of describing it, I guess." (*See id.* at Ex.32 at 182:16-18).  He further testified during his deposition that he was never told to use that specific language by anyone, including an ADA.  (*See id.* at 183:4-11).  Officer Bryan later testified that he was not where he got the boilerplate language to describe the act of masturbation in arrest reports, and did not know if it was the preferred language of the District Attorney's Office.  (*See id.* at Ex.19 at 259:5-11).

70.     Sgt. DeMartino was not present at Mejia's arrest, but he signed the CCR Worksheet, the Desk Appearance Investigation Worksheet and the On-Line Booking Arrest Worksheet, which he reviewed to make sure they were complete, that the arrestee was correctly charged, and that probable cause was stated. (Mejia's arrest file, Bates Nos. 53, 57, 81, 84) (Ex O to Brophy Decl.) (ECF No. 228-15), (DeMartino tr. pp 54-57) (Ex E to Brophy Decl.) (ECF No. 228-6).

        **RESPONSE:** Disputed to the extent that Sgt. DeMartino reviewed to make sure the CCR

        Worksheet, the Desk Appearance Investigation Worksheet and the On-Line Booking

        Arrest Worksheet were complete.  The cited testimony of Sgt. DeMartino does not support

        the statement. Otherwise undisputed.

71.     Lt. Richard Aylmer was not present either Holden or Mejia's arrest. He is listed as a Tour Commander in Holden's arrest paperwork, but did not sign anywhere. When he signs the Criminal Complaint Report as the Tour Commander, he relies on the sergeants to have check the accuracy of the arrest. (Lt. Richard Aylmer deposition tr. pp. 126-130) (Ex Q to Brophy Decl.) (ECF No. 228-18), (Holden arrest file, Bates nos. 1-49) (Ex. L to Brophy Decl.) (ECF No. 228-13).

        **RESPONSE:** Disputed to the extent that Lt. Richard Alymer relies on the sergeants to

        check the accuracy of the arrest, as the cited testimony of Lt. Alymer does not support this

        statement.  In Lt. Alymer's deposition he stated that a sergeant first reviews the Criminal

        Complaint Report, but never testified that they check the accuracy of the arrest.  (*See*

        Spitzer Decl. at Ex2 at 128:18-130:4).  Otherwise undisputed.

72.     Mejia was issued a desk appearance ticket and released at 8:23 pm on July 9, 2014. (Mejia arrest file, Bates No.60) (Ex O to Brophy Decl.) (ECF No. 228-15).

        **RESPONSE:** Undisputed.

73.     Tone, who is identified by Mejia as the tall blond officer, was the only officer who testified at Mejia's criminal trial. (Mejia tr. p. 180) (Ex P to Decl.) (ECF. No. 228-16).

        **RESPONSE:** Undisputed.

74.     Mejia was acquitted after a bench trial in criminal court on November 17, 2014. (Criminal Court verdict sheet) (Ex R to Brophy Decl) (ECF No. 228-19).

        **RESPONSE:** Undisputed.

75. Mejia, who is now divorced, was married to a woman for ten years, and has had relationships with men, but does not identify as gay or bisexual (Mejia tr. pp 31, 97-98, 258) (Ex P to Brophy Decl.) (ECF No. 228-16).

   **RESPONSE:** Disputed to the extent that the statement mischaracterizes Mr. Mejia testimony about his sexual orientation.   While Mr. Mejia does not identify as gay or bisexual, he also does not identify as heterosexual.   Instead, Mr. Mejia does not identify with any normative description of sexuality.   (*See* Spitzer Decl. at Ex.16 at 97:2-98:23). Otherwise undisputed.

76. Tone attended the PAPD academy in 2013 and was trained in anti-bias policing. He has never been disciplined or the subject of an internal investigation. (Tone tr. 15-17, 218) (Ex F to Brophy Decl.) (ECF No. 228-6).

   **RESPONSE:** Disputed to the extent that the anti-bias policing training Officer Tone was adequate enough to characterize officer tone as "trained."   As discussed above, the training programs implemented at the PAPD are significantly deficient and do not provide the proper terminology or resources to understand important distinctions in the LGBTQ community or how to understand and address implicit bias.   Otherwise, undisputed.

77. The Port Authority's Rule 26 Voluntary Disclosure listing witnesses and providing plaintiffs' arrest records was served by overnight Federal Express mail on July 6, 2017. (Defendants' Rule 26 Voluntary Disclosure and Fed. Ex. receipt) (Ex. S to Brophy Decl.) (ECF No. 228-20).

