# EXHIBIT 2

Page 1

```
                 UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF NEW YORK


    CORNELL HOLDEN and MIGUEL     )
    MEJIA on behalf of            )
    themselves and all others     )
    similarly situated,           )
                                  )
              Plaintiffs,         )
                                  )
              vs.                 )   No.
                                  )   1:17 Civ. 02192
    THE PORT AUTHORITY OF NEW     )
    YORK AND NEW JERSEY, et       )
    al.,                          )
                                  )
              Defendants.         )
    ------------------------      )

       * Pages 127-144 designated confidential. *

                    September 27, 2018
                    11:21 a.m.


            Deposition of RICHARD AYLMER, held at
        the offices of Winston & Strawn LLP, 200 Park
        Avenue, New York, New York, before Laurie A.
        Collins, a Registered Professional Reporter
        and Notary Public of the State of New York.
```

Page 2

```
 1
 2  A P P E A R A N C E S:
 3
 4     WINSTON & STRAWN LLP
 5     Attorneys for Plaintiffs
 6        200 Park Avenue
 7        New York, New York 10166-4193
 8     BY:  EMILY C. ELLIS, ESQ.
 9          eellis@winston.com
10          SETH E. SPITZER, ESQ.
11          sspitzer@winston.com
12          - and -
13     THE LEGAL AID SOCIETY
14        199 Water Street
15        New York, New York 10038
16     BY:  CYNTHIA CONTI-COOK, ESQ.
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2            S T I P U L A T I O N S
 3      IT IS HEREBY STIPULATED AND AGREED, by and
 4  among counsel for the respective parties hereto,
 5  that the filing, sealing, and certification of the
 6  within deposition shall be and the same are hereby
 7  waived;
 8      IT IS FURTHER STIPULATED AND AGREED that all
 9  objections, except as to form of the question,
10  shall be reserved to the time of the trial;
11      IT IS FURTHER STIPULATED AND AGREED that the
12  within deposition may be signed before any Notary
13  Public with the same force and effect as if signed
14  and sworn to before the Court.
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  A P P E A R A N C E S (continued):
 3
 4     THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY
 5     Attorneys for Defendants
 6        150 Greenwich Street, 24th Floor
 7        New York, New York 10006
 8     BY:  KATHLEEN GILL MILLER, ESQ.
 9
10  ALSO PRESENT:
11     BENJAMIN RUTKIN-BECKER (Legal Aid Society)
12     DEVERELL WRITE, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1                   Proceedings
 2          THE VIDEOGRAPHER:  We're going on the
 3  record at 11:21 a.m. on September 27, 2018.
 4          Please note that the microphones are
 5  sensitive and may pick up whispering and
 6  private conversations.
 7          Please place all cell phones away from
 8  the microphones as they can interfere with
 9  deposition audio.
10          Audio and video recording will continue
11  to take place unless all parties agree to go
12  off the record.
13          This is Media Unit 1 of the video-
14  recorded deposition of Richard Aylmer taken by
15  counsel for the plaintiff in the matter of
16  Cornell Holden, et al., versus The Port
17  Authority of New York and New Jersey, et al.
18  This case is filed in the U.S. District Court
19  for the Southern District of New York.  We are
20  here at the offices of Winston & Strawn
21  located at 200 Park Avenue, New York, New
22  York.
23          My name is Deverell Write, representing
24  Veritext Legal Solutions.  The court reporter
25  is Laurie Collins from Veritext Legal
```

Page 26

Aylmer

1  transfer?
2  A. What do you mean by "automatic"?
3  Q. Apologies. Let me clarify.
4     So you testified that when you were
5  promoted to sergeant you were automatically
6  transferred as part of that promotion to John F.
7  Kennedy; is that correct?
8  A. Correct.
9  Q. So when you were transferred back to
10 The Port Authority Bus Terminal after your service
11 at John F. Kennedy, was that also part of a
12 promotion?
13 A. Yes.
14 Q. What promotion was that transfer?
15 A. To lieutenant, from sergeant to
16 lieutenant.
17 Q. And when were you promoted to
18 lieutenant?
19 A. September of 2006.
20 Q. And how long did you work at the bus
21 terminal following your promotion from sergeant to
22 lieutenant?
23 A. I was assigned there until I retired,
24 but basically 2016 I worked there till I was out.

