# EXHIBIT 3

Page 1

```
 1   UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF NEW YORK
 2   ---------------------------------------------x
     CORNELL HOLDEN, MIGUEL MEJIA, and JEFFREY K.
 3   REED, on behalf of themselves and others
     similarly situated,
 4           Plaintiffs,
 5
              v.           1:17-cv-02192-JGK-RL
 6
 7   THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY;
     THE PORT AUTHORITY POLICE DEPARTMENT; and
 8   MICHAEL OPROMALLA, SHAUN KEHOE, JOHN TONE,
     JORDAN ESPOSITO, MICHAEL DEMARTINO,
 9   RICHARD AYLMER, and OFFICERS JOHN DOE 1-100,
     sued in their individual capacities and
10   official capacities as officers of the Port
     Authority Police Department
11           Defendants.
     ---------------------------------------------x
12
13                 June 27, 2018
14                 10:58 a.m.
15
16     VIDEO RECORDED DEPOSITION OF SHAUN KEHOE
17
18
19
20              SHAUN KEHOE
21
22
23
24
25
```

Page 2

1
2  Video recorded Deposition of SHAUN KEHOE, taken
3  by the plaintiffs, pursuant to notice, at the
4  offices of Winston & Strawn, 200 Park Avenue,
5  New York, New York, before Mark Richman, a
6  Certified Shorthand Reporter, Registered
7  Professional Reporter and Notary Public within
8  and for the State of New York.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1              S. KEHOE
2         THE VIDEOGRAPHER:  Good morning.
3  We are going on the record at
4  a.m. on June 27, 2018.
5         Please note that the microphones
6  are sensitive and may pick up
7  whispering, private conversations and
8  cellular interference.  Please turn
9  off all cellphones or place them away
10 from the microphones as they can
11 interfere with the deposition audio.
12 Audio and video recording will
13 continue to take place unless all
14 parties agree to go off the record.
15        This is media unit number 1 of
16 the video recorded deposition of Shaun
17 Kehoe, taken by counsel for
18 plaintiffs, in the matter of Cornell
19 Holden, et al., versus The Port
20 Authority of New York & New Jersey, et
21 al., filed in the United States
22 District Court Southern District of
23 New York, case number 17-cv-02192-JGK
24 RL.
25        This deposition is being held at

Page 3

1  A P P E A R A N C E S:
2  WINSTON & STRAWN LLP
   Attorneys for the Plaintiffs
3     200 Park Avenue
      New York, New York 10166
4
5  BY:   ROSS M. KRAMER, ESQ.
       EMILY ELLIS, ESQ.
6      rkramer@winston.com
       eellis@winston.com
7
         -and-
8
   THE LEGAL AID SOCIETY
9     199 Water Street
      New York, New York 10038
10
11 BY:   CYNTHIA CONTI-COOK, ESQ.
       cconti-cook@legal-aid.org
12
13
   THE PORT AUTHORITY OF NEW YORK & NEW JERSEY
14 Attorneys for the Defendants
      Law Department
15    4 World Trade Center, 24th Floor
      New York, New York 10006
16
   BY:   KATHLEEN GILL MILLER, ESQ.
17       THOMAS ROBERT BROPHY, ESQ.
         kmiller@panynj.gov
18       tbrophy@panynj.gov
19
20
21 ALSO PRESENT:
22 CARLOS KING, Videographer
   MOLLY GRIFFARD, Intern, LAS
23 JACK CARTWRIGHT, Intern, WS
   LEAH ROMM, Intern, WS
24 PHOEBE ROSENFELD, Intern, WS
25

Page 5

1              S. KEHOE
2  Winston Strawn, located at 200 Park
3  Avenue, New York, New York.
4         My name is Carlos King from the
5  firm of Veritext and I'm the
6  videographer.  The court reporter is
7  Mark Richman, also from Veritext.
8         I'm not authorized to administer
9  an oath.  I'm not related to any party
10 in this action, nor am I financially
11 interested in the outcome.
12        Counsel and all present in the
13 room and everyone attending remotely
14 will now state their appearance and
15 affiliations for the record.  If there
16 are any objections to the proceedings
17 please state them at the time of your
18 appearance, beginning with the
19 noticing attorney.
20        MR. KRAMER:  For the plaintiffs,
21 Ross Kramer, K-r-a-m-e-r, from Winston
22 & Strawn, and with me is Emily Ellis,
23 E-l-l-i-s, from Winston & Strawn.
24        From The Legal Aid Society,
25 Cynthia Conti-Cook and Molly Griffard.