   **RESPONSE:** Undisputed.

## PLAINTIFF'S LOCAL RULE 56.1 COUNTERSTATEMENT OF ADDITIONAL MATERIAL FACTS

## I.   PABT's History False Arrests for Public Lewdness

1. In 2005, a jury concluded that the Port Authority engaged in a pattern and practice of executing arrests for public lewdness without probable cause in Port Authority men's

restrooms.  *See Martinez v. Port Authority*, No. 01 Civ. 721 (PKC), 2005 WL 2143333, at *5 (S.D.N.Y. Sept. 2, 2005), *aff'd sub nom. Martinez v. The Port Auth. of New York & New Jersey*, 445 F.3d 158 (2d Cir. 2006).

2.     Mr. Martinez, the plaintiff in that case, was arrested outside of a Port Authority restroom by a plainclothes police officer and falsely accused of public lewdness for masturbating. *Id.* at *1-2.

3.     Martinez was arrested while passing through a Port Authority facility during rush hour— like the Plaintiffs in this case.  *See Martinez*, 2005 WL 2143333, at *2; Holden Tr. 123:20-124:5; Mejia Tr. 111:5-19.

4.     He was arrested outside of a Port Authority restroom by a plainclothes police officer and falsely accused and arrested for public lewdness—like the Plaintiffs in this case.  *Martinez*, 2005 WL 2143333, at *1-2; *see* Spitzer Decl. at Ex.15 at 143:15-144:22, 146:3-16; Ex.16 at 156:4-161:13.

5.     Martinez suspected that his arrest was motivated by anti-homosexual bias based on the actions and comments made by PAPD officers—like the Plaintiffs in this case.  *See Martinez*, 2005 WL 2143333, at *23; *see* Spitzer Decl. at Ex.15 at 71:23-72:6; Ex.16 at 206:24-207:7.

## II.     Implementation of Tactical Patrol Units Using Plainclothes Policing Tactics

6.     In 2014, when one of the Port Authority's main facilities, the Port Authority Bus Terminal (the "PABT") implemented plainclothes policing through a "Tactical Patrol Unit" ("TPU").  *See* Spitzer Decl. at Ex.1; *see also* Ex.2. at 98:9-25; 99:8-10.

7.   PAPD leadership assigned junior officers who had no plainclothes police training or on-the-job experience to the TPU, rather than senior officers.  *See* Ex.3.at 35:16-23; Ex.4.at 26:15-17; Ex.5 at 27:21-23; Ex.6 at 18:2-3.

8.   PAPD Officers Kehoe, Opromalla, and Tone, were primarily responsible for the majority of public lewdness arrests during this relevant period, as well as the arrests of the Plaintiffs. These officers had recently graduated the PAPD academy and did not receive specialized training regarding plain clothes policing.  *See id.* at Ex. 12.

## III.   Implementation of Tactical Patrol Units Using Plainclothes Policing Tactics

9.   The PAPD also instituted its "Quality of Life" initiative to target particular offenses in the PABT.  *See* Spitzer Decl. at Ex.7, Ex.8.

10.   Public lewdness and indecent exposure were among the offenses PAPD officers were instructed to target.  *See* Fitzpatrick Tr. 61:9-62:18; Miller Tr. 145:12-146:1.

11.   To implement this initiative, PAPD began using "zero tolerance sweeps" in the PABT for these particular offenses.  *See id.* at Ex.7.

12.   Each patrol was to submit daily totals—incentivizing officers to make more arrests.  *See id.*

13.   In 2014, PAPD officers arrested at least 69 individuals on public lewdness charges.  *See id.* at Ex.12.

14.    All men arrested, including both Plaintiffs, were accused of masturbating in the restroom and were allegedly observed by plainclothes officers standing at an adjacent urinal.  *See id.* at Ex.14.

15.    Plainclothes officers at the PABT placed themselves near urinals, peered around dividers, made eye contact with Mr. Holden, and smirked at Mr. Mejia while they were using the urinal. *See* Spitzer Decl. at Ex.15 at 135:25-136:9; Ex.16 at 126:21-127:8.

16.    After Plaintiffs reacted to the plainclothes officers' unusual antics, they were arrested upon leaving the PABT restroom and charged with Public Lewdness under N.Y.P.L. § 245.00 and/or Exposure of a Person under N.Y.P.L. § 245.01.