Page 27

Aylmer

1  Q. What do you mean, in 2016 you worked
2  there until you were out?
3  A. I went out sick before I retired. So I
4  was assigned to the bus terminal, but I wasn't
5  physically working.
6  Q. Thank you.
7     So going back to your work as a police
8  officer at The Port Authority Bus Terminal, I
9  believe you said from July of '90 to January 2003,
10 what were your responsibilities as an officer
11 during that time period?
12 A. To enforce the law and basically to
13 ensure the safe passage of the community through
14 the terminal in and out to get their buses.
15 Q. And what were your specific duties as a
16 police officer at The Port Authority Bus Terminal
17 from July of '90 to January of 2003?
18 A. We were assigned patrol posts, we
19 patrolled our area, and assisted the patrons in
20 any way they needed help.
21 Q. Did you ever police in plainclothes as
22 part of your duties as a police officer at The
23 Port Authority Bus Terminal from July of '90 to
24 January of 2003?

Page 28

Aylmer

1  A. Yes, once or twice, not very often.
2  Q. Did you ever patrol The Port Authority
3  Bus Terminal restrooms as a police officer from
4  July of '90 to January 2003?
5  A. Not that I recall.
6  Q. If you recall, approximately how many
7  arrests did you make as a police officer at The
8  Port Authority Bus Terminal from July of '90 to
9  January of 2003?
10 A. I would say probably close to a
11 thousand arrests.
12 Q. If you recall, were any of those 1,000
13 or so arrests for public lewdness?
14 A. I can't tell you specifically. I don't
15 recall that.
16 Q. And also if you recall, were any of
17 those close to 1,000 arrests made for exposure of
18 a person?
19 A. Again, I couldn't specifically say
20 "yes" or "no."
21 Q. So I believe you said you were promoted
22 to sergeant in 2003; is that correct?
23 A. Sergeant in 2003, yes.
24 Q. And during that time you worked

Page 29

Aylmer

1  exclusively at John F. Kennedy; is that correct?
2  A. No. It was once or twice that I worked
3  at LaGuardia Airport, LaGuardia.
4  Q. You did not work as a sergeant at The
5  Port Authority Bus Terminal, though; is that
6  correct?
7  A. I don't remember. I don't believe so.
8  I couldn't tell you specifically.
9  Q. What were your responsibilities as a
10 sergeant of The Port Authority Police Department
11 at JFK?
12 A. At JFK it was to oversee the tour, you
13 know, go out and -- go out during the tour and
14 drive around, see that the airport was, you know,
15 everything seemed to be as it should be, check on
16 the officers, make sure they were where they were
17 supposed to be, make some roll calls, sign
18 paperwork, and deal with any problems that came
19 up.
20 Q. What is a roll call?
21 A. It's a sheet that tells you how to
22 choose an officer to a post.
23 Q. And I believe you testified you make
24 some roll calls. Does that mean as a sergeant you

Page 30

Aylmer

1  
2  assigned those officers to those posts?  
3     A.   No.  At Kennedy Airport the desk  
4  officers assigned them, and we reviewed them and  
5  gave them back to the desk officers.  We didn't  
6  make them.  
7     Q.   When you were promoted to the position  
8  of sergeant, did you apply for that promotion?  
9     A.   Excuse me?  
10    Q.   Let me review the question.  When you  
11 were promoted to the position of sergeant, did you  
12 apply for the promotion?  
13    A.   Yes.  
14    Q.   How did you apply for the promotion to  
15 sergeant?  
16    A.   They put out a promotional  
17 announcement, you submit a handwritten saying I'd  
18 like to apply -- everybody is issued the sergeant  
19 material.  And you submit that you want to take  
20 the test, and they schedule you to take the test.  
21    Q.   Did you receive any training after you  
22 were promoted to sergeant?  
23    A.   Can you be a little more specific?  
24    Q.   Sure.  Did you receive any training  
25 related to the promotion to sergeant after you  

Page 31

Aylmer

1  
2  were promoted to sergeant?  
3     A.   Just some basic supervisory training  
4  for a week or two, nothing really extensive.  
5     Q.   Do you recall what you learned in those  
6  two weeks of supervisory training?  
7     A.   Not specifically.  
8     Q.   You mentioned your responsibilities as  
9  a sergeant earlier.  Were any of those new  
10 responsibilities that were -- withdrawn.  
11         Were any of those new responsibilities  
12 that were particular to your promotion as sergeant  
13 and not to your role as police officer?  
14        MS. MILLER:  Objection.  
15        You may answer if you can.  
16    A.   Just checking the paperwork was  
17 different.  
18    Q.   How was checking the paperwork  
19 different?  
20    A.   Just to read reports that came in.  
21    Q.   What types of reports did you read as a  
22 sergeant?  
23    A.   Aideds, people who were -- reports on  
24 people who got injured, accident reports, CCRs for  
25 crimes, any paperwork that came in.  