2 (Pages 2 - 5)

Page 26

S. KEHOE

Q. And what is the TPU?
A. The TPU is a plainclothes team that is used to patrol The Port Authority bus terminal.
Q. What does TPU stand for?
A. I'm not a hundred percent sure. I don't know.
Q. When you began working with the TPU, did you receive any special training?
A. No.
Q. Did you receive any instructions from any superiors about how your work on the TPU should be conducted?
A. I receive instructions from my supervisors every day, including all days that I was with the TPU unit, yes.
Q. Did you receive instructions about specific types of offenses that you were supposed to concentrate on?
A. No.
Q. Did you receive specific instructions on how to patrol restrooms at The Port Authority bus terminal?
A. No.

Page 27

S. KEHOE

Q. We'll get back to that in a little bit. I think it makes sense to talk a little bit about your background and your educational and your work history, so let's try that.
   Did you go to high school?
A. Yes.
Q. And where did you go to high school?
A. Hicksville, New York.
Q. What was the name of the school?
A. Holy Trinity Diocesan High School.
   MR. KRAMER: Are you having any trouble with the speed of the answers or are we okay?
   THE REPORTER: Just fine.
Q. When did you graduate from high school?
A. 2003.
Q. Did you attend any school after graduating from high school?
A. I did.
Q. What school did you attend?

Page 28

S. KEHOE

A. John Jay College of Criminal Justice.
Q. And is that in Manhattan?
A. Yes.
Q. Did you graduate from John Jay?
A. I did.
Q. And when did you graduate?
A. Graduated with my bachelor's degree in 2007 and my master's degree in 2009.
Q. What was your bachelor's degree in?
A. Public administration.
Q. What does a bachelor's in public administration entail? What does that course of study involve?
A. There's multiple facets. It can go from math classes to financial classes to just general -- there was a minor in criminal justice, so different type of forensic classes as well.
Q. So are you saying that you had a minor in criminal justice?
A. Yes.

Page 29

S. KEHOE

Q. In connection with your studies at John Jay, did you take criminal law classes?
A. I did.
Q. Did you study the New York Penal Law?
A. I did.
Q. Did you study criminal procedure?
A. Briefly.
Q. Do you remember studying the New York criminal procedure laws?
A. I remember going over them, not, I wouldn't say studying. I would say we reviewed them.
Q. What was your master's in?
A. Protection management.
Q. What is protection management?
A. Focused mostly on security systems, fire systems, security, corporate security, along those lines.
Q. After receiving your master's degree, did you receive any further education?

Page 34

1  S. KEHOE
2  grade of 77 on that test.
3     Q. What about the test in
4  connection with the Suffolk County Police
5  Department?
6     A. I believe I obtained a passing
7  grade of 92 on that test.
8     Q. And the test for the Department
9  of Environmental Protection?
10    A. I don't recall.
11    Q. Do you recall if you passed that
12 test?
13    A. I don't recall.
14    Q. So at that point you had the
15 option of attending an academy for either
16 of those police departments or for The
17 Port Authority Police Department; is that
18 right?
19       MR. BROPHY: Note my objection.
20    You can answer.
21    A. That is not right.
22    Q. Can you explain how that worked?
23    A. Each test is a little bit
24 different. For Nassau County and Suffolk
25 County, it is, falls under New York State

Page 35

1  S. KEHOE
2  Civil Service and they take the grades
3  from highest to lowest. At the time of my
4  appointment with The Port Authority, I had
5  not been called for either of those jobs.
6     Q. So you received an offer to
7  attend The Port Authority Police
8  Department academy?
9     A. I did.
10    Q. Did you choose to attend that
11 academy?
12    A. I did.
13    Q. Do you remember when you
14 started?
15    A. March 14th, 2008.
16    Q. How long is the police -- the
17 PAPD academy?
18    A. Approximately, six months.
19    Q. And you said you started in
20 March of 2008, so you would have graduated
21 later in 2008?
22    A. I started March 14th, 2008, I
23 graduated early August of 2008.
24    Q. While you were at the PAPD
25 academy, what did you study?