**IV.**    **PAPD's Training and Supervision Structure**

      a.  *Bias-Based Policing Training*

17.    The PAPD's training on bias-based policing in relation to the LGBTQ community consists of three slides of the 63-page profiling presentation. It includes terms objectively outdated terms such as "transvestite," "cross dressers," and "transgendered." *See* Spitzer Decl. at Ex.34.

18.    The trainings also label the entire section an introduction to those who engage in "an alternative lifestyle." *See id.*

19.    Absent from any of the PAPD trainings is any discussion of prior problematic police actions targeting LGBTQ individuals or any evaluative measure to determine if PAPD officers retain any information about how to combat bias based policing.

      b.  *Failure to Provide Plainclothes Policing Training*

20.    PAPD assigned junior officers to plainclothes patrol earlier in their tenure with the department. *See* Spitzer Decl. at Ex.2 at 96:2-8 (noting that higher ranking PAPD's officers did not conduct plain clothes patrols); Ex.28 at 36:3-15; Ex3 at 35:16-2; Ex.2 at 26:15-17; Ex.5 at 27:21-23; Ex.6 at 18:2-3.

21. Testimony from these officers further reveals the limited understanding officers had about how plainclothes policing differed from uniformed policing. *See id.* at Ex.2 at 97:8-22; 98:9-24 (admitting he had "very little" understanding of what a tactical plainclothes unit is and did not receive any training); Ex.5 at. 24:20-25, 65:6-9; Ex.32 at 23:18-22, 70:20-24; Ex.6 at 18:5-8, 97:12-99:13.

22. PAPD leadership knew that plain clothes officers would be patrolling public restrooms and interacting with patrons. *See* Ex.9 at 72:1-12.

23. Still, the PAPD Academy did not provide a single course on the distinctions between plainclothes policing and policing in uniform at the academy or onsite. *See id.* at Ex.4 at 35:9-36:16, 85:25-86:4; Ex.3 at 26:9-11, 119:20-25, 120:2-3; Ex.26 at 70:13-18, 82:4-25; 201:7-25; Ex.27 at 59:3-60:23; Ex.28 at 55:16-56:5; Ex.29 at Tr. 68:3-19.

24. PAPD officers receive no police training related specifically to offenses occurring in private spaces, or to sexual offenses. *See id.* at Ex.4 at 36:6-16; Ex.3 at 119:20-25, 120:2-3; Ex.26 at 82:4-25; Ex.30 at 28:21-29:3.

25. The failure to train officers led to instances of officers standing near urinals in PABT restrooms for extended periods of time (*see id.* at Ex.4 at 171:12-14); engaging in behavior crudely designed to invoke some reaction out of patrons (i.e. smirking, making eye contact while patrons are exposed, inappropriate gesturing). *See id.* at Ex.15 at 136:5-9; Ex.16 at 126:16-127:5; Ex.35 at ¶3.

26. PAPD's own senior officers denounced these tactics. *See id.* at Ex.9 at 121:3-8; Ex.10 at 48:21-49:13).

      c. *Failure to Supervise*

27. To support of the public lewdness and indecent exposure charges, PAPD officers signed sworn affidavits using identical or nearly identical allegations that each man was "exposing his naked erect penis" and "manipulating it in a back and forth motion in full public view." *See* Spitzer Decl. at Ex.18, Ex.19.

28. Although, supervising officers, sergeants and tour commanders are required to review and sign off on arrest paperwork, they did not question these records or the PAPD officers executing these arrests. *See id.* at Ex.10 at 132:22-133:23; Ex.19 at 217:15-217:24.

**V.     Evidence of Selective Enforcement**

29. Mr. Holden and Mr. Mejia never masturbated in the men's restrooms at the PABT. This was clear to the prosecutor's office when they dismissed the charges against Mr. Holden and to the judge who acquitted Mr. Mejia. *See* Spitzer Decl. at Ex.15 at 41:11-42:2; Ex.33 at 126:3-126:7.

30. Defendants do not claim in their statement of facts that either Holden or Mejia were engaged in public masturbation.

31. Thus, to explain the actions of the PAPD officers, we must accept that either the PAPD was engaging in random arrests of individuals in the bathroom without any probable cause, or they were deliberately targeting men with characteristics like the Plaintiffs in this case for an improper reason.

32. The arrests of Mr. Holden and Mr. Mejia were not random—these men were deliberately targeted because of their sexual orientation or gender identity. Several other gay men, or gender non-conforming men came forward to discuss their experiences after being arrested

in the PABT men's restrooms.  Yet, because of the sensitive nature of this litigation, these men did not want to enter their names into the record.  *See id.* at Ex.14.