Page 32

Aylmer

1  
2     Q.   What's a CCR?  
3     A.   Criminal complaint report.  
4     Q.   Is that paperwork that's associated  
5  with an arrest?  
6     A.   Yes.  
7     Q.   As a sergeant were you responsible for  
8  instructing police officers on how to patrol the  
9  posts that they were assigned?  
10    A.   No.  
11    Q.   As a sergeant did you oversee those  
12 police officers patrolling their assigned posts?  
13    A.   Yes.  
14    Q.   Were any of the patrols that you  
15 supervised as a sergeant plainclothes patrols?  
16    A.   Not really.  
17    Q.   Are there plainclothes patrols at  
18 John F. Kennedy Airport?  
19    A.   Yes.  
20    Q.   Approximately how many arrests --  
21 withdrawn.  
22        Did you make any arrests as a sergeant  
23 at John F. Kennedy Airport?  
24    A.   No.  
25    Q.   And I believe that you testified that  

Page 33

Aylmer

1  
2  you were promoted to lieutenant in September of  
3  2006; is that correct?  
4     A.   September of 2006.  
5     Q.   That's correct; yes?  
6     A.   Yes.  
7     Q.   And you worked as a lieutenant at The  
8  Port Authority Bus Terminal from 2006 to 2016; is  
9  that correct?  
10    A.   Yes.  
11    Q.   And did you apply for the promotion to  
12 lieutenant?  
13    A.   Yes.  
14    Q.   Can you describe that application  
15 procedure?  
16    A.   Exactly the same as sergeant:  They put  
17 out a memo that they're promoting; you put in a  
18 handwritten.  They gave everybody the material,  
19 and you put in a handwritten.  And they scheduled  
20 you for the test, you took the test, and you went  
21 on the lieutenants list.  
22    Q.   What is a handwritten?  I should have  
23 asked you earlier.  
24    A.   It's just a paper that says, you know,  
25 the undersigned would request to be scheduled to

| Page 90 | Page 92 |
|---|---|
| 1            Aylmer | 1            Aylmer |
| 2  complaint or some loud things you heard and you | 2       Q.   In 2014 would you say that exposure of |
| 3  would encounter a crime in progress. | 3  a person was a common occurrence at The Port |
| 4       Q.   In 2014 was there a time when any | 4  Authority Bus Terminal? |
| 5  patrol of plainclothes officers included going | 5            MS. MILLER:  Objection. |
| 6  inside of a restroom? | 6            You may answer. |
| 7       A.   I couldn't tell you exactly. | 7       A.   I don't believe so. |
| 8       Q.   During any of the shifts that you | 8       Q.   In 2014 would you say that public |
| 9  worked as a lieutenant, do you recall if there | 9  lewdness was a common occurrence at The Port |
| 10  were plainclothes officers who were patrolling | 10  Authority Bus Terminal? |
| 11  inside of restrooms? | 11            MS. MILLER:  Objection. |
| 12            MS. MILLER:  Objection. | 12            You may answer. |
| 13            You may answer. | 13       A.   I don't believe so. |
| 14       A.   I couldn't tell you exactly. | 14       Q.   Have you ever discussed public lewdness |
| 15       Q.   You mentioned just a few minutes ago | 15  in the men's restrooms of The Port Authority Bus |
| 16  sometimes someone from the general public would | 16  Terminal with any other officers of The Port |
| 17  report an incident.  Does The Port Authority | 17  Authority Police Department? |
| 18  Police Department receive civilian complaints for | 18            MS. MILLER:  Objection. |
| 19  incidents of public lewdness? | 19            You may answer. |
| 20       A.   Occasionally. | 20       A.   Not to my recollection. |
| 21       Q.   Have you ever personally received | 21       Q.   Have you ever discussed the condition |
| 22  complaints for public lewdness in The Port | 22  of exposure -- sorry, let me withdraw that. |
| 23  Authority Bus Terminal restrooms? | 23            Have you ever discussed exposure of a |
| 24       A.   Not off the top of my head. | 24  person in The Port Authority Bus Terminal men's |
| 25       Q.   Who would typically receive civilian | 25  restrooms with any other officer of The Port |