Page 36

1  S. KEHOE
2     A. It's six months worth of
3  lessons. You have to be a little bit more
4  specific.
5     Q. Well, what did you learn at the
6  PAPD academy?
7     A. New York --
8        MR. BROPHY: Objection. You can
9     answer.
10    A. New York law, New Jersey law,
11 various medical, you know, how to do CPR.
12 There was multiple, multiple classes.
13 Defensive tactics.
14    Q. Did you study New York criminal
15 law?
16    A. Yes.
17    Q. Did you study the New York Penal
18 Law?
19    A. Yes.
20    Q. Did you study New York Criminal
21 Procedure Law?
22    A. Briefly.
23    Q. In connection with your work as
24 a PAPD officer, isn't much of what you do
25 -- doesn't much of what you do involve the

Page 37

1  S. KEHOE
2  New York Criminal Procedure Law?
3        MR. BROPHY: Objection. You can
4     answer.
5     A. No.
6     Q. Do you stop suspects during your
7  work as a PAPD officer?
8     A. Define stop.
9     Q. Do you approach suspects during
10 your work as a PAPD officer?
11       MR. BROPHY: Objection, you can
12    answer.
13    A. I don't like how you word that.
14 I don't know if they are a suspect until
15 after I, well after I stop somebody and I
16 obtain information from that person. So
17 do I, do I come in contact with people?
18 Yes, I do.
19    Q. Well you just said that you
20 don't know if someone is a suspect until
21 you speak to them. Is that what you just
22 said?
23    A. Until I know the facts of the
24 case. I just don't, I can't -- I can't
25 tell I stop somebody and say that person

10 (Pages 34 - 37)

Page 118

S. KEHOE

1  
2  lewdness in the men's room. Upon others.
3  There's many.
4      Q.  So who did you have this
5  conversation with where these issues were
6  brought to your attention?
7      A.  I don't recall.
8      Q.  Was it a superior with The Port
9  Authority Police Department?
10     A.  I would say multiple superiors.
11 I don't recall who though.
12     Q.  So it sounds like you did have
13 other conversations with superiors at The
14 Port Authority Police Department where the
15 public lewdness was discussed?
16         MR. BROPHY:  Note my objection.
17     You can answer.
18     Q.  Is that right?
19     A.  That's not right.  I was given
20 -- I was -- I was explained -- it wasn't a
21 conversation.  It was a, more of a
22 detailed description of the crimes
23 occurring in the Port Authority bus
24 terminal.
25     Q.  During those conversations, what

Page 119

S. KEHOE

1  
2  detailed description of the crimes were
3  you given?
4          MR. BROPHY:  Note my objection.
5      Q.  With regard -- I apologize.
6          MR. BROPHY:  Sorry.
7      Q.  With regard to public lewdness?
8          MR. BROPHY:  Objection.  You can
9      answer.
10     A.  There was -- there was multiple
11 reports that there was public lewdness in
12 the men's room in the second floor of the
13 bus terminal.
14     Q.  Were there any further details
15 that were given to you?
16     A.  No.
17     Q.  Did anyone describe to you what
18 form that public lewdness was taking?
19     A.  No.
20     Q.  Did anyone instruct you on how
21 you should patrol for public lewdness?
22     A.  No.
23     Q.  Did anyone give you any
24 instructions on how you should patrol
25 restrooms at The Port Authority bus

Page 120

S. KEHOE

1  
2  terminal?
3      A.  No.
4      Q.  Did you talk to fellow PAPD
5  officers about the public lewdness issue
6  at The Port Authority bus terminal?
7      A.  No.
8      Q.  Are there any written guidelines
9  as to how you should conduct plainclothes
10 patrols?
11     A.  I don't know.
12     Q.  Did you review any written
13 guidelines as to how to conduct
14 plainclothes patrols?
15     A.  No.
16     Q.  Are there any written guidelines
17 as to how you should patrol inside
18 restrooms at The Port Authority bus
19 terminal?
20     A.  Not that I'm -- not that I'm
21 aware.
22     Q.  Have you reviewed any?
23     A.  No.
24     Q.  Did there come a time when your
25 plainclothes patrols involved entering

Page 121

S. KEHOE

1  
2  men's restrooms at The Port Authority bus
3  terminal?
4      A.  Yes.
5      Q.  Can you remind me when your
6  plainclothes patrol first started?
7      A.  Plainclothes patrol has been an
8  off and on thing from when I got on the
9  job in 2008 until present time.  I don't
10 remember the first time that I ever worked
11 plainclothes.  I couldn't give you a date.
12     Q.  Would it have been in the period
13 2008 to 2010, your first three years on
14 the job?
15     A.  Very likely, yes.
16     Q.  During that period, would your
17 plainclothes patrol have involved the
18 public restroom, patrol of the men's
19 restrooms at the Port Authority bus
20 terminal?
21     A.  Yes.
22     Q.  During that period, do you
23 recall observing any lewd behavior in the
24 public restrooms at the Port Authority bus
25 terminal?

31 (Pages 118 - 121)