33.   Both Mr. Holden and Mr. Mejia assert that they present themselves in a manner that does not conform to the heteronormative norms of how men are expected to dress in public. For example, Holden was wearing fitted clothing, jewelry, and was carrying a designer duffle bag.  *See id.* at Ex.15 at 170:13-170:22.  Mr. Mejia was wearing a sleeveless basketball jersey and jewelry, and carrying a burgundy messenger bag. Mr. Mejia also had several tattoos on his arms, including one of a "merman" and one of an Arab person with a headdress.  *See id.* at Ex.16 at 26:20-32:15, 47:8-47:14.

34.   Mr. Holden testified that he heard PAPD officers joke about his arresting officer, Officer Opromalla, as being the "gay whisperer."  *See id.* at Ex.15 at 156:2-156:15.  That fact is neither speculation nor hearsay—it is sworn testimony and relevant evidence in this case.

35.   Ultimately, the very existence of the "gay whisperer" comment presents a material fact in dispute as PAPD's officers claim to have never used such a term.  It is a question of credibility and it must be heard by a jury.

36.   Defendants presentation of Mr. Holden and Mr. Mejia's arrests as isolated events of two men that simply happened to be gay or non-conforming obscures the long and disturbing history of law enforcement officers targeting public restrooms to arrest and prosecute gay and non-conforming men – men who were often too humiliated to speak out and contest their unfair treatment.  *See* Spitzer Decl. at Ex.11 at ¶¶8,13.[1]

---

[1] Consistent with this history, many of the witnesses who experienced the exact same behavior as Mr. Holden and Mr. Mejia did not wish to come forward for the exact same reasons.

37. The PAPD employs precisely the same tactics historically used by officers to draw out and target gay, bisexual or gender nonconforming men: standing at urinals next to the profiled target, sometimes for extended periods of time and making eye contact or facial expressions to get the profiled target to respond in some way.  *See id.* at Ex. 11 at ¶¶ 9, 17, 19, 29; Ex.15 at. 135:25-136:9; Ex.16 at 126:21-127:5.

38. Consistent with these historical practices, the public lewdness arrests carried out by the PAPD targeted the men's bathrooms—not other areas where lewdness or exposure occurred.  *See id.* at Ex. 11 at ¶ 20.

**VI.   Prior Pleading and Proceedings**

39. On March 27, 2017, Plaintiffs filed this action as a putative class action, naming PAPD Officers Opromalla, Tone and Kehoe, as well as the Port Authority of New York and New Jersey and the Port Authority Police Department as defendants.  The Complaint asserted claims under § 1983 for violation of Plaintiffs' rights to due process, equal protection and privacy under the Fourth and Fourteenth Amendments.

40. As discovery revealed the involvement of more defendants, Plaintiffs filed two amended complaints—one on October 6, 2017 and the second on November 28, 2018 adding Sgt. Esposito, Sgt. DeMartino, Lt. Aylmer, Lt. O'Dell, Sgt. Miller, Captain Fitzpatrick and police officers Marcos, Polonia, Malcolm Russell, Mark Montero, Vijay Seetaram, Martin Jaycard, and Melvin Cruz.

41. On April 10, 2019, at the request of Mr. Marcos Polonia and Mr. Malcom Russell and due to concerns about the embarrassing nature of the charges at issue, Plaintiffs by stipulation formally withdrew and discontinued their claims and continued only with the named plaintiffs in this litigation—Mr. Holden and Mr. Mejia.  On June 14, 2019 plaintiffs moved

to certify the class which was denied February 26, 2020.  Mr. Holden and Mr. Mejia continued the suit as individuals.

June 30, 2020                                        Respectfully Submitted,

                                                    **WINSTON & STRAWN LLP**

                                                    By: */s/ Thomas Patrick Lane*
                                                    Michael S. Elkin
                                                    Thomas Patrick Lane
                                                    Seth E. Spitzer
                                                    Matthew A. Stark
                                                    200 Park Avenue
                                                    New York, NY 10166
                                                    (212) 294-6700

                                                    Daniel R. McNeely (*pro hac vice*)
                                                    35 W. Wacker Dr.
                                                    Chicago, IL 60601
                                                    312-558-5600

                                                    **THE LEGAL AID SOCIETY**

                                                    By: */s/ Marlen Bodden*
                                                    Marlen Bodden
                                                    199 Water Street, 6th Floor
                                                    New York, NY 10038
                                                    (212) 577-3265

                                                    *Attorneys for Plaintiffs*