| Page 91 | Page 93 |
|---|---|
| 1            Aylmer | 1            Aylmer |
| 2  complaints for The Port Authority Bus Terminal? | 2  Authority Police Department? |
| 3       A.   Desk sergeant. | 3            MS. MILLER:  Objection. |
| 4       Q.   Do you recall any specific civilian | 4            You may answer. |
| 5  complaints for public lewdness in The Port | 5       A.   Not that I could say. |
| 6  Authority Bus Terminal restrooms? | 6       Q.   Has anyone ever told you about public |
| 7       A.   No. | 7  lewdness occurring -- let me withdraw that. |
| 8       Q.   Is public lewdness in the men's | 8            Has any officer of The Port Authority |
| 9  restrooms of The Port Authority Bus Terminal a | 9  Police Department ever told you about public |
| 10  usual occurrence in the bus terminal generally? | 10  lewdness occurring in the men's restrooms of The |
| 11            MS. MILLER:  Objection. | 11  Port Authority Bus Terminal? |
| 12            You may answer. | 12            MS. MILLER:  Objection. |
| 13       A.   I really couldn't say. | 13            You may answer. |
| 14       Q.   Would you say that public lewdness is a | 14       A.   Officers have reported it as a cause |
| 15  condition at The Port Authority Bus Terminal? | 15  for arrest. |
| 16            MS. MILLER:  Objection. | 16       Q.   How many officers have reported it as a |
| 17            You may answer. | 17  cause for arrest to you specifically? |
| 18       A.   What do you mean by "condition"? | 18       A.   I couldn't tell you. |
| 19       Q.   Let me rephrase. | 19       Q.   How many approximately? |
| 20            Would you say public lewdness is a | 20       A.   I really couldn't even give you the |
| 21  common occurrence at The Port Authority Bus | 21  approximate number. |
| 22  Terminal? | 22       Q.   Do you recall which officers reported |
| 23            MS. MILLER:  Objection. | 23  to you that public lewdness was a cause for |
| 24            You may answer. | 24  arrest? |
| 25       A.   I really couldn't say. | 25       A.   Not specifically. |

Page 94

1       Aylmer
2    Q.  Have you ever heard anyone mention
3  public lewdness in the men's restrooms of The Port
4  Authority Bus Terminal at a roll call?
5    A.  Not that I recall.
6    Q.  Have you personally ever mentioned
7  public lewdness in the men's restrooms of The Port
8  Authority Bus Terminal at a roll call?
9    A.  No.
10   Q.  Going back to civilian complaints, have
11 you ever received civilian complaints for the way
12 officers have policed public lewdness in the
13 restrooms at The Port Authority Bus Terminal?
14   A.  No.
15   Q.  Is public lewdness considered a
16 quality-of-life offense?
17   A.  No.
18   Q.  What is a quality-of-life offense?
19   A.  Most -- usually low -- you know,
20 low-level crimes, violations like disorderly
21 conduct, loitering, soliciting, offenses like
22 that.
23   Q.  Have you ever heard the term
24 "quality-of-life sweep"?
25   A.  No.

Page 95

1       Aylmer
2    Q.  Do you have any understanding of what
3  the term "sweep" is in the context of The Port
4  Authority Police Department?
5    A.  Never really heard it used with The
6  Port Authority Police.
7    Q.  While you worked at The Port Authority
8  Police Department, did the department have any
9  policies regarding how police should interact with
10 LGBTQ individuals during arrest?
11   A.  Could you be a little more specific?
12   Q.  Sure.  Is there any -- withdrawn.
13      While you worked at The Port Authority
14 Police Department, did you ever receive any
15 guidance with how -- let me rephrase that.
16      While you worked at The Port Authority
17 Police Department, did you ever receive any
18 guidance on how to interact with LGBTQ+
19 individuals in the bus terminal generally?
20   A.  Not really, no.
21   Q.  Did the department ever provide any
22 trainings on how to interact with LGBTQ
23 individuals when you were stopping them for
24 arrests?
25   A.  No, I don't believe so.

Page 96

1       Aylmer
2    Q.  To your knowledge in 2014 did any
3  higher ranking officers order a police officer to
4  conduct a plainclothes patrol of the men's
5  bathrooms in The Port Authority Bus Terminal?
6       MS. MILLER:  Objection.
7       You may answer.
8    A.  No.
9    Q.  To your knowledge in 2014 did any
10 higher-ranking officer order plainclothes patrols
11 to police for public lewdness in the men's
12 restrooms at The Port Authority Bus Terminal?
13      MS. MILLER:  Objection.
14      You may answer.
15   A.  No.
16   Q.  To your knowledge in 2014 did any
17 higher-ranking officers order a police officer,
18 plainclothes patrol, to make arrests for exposure
19 of a person in bathrooms at The Port Authority Bus
20 Terminal?
21      MS. MILLER:  Objection.
22      You may answer.
23   A.  Say that again.
24   Q.  Sure.  To your knowledge in 2014 did
25 any higher-ranking officers order a police

Page 97

1       Aylmer
2  officer, plainclothes patrol, to make arrests for
3  exposure of a person in bathrooms at The Port
4  Authority Bus Terminal?
5       MS. MILLER:  Objection.
6       You may answer.
7    A.  No.
8    Q.  Do you have any understanding of what
9  the tactical plainclothes unit is?
10   A.  Very little.
11   Q.  What is your understanding of the
12 tactical plainclothes unit?
13   A.  Years ago when I first started, they
14 used to have a unit of police officers who worked
15 steady detail as plainclothes.  It was done away
16 with.  That was a tactical plainclothes unit.
17   Q.  When was that unit done away with?
18   A.  Probably in the nineties sometime.
19   Q.  And you said a "steady detail."  Does
20 that mean that they patrolled in plainclothes
21 full-time?
22   A.  Yes.
23   Q.  Where was the tactical plainclothes
24 unit stationed, if you recall?
25      MS. MILLER:  Objection.

25 (Pages 94 - 97)

Page 98

Aylmer

1  
2      You may answer.  
3      A.   I don't know the specific area.  I was  
4  pretty new.  They worked like near the detectives  
5  office, and they didn't work, you know, by our  
6  office.  So I'm not sure exactly if they worked  
7  out of the detectives office or they had their own  
8  office.  It was kind of before my time.  
9      Q.   As a police officer of The Port  
10 Authority Police Department, did you ever receive  
11 any training about how to conduct patrols in  
12 plainclothes?  
13     A.   No, not really.  
14     Q.   In your experience as a Port Authority  
15 police officer, is patrolling in plainclothes  
16 different from patrolling in your uniform?  
17     A.   Yes.  
18     Q.   How so?  
19     A.   You are able to mix in with the public  
20 easier, you have more ability to observe crimes  
21 being committed because people don't know you're a  
22 police officer, make different arrests sometimes  
23 because it's more crime as opposed to quality of  
24 life.  
25     Q.   Are there types of arrests that  

Page 99

Aylmer

1  
2  plainclothes policing is utilized to police?  
3         MS. MILLER:  Objection.  
4         You may answer.  
5      A.   Not really, not in these days, no.  
6      Q.   What do you understand the purpose of  
7  plainclothes policing to be?  
8      A.   Just to put out officers that are able  
9  to blend in more readily and have the ability to  
10 make arrests.  
11     Q.   Are there patrols within The Port  
12 Authority Bus Terminal for which it would be  
13 better to have plainclothes officers than  
14 uniformed officers?  
15        MS. MILLER:  Objection.  
16        You may answer.  
17     A.   What do you mean by "patrols"?  
18     Q.   Excuse me.  I think I used the wrong  
19 term.  
20        Are there posts within The Port  
21 Authority Bus Terminal for which it would be  
22 better to have plainclothes officers rather than  
23 uniformed officers?  
24     A.   Yes.  
25     Q.   What are those posts?  

Page 100

Aylmer

1  
2      A.   Like the long-haul bus levels where  
3  people are -- people come from out of state and  
4  traveling back to out of state, they're very  
5  easily conned by these people, you know, by some  
6  element of the bus terminal.  
7         And, you know, if there's uniformed  
8  officers around, the uniformed officer is in one  
9  area, they go through another area.  But with  
10 plainclothes the officers blended in.  So these  
11 individuals will take action, and then the police  
12 are able to move in on them.  
13     Q.   You said earlier, I believe, that  
14 plainclothes units are used more with crimes and  
15 less with quality-of-life offenses; correct?  
16        MS. MILLER:  Objection.  
17     A.   Right.  
18     Q.   Can you explain what you mean by that?  
19     A.   Well, like I just said, they might --  
20 in an area like the long-haul levels, they would  
21 be more apt to be able to get arrests, good  
22 arrests, such as thefts of cell phones that being  
23 charged, thefts of luggage from people who are  
24 sitting there and nod off, people who are swindled  
25 out of tickets; whereas a uniformed officer, as  

Page 101

Aylmer

1  
2  soon as the guy sees the uniform, he's gone.  
3      Q.   Why are plainclothes units not as  
4  effective at policing quality-of-life crimes?  
5      A.   I don't know if I'd say they were not  
6  effective.  It's just -- how would -- how would I  
7  say it?  It's kind of like an overkill, like, you  
8  know, don't need a uniformed officer -- you don't  
9  need a plainclothes guy to see somebody asking for  
10 a quarter by the ticket windows.  That's -- a  
11 uniformed officer can do that.  
12     Q.   I believe you said earlier that as a  
13 lieutenant you sometimes had officers report to  
14 you conduct in the men's bathrooms at The Port  
15 Authority Bus Terminal that gave rise to an  
16 arrest; is that correct?  
17        MS. MILLER:  Objection.  
18        You may answer.  
19     A.   Just state that one more time.  
20        MS. MILLER:  Would you read that back,  
21     please.  
22        (Record read.)  
23     A.   Yeah.  
24     Q.   Do you recall any of those incidents  
25 specifically?  

26 (Pages 98 - 101)

```
                                                          Page 102                                                          Page 104
 1                    Aylmer                                          1                    Aylmer
 2       A.   No, not specific ones.                                  2   yours, I think.
 3            MS. ELLIS:  I'm going to ask you to                     3       A.   1750.  Okay.  1751 is the back side of
 4   mark this as Exhibit 1.                                          4   a CCR.
 5            (Aylmer Exhibit 1, arrest envelope,                     5       Q.   And 1752 --
 6   Bates-stamped PA 001750 through 1777, marked                     6       A.   Is the front side.  And 1753 is a
 7   for identification.)                                             7   follow-up CCR.  1754 I believe is the back of the
 8            MS. MILLER:  Let the record reflect                     8   follow-up CCR.  1755 looks like a photostat of the
 9   that I've been handed --                                         9   arrest envelope again.  1756, this is a desk
10            MS. ELLIS:  It's Bates numbers                         10   appearance ticket investigation sheet, and 1757 is
11   PA 001750.  I believe actually all the pages                    11   the back side of the DAT investigation sheet.
12   in this copy are stamped the same way.  I'm                     12            And 1758 is a copy of The Port
13   not sure if this is --                                          13   Authority booking sheet.  1759 is an affidavit
14            MS. MILLER:  I have through PA 1777,                   14   from the district attorney.  1760 is some pedigree
15   and then there's an extra page, which is                        15   information in the DL on an individual.  1761 is a
16   PA 1750, which is blank.                                        16   cover sheet for the fax machine when we fax
17            MS. ELLIS:  Yes, that's correct.                       17   something.
18   Sorry, I was looking at the wrong place.                        18            1762 is a picture of an individual,
19            MS. MILLER:  What is this, Aylmer 1?                   19   male black.  1763 is a request to CPD for an NCIC
20            MS. ELLIS:  That's correct.                            20   check.  1764 is a response from CPD on that check.
21       Q.   Do you recognize the document that's                   21   1755 is again part of the response from CPD on
22   been placed in front of you as Aylmer 1?                        22   that check.  1766 is part of a response from CPD
23            MS. MILLER:  Can I just have a second                  23   on that check.
24   because mine is upside-down.                                    24            1767 is a fax cover sheet used when we
25            MS. ELLIS:  Why don't we go off the                    25   fax things.  1768 is an online booking arrest

                                                          Page 103                                                          Page 105
 1                    Aylmer                                          1                    Aylmer
 2   record.                                                          2   worksheet.  1769 is the back side of the arrest
 3            THE VIDEOGRAPHER:  The time on the                      3   booking worksheet.  1770 is a CCR.  1771 appears
 4   video monitor is 2:35 p.m.  We're off the                        4   to be the back side of the CCR.
 5   record.                                                          5            1772 appears to be an online booking
 6            (Pause.)                                                6   sheet.  1773 appears to be the back side of an
 7            THE VIDEOGRAPHER:  We are back on the                   7   online booking sheet.  1774 is again an online
 8   record.  The time on the video monitor is                        8   booking sheet.  1750 is the back side of an online
 9   p.m.                                                             9   booking sheet.  1777 --
10       Q.   So have you had a chance to review this                10            MS. MILLER:  9771 was next.
11   document?                                                       11       A.   1776 was blank, wasn't it?
12       A.   I looked at all of them.                               12            MS. MILLER:  No.
13       Q.   Do you recognize this document?                        13       A.   My mistake.  I'm sorry.  1776 is again
14       A.   This particular one?                                   14   a request for an NCIC check, a request for an NCIC
15       Q.   Yes, Exhibit 1 in front of you.                        15   check.  1777 is a desk appearance ticket.
16       A.   I'm pretty sure it's a photostat of the                16            And that's all I have.
17   arrest envelope, if I'm not mistaken.                           17       Q.   Thank you.
18       Q.   And can you describe the pages that                    18            If you could turn your attention to
19   follow?                                                         19   page PA 1776.
20       A.   Let's see.  This page here --                          20       A.   1776.  Correct.
21            MS. MILLER:  You have to go by Bates                   21       Q.   If you could look at the top of the
22   number.  Beginning with I guess page 1751, is                   22   sheet when the box starts that says tour
23   that the one you want to begin with.                           23   commander -- and I think it's a misspelling -- but
24       A.   They're all 1751, aren't they?                         24   lieutenant it looks like it says Aylmer.
25            MS. MILLER:  It's upsides down in                      25       A.   Yes.
```

|  | Page 126 |  | Page 128 |
|---|---|---|---|
| 1 | Aylmer | 1 | Aylmer - Confidential |
| 2 | A. It could have been anybody who was | 2 | MS. MILLER: I'm sorry, would you read |
| 3 | working that day that was higher than him. | 3 | that page again, please? |
| 4 | MS. ELLIS: I'm going to ask you to | 4 | MS. ELLIS: I will, yes. Just to |
| 5 | mark this as Exhibit 2. Before we do that, I | 5 | clarify, I'm talking about the small number -- |
| 6 | need to designate this portion of the | 6 | there's a second page number on this as well. |
| 7 | transcript as confidential. This exhibit is | 7 | It's PA 1820, 1820. |
| 8 | also confidential. | 8 | Q. Do you see under "tour commander" where |
| 9 | (The following portion has been | 9 | it says Lieutenant Aylmer? |
| 10 | designated confidential.) | 10 | A. Yes. |
| 11 |  | 11 | Q. Is that you? |
| 12 |  | 12 | A. That's my name, yeah. |
| 13 |  | 13 | Q. Does that mean that you were the tour |
| 14 |  | 14 | commander at the time of this arrest? |
| 15 |  | 15 | A. Probably, unless he put it down at the |
| 16 |  | 16 | time he sent the paperwork in. Okay, yes, I was |
| 17 |  | 17 | the tour commander. |
| 18 |  | 18 | Q. Okay. Let's turn back to page 1811. |
| 19 |  | 19 | What do you recognize this form to be? |
| 20 |  | 20 | A. This is a criminal complaint report. |
| 21 |  | 21 | Q. And as the tour commander, would you |
| 22 |  | 22 | have reviewed the criminal complaint report for |
| 23 |  | 23 | this arrest? |
| 24 |  | 24 | A. Not -- well, not necessarily, no. |
| 25 |  | 25 | Q. Under what circumstances would you have |

|  | Page 127 |  | Page 129 |
|---|---|---|---|
| 1 | Aylmer - Confidential | 1 | Aylmer - Confidential |
| 2 | (Aylmer Exhibit 2, arrest paperwork, | 2 | reviewed this complaint report as the tour |
| 3 | Bates-stamped PA 1810 through PA 1832, marked | 3 | commander? |
| 4 | for identification.) | 4 | A. If it was turned in while I was |
| 5 | MS. ELLIS: The Bates stamps for this | 5 | working. |
| 6 | document are PA 1810 through PA 1832. | 6 | Q. If it was turned in -- withdrawn. |
| 7 | And let's go off the record while the | 7 | Does the tour commander review every |
| 8 | witness reviews. | 8 | CCR submitted to him -- let me withdraw that. |
| 9 | THE VIDEOGRAPHER: The time on the | 9 | Are tour commanders responsible for |
| 10 | video monitor is 3:34 p.m. We're off the | 10 | reviewing every CCR submitted to them while |
| 11 | record. | 11 | they're on duty for a specific shift? |
| 12 | (Pause.) | 12 | MS. MILLER: Objection. |
| 13 | THE VIDEOGRAPHER: We're back on the | 13 | You may answer. |
| 14 | record. The time on the video monitor is | 14 | A. No. |
| 15 | p.m. | 15 | Q. Do officers submit CCRs to other |
| 16 | Q. Have you had an opportunity to review | 16 | sergeants or lieutenants who are on duty at the |
| 17 | the document marked as Exhibit 2? | 17 | same time as the tour commander? |
| 18 | A. Yes. | 18 | MS. MILLER: Objection. |
| 19 | Q. And what do you understand this | 19 | You may answer. |
| 20 | document to be? | 20 | A. Most paperwork, including CCRs, are |
| 21 | A. It looks like copies of some arrest | 21 | first submitted to the sergeant, and he reviews it |
| 22 | paperwork from the bus terminal. | 22 | and then puts it in a box for a lieutenant. |
| 23 | Q. And if you could turn to page | 23 | Q. Are all CCRs reviewed by the sergeant |
| 24 | PA 001820. I recognize that this one is also | 24 | also reviewed by the lieutenant or does the |
| 25 | stamped -- | 25 | sergeant distinguish between which CCRs need to be |

| | |
|---|---|
| Page 130<br>1  Aylmer - Confidential<br>2  reviewed by a lieutenant?<br>3  A.  No, all get reviewed by a lieutenant<br>4  eventually.<br>5  Q.  Turning to page 1813, if you would<br>6  review number 83, the additional details of<br>7  complaint.  Let me know when you're finished.<br>8  (Pause.)<br>9  Q.  Ready?<br>10  A.  Yep.<br>11  Q.  Having reviewed this narrative, do you<br>12  believe that the narrative supports a charge of<br>13  public lewdness?<br>14  A.  Yes.<br>15  Q.  Do you believe that all of the elements<br>16  of public lewdness are included in this narrative?<br>17  A.  Yes.<br>18  Q.  Having read this narrative, do you<br>19  believe that all of the elements of exposure of a<br>20  person are included in this narrative?<br>21  A.  Yeah.<br>22  Q.  And having read this narrative, do you<br>23  believe that the narrative supports a charge of<br>24  exposure of a person?<br>25  MS. MILLER:  Would you read that back? | Page 132<br>1  Aylmer - Confidential<br>2  likely.<br>3  Q.  Do you know how many arrests for public<br>4  lewdness occurred in 2014 at The Port Authority<br>5  Bus Terminal?<br>6  A.  No.<br>7  Q.  Do you know how many arrests occurred<br>8  for public lewdness in the men's restrooms of The<br>9  Port Authority Bus Terminal in 2014?<br>10  A.  No.<br>11  Q.  In 2014 there were approximately 60<br>12  arrests for public lewdness in the men's<br>13  bathrooms.  Does that seem unusual to you in all<br>14  of your experience as a Port Authority police<br>15  officer?<br>16  MS. MILLER:  Objection.<br>17  You may answer.<br>18  A.  60 arrests for the entire year?<br>19  Q.  Correct, in 2014 there were<br>20  approximately 60 arrests for public lewdness in<br>21  the men's bathrooms at The Port Authority Bus<br>22  Terminal.  Does that seem unusual to you in all of<br>23  your experience as a Port Authority police officer<br>24  at The PABT, Port Authority Bus Terminal?<br>25  MS. MILLER:  Objection. |
| Page 131<br>1  Aylmer - Confidential<br>2  What was the last part?<br>3  (Record read.)<br>4  A.  Yes, I would think so.<br>5  Q.  So do you see where it says, standing<br>6  approximately 1 foot from urinal?<br>7  A.  Yeah.<br>8  Q.  How far away typically does a man need<br>9  to stand from a urinal in order to urinate?<br>10  MS. MILLER:  Objection.<br>11  You may answer.<br>12  A.  I think it kind of depends.  Some<br>13  closer than others, you know.  You know, two, a<br>14  couple inches.  Most people are very close, not, a<br>15  foot is kind of impressed with yourself, I guess.<br>16  Q.  In 2014 were there any reports of<br>17  sexual behavior happening in the men's bathrooms<br>18  at The Port Authority Bus Terminal?<br>19  A.  Can you be more specific?<br>20  Q.  Sure.  In 2014 were there any civilian<br>21  complaints of sexual behavior occurring in the<br>22  men's bathrooms at The Port Authority Bus<br>23  Terminal?<br>24  A.  I can't tell you of specific<br>25  complaints, but in general I would say most | Page 133<br>1  Aylmer - Confidential<br>2  You may answer.<br>3  A.  I really couldn't say based on the<br>4  ratios.  I have no knowledge of ratios of what --<br>5  how many -- how many arrests for what took place<br>6  each year.<br>7  Q.  When I asked you if there were any<br>8  civilian complaints in 2014 for sexual behavior<br>9  occurring in the men's bathrooms at The Port<br>10  Authority Bus Terminal, I believe you testified<br>11  that you would say it was most likely; is that<br>12  correct?<br>13  MS. MILLER:  Objection.<br>14  You may answer.<br>15  A.  I think so.<br>16  Q.  Why do you believe it is likely that<br>17  there were complaints of sexual behavior in the<br>18  men's bathrooms in The Port Authority Bus Terminal<br>19  in 2014?<br>20  A.  Because the bus terminal and the<br>21  surrounding area has always had a history, long<br>22  before I got there, of, you know, sexual activity<br>23  in the building.<br>24  Q.  Can you describe that history?  Excuse<br>25  me.  Can you describe your understanding of the |