# EXHIBIT 4

Page 1

1  UNITED STATES DISTRICT COURT
   FOR THE SOUTHERN DISTRICT OF NEW YORK
2  ---------------------------------------------x
   CORNELL HOLDEN, MIGUEL MEJIA, and JEFFREY K.
3  REED, on behalf of themselves and others
   similarly situated,
4          Plaintiffs,
5
           v.            1:17-cv-02192-JGK-RL
6
7  THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY;
   THE PORT AUTHORITY POLICE DEPARTMENT; and
8  MICHAEL OPROMALLA, SHAUN KEHOE, JOHN TONE,
   JORDAN ESPOSITO, MICHAEL DEMARTINO,
9  RICHARD AYLMER, and OFFICERS JOHN DOE 1-100,
   sued in their individual capacities and
10 official capacities as officers of the Port
   Authority Police Department
11         Defendants.
12
   ---------------------------------------------x
13
14              June 26, 2018
15              10:41 a.m.
16
17
18       MICHAEL OPROMALLA
19
20
21
22
23
24
25

| | |
|---|---|
| Page 2 | Page 4 |

Page 2

                    June 26, 2018

                    10:41 a.m.

 8  Video recorded Deposition of MICHAEL OPROMALLA,
 9  taken by the plaintiffs, pursuant to notice, at
10  the offices of Winston & Strawn, 200 Park
11  Avenue, New York, New York, before Mark
12  Richman, a Certified Shorthand Reporter,
13  Registered Professional Reporter and Notary
14  Public within and for the State of New York.

Page 4

 2      THE VIDEOGRAPHER:  Good morning.
 3  We are going on the record at
 4  a.m. on June 26, 2018.  Please note
 5  that the microphones are sensitive and
 6  may pick up whispering, private
 7  conversations and cellular
 8  interference.  Please turn off all
 9  cellphones or place them away from the
10  microphones as they can interfere with
11  the deposition audio.  Audio and video
12  recording will continue to take place
13  unless all parties agree to go off the
14  record.
15      This is media unit number 1 of
16  the video recorded deposition of
17  officer Michael Opromalla, taken by
18  counsel for plaintiffs, in the matter
19  of Cornell Holden, et al., versus The
20  Port Authority of New York & New
21  Jersey, et al., filed in the United
22  States District Court Southern
23  District of New York, case number
24  17-cv-02192-JGK RL.
25      This deposition is being held at

Page 3

1 A P P E A R A N C E S:
2 WINSTON & STRAWN LLP
  Attorneys for the Plaintiffs
3   200 Park Avenue
    New York, New York 10166
4
5 BY:  ROSS M. KRAMER, ESQ.
      EMILY ELLIS, ESQ.
6     rkramer@winston.com
      eellis@winston.com
7
        -and-
8
  THE LEGAL AID SOCIETY
9   199 Water Street
    New York, New York 10038
10
11 BY:  CYNTHIA CONTI-COOK, ESQ.
       cconti-cook@legal-aid.org
12
13
   THE PORT AUTHORITY OF NEW YORK & NEW JERSEY
14 Attorneys for the Defendants
     Law Department
15   4 World Trade Center, 24th Floor
     New York, New York 10006
16
   BY:  KATHLEEN GILL MILLER, ESQ.
17      THOMAS ROBERT BROPHY, ESQ.
        kmiller@panynj.gov
18      tbrophy@panynj.gov
19
20
21 ALSO PRESENT:
22 CARLOS KING, Videographer
   MOLLY GRIFFARD, Intern, LAS
23 JACK CARTWRIGHT, Intern, WS
   LEAH ROMM, Intern, WS
24
25

Page 5

 2  the offices of Winston & Strawn
 3  located at 200 Park Avenue, New York,
 4  New York.
 5      My name is Carlos King from the
 6  firm of Veritext and I'm the
 7  videographer.  The court reporter is
 8  Mark Richman also from Veritext.
 9      I'm not authorized to administer
10  an oath.  I'm not related to any party
11  in this action.  And I'm not
12  financially interested in the outcome.
13      Counsel and all present in the
14  room and everyone attending remotely
15  will now state their appearance and
16  affiliations for the record.  If there
17  are any objections to the proceedings
18  please state them at the time of your
19  appearance, beginning with noticing
20  attorney.
21      MR. KRAMER:  So I'm Ross Kramer,
22  K-r-a-m-e-r, from Winston & Strawn.
23  With me is Emily Ellis, E-l-l-i-s,
24  from Winston & Strawn.  Cynthia
25  Conti-Cook from The Legal Aid Society.

Page 26

1  M. OPROMALLA
2  A. I can't recall. I didn't really
3  communicate with them. We were in
4  separate departments.
5  Q. So what did you do after you
6  left your position as a guidance
7  counselor?
8  A. I entered the Police Academy
9  with The Port Authority Police Department.
10  Q. Why did you leave your position
11  as a guidance counselor?
12  A. I was always curious about a
13  career in law enforcement and decided to
14  explore that.
15  Q. So when did you enter the Police
16  Academy?
17  A. August of 2013.
18  Q. So I don't know the answer to
19  this. Is there a separate Police Academy
20  for The Port Authority Police from NYPD,
21  or is it all the same academy?
22  A. It's a separate department.
23  Q. It's a separate department
24  within the same Police Academy or is it
25  sort of a separate school in itself?

Page 27

1  M. OPROMALLA
2  A. It is a separate academy from
3  the NYPD.
4  Q. Where is that located?
5  MS. MILLER: The Port Authority
6  Police Academy?
7  MR. KRAMER: I'm sorry.
8  Q. The Port Authority Police
9  Academy?
10  A. 241 Erie Street, Jersey City.
11  Q. The application process for The
12  Port Authority Police Academy, is that
13  separate from the application you would
14  file to the NYPD Police Academy? Does it
15  have its own separate application process?
16  A. Yes, it is separate.
17  Q. Did you apply for other law
18  enforcement jobs at the same time you
19  applied for The Port Authority Police
20  Academy?
21  A. I did.
22  Q. What other, what other law
23  enforcement academies?
24  A. I applied for NYPD.
25  Q. And what was the result of your

Page 28

1  M. OPROMALLA
2  NYPD application?
3  A. I chose to go with The Port
4  Authority Police Department.
5  Q. So you were also accepted to the
6  NYPD Police Academy?
7  A. I was.
8  Q. What, what made you decide to go
9  to The Port Authority Police Academy?
10  A. I actually, I have a family
11  member on the job.
12  Q. And who is that?
13  A. Sergeant Opromalla.
14  Q. What's his relationship with
15  you?
16  A. Cousins.
17  Q. At the time you were making that
18  decision, what was your understanding of
19  the job of a Port Authority police
20  officer?
21  A. I understood The Port Authority
22  police to patrol and uphold the laws of
23  transportation facilities in New York &
24  New Jersey.
25  Q. So you started the Police

Page 29

1  M. OPROMALLA
2  Academy, to get back on track, in August
3  of 2013; is that right?
4  A. That's correct.
5  Q. How long a program is The Port
6  Authority Police Academy?
7  A. It's approximately five months.
8  Q. Do you know how long the NYPD
9  Police Academy is?
10  A. I do not.
11  Q. Are you paid during the time
12  that you're at The Port Authority Police
13  Academy?
14  A. You are.
15  Q. Do you live on a campus there,
16  or do you stay living in your, in your
17  formal residence?
18  A. There's, there's no campus. You
19  commute.
20  Q. Can you describe to me the
21  course of study at The Port Authority
22  police Police Academy? And we will drill
23  down to specifics. But can you give me a
24  description of what you study at the
25  Police Academy?

8 (Pages 26 - 29)

Page 34

M. OPROMALLA

1
2  that may have a mental disability as well
3  as homeless individuals.
4     Q.   And what were the -- what were
5  the lessons in connection with people like
6  you've just described?
7        MS. MILLER:  Objection.  You may
8     answer.
9     A.   From what I remember, one of the
10 topics we discussed when dealing with
11 someone that may have autism or a mental
12 disability, they may not understand your
13 questions.  They may become irate.  So
14 we're taught to try to de-escalate as much
15 as possible.
16    Q.   Would the same thing be the case
17 for someone that you identified as, I
18 think you mentioned homeless?
19    A.   Yes.  Generally when dealing
20 with a homeless individual, you want to
21 try to offer them assistance, as well as
22 any type of outreach.
23    Q.   What about somebody who was, you
24 suspected of being intoxicated or on
25 drugs, was that a subject that was

Page 35

M. OPROMALLA

1
2  covered?
3     A.   Yes.
4     Q.   And what were the, what were the
5  lessons about dealing with those types of
6  people?
7     A.   Primarily, you try to assess if
8  they need medical attention.
9     Q.   Was there any training on
10 dealing with people who may be, identify
11 as LGBT?
12    A.   I don't recall.
13    Q.   Was there any training or did
14 any of the classes touch on dealing with
15 people of color?
16    A.   No.
17    Q.   Was there any discussion about
18 unconscious bias amongst law enforcement?
19    A.   I don't recall.
20    Q.   Was there any discussion on
21 issues with law enforcement targeting
22 minorities?
23    A.   I can't recall.
24    Q.   Was there any training given at
25 all about how to deal with people who may

Page 36

M. OPROMALLA

1
2  identify as LGBT?
3     A.   We were trained to deal with
4  everyone unbiasedly.  I don't recall if
5  there was anything specific.
6     Q.   Was there any training about, or
7  discussion about law enforcement in
8  connection with restrooms?
9     A.   No.
10    Q.   Was there any training or
11 discussion about the special issues that
12 come up with regard to places that people
13 treat as private?
14       MS. MILLER:  Objection.  You may
15    answer.
16    A.   No.
17    Q.   You mentioned that you were
18 trained to deal with people unbiasedly.
19 What did that mean to you?
20    A.   To me, that means you treat
21 people equally, regardless of race, color,
22 religion, orientation.
23    Q.   In connection with law
24 enforcement, do you think that that is
25 always possible?

Page 37

M. OPROMALLA

1
2        MS. MILLER:  Objection.  You may
3     answer.
4     A.   Can you repeat?
5     Q.   In connection with your law
6  enforcement responsibilities, do you think
7  it's always possible or realistic to treat
8  people the same, no matter their race or
9  gender identification or religion?
10       MS. MILLER:  Objection.  You may
11    answer.
12    A.   I do.
13    Q.   Do you always treat people the
14 same in connection with your law
15 enforcement responsibilities in connection
16 with their age?
17    A.   I do.
18    Q.   So as an experienced law
19 enforcement officer, do you find that
20 young people tend to commit a different
21 type of offense than older people?
22       MS. MILLER:  Objection.  You may
23    answer.
24    A.   I'm not sure I understand.
25    Q.   Let's, let's be more specific.

10 (Pages 34 - 37)

Page 82

M. OPROMALLA

Q. Why -- why would you think a man would try to look at you while he was masturbating in a bathroom if he was not a gay man?

A. I don't know. It's possible that he's gay, but I don't know for certain. And I'm not making assumptions about anyone. I'm strictly enforcing a condition.

Q. Did you ever have discussions of anyone else at The Port Authority -- did you ever have discussion with anyone else at The Port Authority Police Department about whether this -- these incidents involved gay men?

A. I'm sorry, can you repeat the question?

Q. Let me break it down into two questions.

Do you ever remember having conversations with anyone else at The Port Authority Police Department regarding these incidents of public lewdness that were occurring in The Port Authority men's

Page 83

M. OPROMALLA

bathrooms?

A. I recall being told of the activities and behavior that go on in there.

Q. Do you remember who told you that, specifically?

A. Specifically, no.

Q. Would you have been told that by supervisors?

A. That the first day I worked plain clothes I was informed by a supervisor that this goes on.

Q. You say worked plain clothes. Was that the first day on the job, or was it some time subsequent that you worked plain clothes?

A. It was approximately three months or so in to my career.

Q. And how long did you work plain clothes for?

A. Approximately, six to eight months.

Q. And then you went back to being a uniformed officer?

Page 84

M. OPROMALLA

A. That's correct.

Q. Did you ever again work plain clothes, or was it just that one, six to eight month tour?

A. I had gotten the detail sporadically later on in my career.

Q. Was this the longest detail, plain clothes detail that you had in your career, in 2014?

A. Yes.

Q. When you were informed that there was an issue in The Port Authority men's bathrooms of men engaged in public lewdness, including masturbating in the bathroom, were you told that this was a problem with gay men?

A. No.

Q. Subsequent to that initial conversation, did you ever have a conversation with anyone else at The Port Authority Police Department about incidents of public lewdness including masturbating in The Port Authority bus terminal men's bathrooms?

Page 85

M. OPROMALLA

MS. MILLER: Objection. You may answer.

A. I'm sorry, one more time.

Q. After that first time when you were informed of this condition, do you remember ever having discussions about these incidents with anyone else on the -- in The Port Authority Police Department?

MS. MILLER: Objection. You may answer.

A. I do.

Q. Who do you remember having conversations with?

A. Captain Fitzpatrick. He, he had explained that this was an ongoing condition and that he wanted us to continue to enforce the laws specifically regarding this condition.

Q. When was that discussion with Captain Fitzpatrick?

A. I don't recall. It was some time when I first started working plain clothes.

Q. When you started working plain

Page 86

M. OPROMALLA

1
2  clothes, were you given any extra
3  instruction or training?
4     A.   No.
5     Q.   Do plain clothes patrols include
6  only the restrooms or do they include
7  other parts of The Port Authority bus
8  terminal as well?
9     A.   Other parts as well.
10    Q.   When you had the discussion with
11 Captain Fitzpatrick, did either you or he
12 mention that this situation involved gay
13 men?
14    A.   No.  Orientation wasn't the
15 factor.  It was strictly addressing this
16 ongoing, frequent condition.
17    Q.   Do you recall having any
18 conversations with other police officers
19 about this condition in The Port Authority
20 bus terminal men's rooms?
21       MS. MILLER:  Objection.  You may
22   answer again.
23    A.   Yes, other officers worked plain
24 clothes as well and they had effected
25 arrests for this condition as well.

Page 87

M. OPROMALLA

1
2     Q.   During any of those
3  conversations, do you recall it coming up
4  that these incidents involved gay men?
5     A.   No.
6     Q.   Do you recall anyone you were
7  speaking with speculating that this was --
8  involved gay men masturbating in The Port
9  Authority bus terminal men's rooms?
10    A.   No, I don't recall.
11    Q.   Do you recall discussing your
12 belief, as we discussed earlier, that it
13 was surprising that this was going on?
14    A.   I don't remember.  I just
15 remember me being very surprised that this
16 was a condition.
17    Q.   Do you remember other officers
18 ever expressing surprise to you that this
19 was a condition going on at The Port
20 Authority bus terminal?
21    A.   Specifically, no.
22    Q.   Who do you remember having
23 conversations with about this condition
24 occurring at The Port Authority bus
25 terminal?

Page 88

M. OPROMALLA

1
2     A.   I don't remember specific
3  conversations.  I --
4     Q.   Do you remember --
5     A.   I'm sorry.
6     Q.   I didn't mean to interrupt you.
7  If I ever do, it's my fault, I shouldn't
8  do that.  Do you patrol with partners?
9     A.   Yes.
10    Q.   How many partners have you had
11 since you've been with The Port Authority
12 Police Department?
13    A.   I have -- can I refrain -- can I
14 correct something?
15    Q.   Yeah, of course.
16    A.   When you work plain clothes you
17 have a partner.
18    Q.   Okay.  So that's a good, that's
19 a good factor.  Appreciate that.  So
20 during the time that you were plain
21 clothes in this period in 2014, did you
22 have one partner or did you have more than
23 one partner?
24    A.   Usually it's two partners and a
25 sergeant -- two officers and a sergeant.

Page 89

M. OPROMALLA

1
2     Q.   So that would be a team of four
3  people?
4     A.   No, about three.
5     Q.   Okay.  So I thought it was two
6  officers, you meant two officers beside
7  yourself.  You just mean yourself, one
8  other officer and a sergeant?
9     A.   Generally, yes.
10    Q.   Would the -- would that team of
11 three be the same every day, or did it
12 rotate?
13    A.   It changed all the time.
14    Q.   So during the time that you were
15 a -- doing this plain clothes shift, how
16 many different partners would you say you
17 had?
18       MS. MILLER:  Objection.  You may
19   answer.
20    A.   Say at least 10 to 15 different
21 people.
22    Q.   Was there -- were there any
23 partners that you worked with more
24 frequently than others during that time
25 period?

23 (Pages 86 - 89)

Page 170

M. OPROMALLA

Q. One thing that I know we touched on but I just want to make sure we've exhausted it, it's very -- a topic that I'd like to, to talk about a little more is what instructions you were given by superiors in terms of your patrols in the men's restrooms.

So just recapping, correct me if I'm wrong, you were spoken to by Captain Fitzpatrick when you started your plain clothes detail about the issues of public lewdness in the men's restrooms; is that right?

A. That's correct.

Q. And you were also spoken to by Sergeant Miller about that same condition; is that right?

A. That's correct.

Q. Do you remember who spoke to you first, was it Sergeant Miller or sergeant Fitzpatrick -- or Captain Fitzpatrick?

A. I believe it was Sergeant Miller the first day I worked.

Q. Did Sergeant Miller give you any

Page 171

M. OPROMALLA

practical instructions as to how to carry out your patrols in the men's room?

A. He just informed me of what to look for in regards to public lewdness, as well as he told me to take enforcement if I saw another -- another crime or issue arise.

Q. Did he ever talk about details such as whether you should approach a urinal?

A. He informed me that if you stand at the urinal long enough, you may see somebody engage in this type of behavior.

Q. So he said that when you go into the men's room, you might already see someone engaging in that behavior and that's one circumstance, right?

A. That's correct.

Q. And he also said that if you wait at the urinal for long enough, someone may start engaging in that behavior; is that right?

A. That's correct.

Q. Did he say how long you should

Page 172

M. OPROMALLA

stand in the urinal?

A. No, he didn't. I don't think there's a time limit.

Q. What's the longest that you stood at a urinal waiting for this behavior to occur?

A. Five, ten minutes.

Q. Did you ever stand at a urinal waiting for the behavior to occur, and it didn't occur so you just walked away?

A. Yes.

Q. Did Sergeant Miller give you -- or -- give you any instruction about interacting with people at the other urinals?

A. No, he did not.

Q. Did he say that you should or should not try to make eye contact with them?

A. No, he did not.

Q. Did he say that you should or should not try to see them -- to see their penis while you were at the urinal?

A. He informed me that in order to

Page 173

M. OPROMALLA

have probable cause, you need to see them masturbating.

Q. Did sergeant -- I keep calling him sergeant. Did Captain Fitzpatrick give you any practical instructions about how to conduct your patrol in the men's room?

A. Not particularly, no.

Q. Did he discuss with you whether you should or should not stand at a urinal?

A. He did not. He just encouraged us in addressing the condition.

Q. During any conversation where you were receiving instruction from or direction from Sergeant Miller, did he mention the terms gay or homosexual in any context?

A. No.

Q. And when you were having the conversation with Captain Fitzpatrick, did he mention the terms gay or homosexual in any context?

A. No.

Page 210

1     M. OPROMALLA
2  testimony -- I'm sorry, withdrawn.
3         Your testimony was that in your
4  experience people masturbating within the
5  men's restroom sometimes attempt to engage
6  other patrons in the restroom; is that
7  right?
8         MS. MILLER:  Objection.  You may
9     answer.
10    A.    That's correct.
11    Q.    And when you exited the
12 bathroom, was Mr. Holden still in your
13 opinion in the process of masturbating at
14 the urinal?
15        MS. MILLER:  Objection.  You may
16    answer.
17    A.    He was.
18    Q.    Did you have any concern that if
19 you left the bathroom he could have tried
20 to engage someone who was not a plain
21 clothes officer?
22    A.    It's a possibility.  But at that
23 time, as I said before, I thought it was
24 safer for him to exit before the approach.
25    Q.    You thought it was safer to

Page 211

1     M. OPROMALLA
2  yourself or to other patrons?
3         MS. MILLER:  Objection.  You may
4     answer again.
5     A.    To the defendant, to myself and
6  to other patrons.
7     Q.    Did you believe it was safer for
8  you to exit the bathroom than for you to
9  stand back in the bathroom and wait for
10 him to leave?
11    A.    I suppose that it would have
12 been an option for me to observe in the
13 bathroom, but I didn't.  And it doesn't
14 change the fact that I observed him
15 engaging in behavior that fits the public
16 lewdness statute.
17    Q.    If you observed -- you said
18 you've had 14 arrests; is that right?
19    A.    That's correct.
20    Q.    14 arrests for public lewdness,
21 apologize.  Is that right?
22    A.    That's correct.
23    Q.    In each of those cases, have you
24 left the bathroom while a suspect was
25 still engaged in that lewd behavior?

Page 212

1     M. OPROMALLA
2     A.    In many of the cases, yes.
3  Because the -- from what I observed, the
4  suspects exited shortly after.
5     Q.    But there was a period of time
6  when you as a law enforcement agent had
7  left the bathroom while that crime was in
8  progress in each of those cases; is that
9  right?
10    A.    No, that's not correct.
11    Q.    Okay, then we will get to each
12 one if that's certainly not correct
13 because I certainly don't want to have you
14 say anything that's not correct.
15        In Mr. Holden's case you left
16 the bathroom while what you believed to be
17 a crime was in process; is that right?
18    A.    It was in process.  But like I
19 said before, I felt it was best at the
20 time to approach him when he exited the
21 men's room.
22    Q.    You felt it best in connection
23 with public safety, correct?
24        MS. MILLER:  Objection.  You may
25    answer again.

Page 213

1     M. OPROMALLA
2     Q.    I'm sorry.  Did you believe that
3  that was best in connection with public
4  safety?
5     A.    I did.
6     Q.    Did you believe it was best to
7  wait 20 minutes in connection with public
8  safety?
9     A.    As a rookie officer, yes, I felt
10 that was the best scenario.
11    Q.    Did you feel --
12    A.    As an officer --
13    Q.    My apologies.
14    A.    -- with almost five years on,
15 maybe I would handle it differently now.
16    Q.    How would you handle it
17 differently now?
18    A.    Perhaps I would -- I would --  I
19 would wait in the bathroom.
20    Q.    If you had left the bathroom,
21 would you go back in to check and see what
22 was taking so long?
23        MS. MILLER:  Objection.  You may
24    answer.
25    A.    Yeah, I might go in to check.

Page 258

M. OPROMALLA

A. Well I'm actually doing paperwork for a good remainder of the day. It actually takes a while.

Q. So I see you didn't make any further arrests those two days; is that right?

A. No, that's correct.

Q. Okay. So the next one we have is I guess my exhibit L.

(Exhibit 12, arrest report from May 27, 2014, no Bates number was marked for identification.)

Q. We will go through these as fast as we can. I don't think we have too many specific questions. This looks like an arrest report from May 27, 2014. Right?

A. Yes.

Q. So the arrest we talked about of Cornell Holden was before this one, right?

A. Yes.

Q. It was before the first four but after this one so it would have been your fifth arrest?

A. Yes, that sounds right.

Page 259

M. OPROMALLA

Q. And that was within a two week span?

A. Yes.

Q. April 28th to May 12th?

A. Yes.

Q. So this was another arrest, the exhibit we're looking at now, for public lewdness and you were the arresting officer, correct?

A. That's correct.

Q. Do you have any independent recollection of this arrest, what happened or what the person looked like?

A. I'm sorry, I don't. I can't see the name.

Q. It's also hard going back and looking at the descriptions because the descriptions of all of these arrests seem to be essentially the same, right, the way that they're described in your paperwork?

A. You could say that, yes.

Q. Would you -- would you actually cut and paste it on a computer program from earlier arrest paperwork?

Page 260

M. OPROMALLA

A. No.

Q. Would you refer back to the earlier arrest paperwork in using the language on later arrest paperwork?

MS. MILLER: Objection. You may answer.

A. Well I mean once you do one, you kind of understand what -- how to describe masturbating. I mean that's how you describe it. It's not that complicated. So that's why the language may seem similar. But that's -- I'm just describing the acts that fit the charge of public lewdness.

Q. Did you ever look at any kind of like model or guideline or boiler plate language for how to describe an arrest for public lewdness or exposure?

A. No.

Q. So this language was developed by you in connection with your arrests; is that right?

A. I may have asked an older officer at some point, you know, what's

Page 261

M. OPROMALLA

the best way to articulate this. And also, you know, I thought at the time I was being descriptive, so.

Q. In the four and a half years you've worked, I think you said early on you've made about 30 arrests; is that right?

A. 30 arrests throughout the time I've been on with The Port Authority.

Q. That's about four and a half years now, almost coming on five years?

A. That's correct.

Q. So, so far we've looked at six of your 30 arrests that all took place within the first four months of you arriving on the force?

A. That's correct.

Q. Let's go on to the next one.

(Exhibit 13, arrest that was made on May 28th, 2014 no Bates number was marked for identification.)

Q. We're marking this exhibit as exhibit 13. Is this an arrest that was made on May 28th, 2014 where you were the

```
                                                     Page 290
 1           M. OPROMALLA
 2   arrests for public lewdness and indecent
 3   exposure in those men's rooms was being
 4   communicated to the community?
 5           MS. MILLER:  Objection.
 6      A.   I don't know if other than
 7   newspaper articles, if it was being
 8   communicated to the community.
 9      Q.   Did you believe that members of
10   the public who were arrested using those
11   bathrooms were members of a certain
12   community?
13           MS. MILLER:  Objection, you may
14      answer.
15      A.   No, I don't know how I would
16   know that.
17      Q.   Did you or any other officer
18   express an opinion that the people who
19   were arrested were members of the New York
20   gay community?
21      A.   No, I don't recall that.
22      Q.   Do you ever recall any officer
23   with whom you worked discussing that these
24   arrests were of gay men using the
25   restrooms?
```

```
                                                     Page 291
 1           M. OPROMALLA
 2      A.   No.
 3           MR. KRAMER:  Okay.  Could we
 4      take a five-minute break and we will
 5      review whether we have anything else.
 6      If we do it will be very brief and
 7      then we will call it a day.
 8           MS. MILLER:  Okay.
 9           MR. KRAMER:  Okay.
10           THE VIDEOGRAPHER:  The time is
11      5:33 p.m. and we're off the record.
12           (A recess was had.)
13           THE VIDEOGRAPHER:  The time is
14      5:42 p.m., we're back on the record.
15      Q.   We referenced some of these
16   arrests as being made in the second floor
17   men's bathroom in The Port Authority bus
18   terminal; is that right?
19      A.   That's correct.
20      Q.   And that bathroom is open to the
21   public; is that correct?
22      A.   That's correct.
23      Q.   We also discussed very briefly
24   the idea of quotas.  Were you ever told
25   that you had a quota for a certain number
```

```
                                                     Page 292
 1           M. OPROMALLA
 2   of arrests to make?
 3      A.   No.
 4      Q.   Were you ever told in any of
 5   your classes or training sessions that
 6   it's unlawful to have arrest quotas?
 7      A.   I don't recall.
 8      Q.   We looked at your, your
 9   personnel file very briefly.  In your time
10   with The Port Authority Police Department,
11   have you ever been disciplined?
12      A.   No.
13      Q.   Have you ever had any incidents
14   that were reviewed by superiors?
15           MS. MILLER:  Objection.
16      A.   No.
17      Q.   Have you ever made any arrests
18   that were questioned by superiors?
19      A.   No.
20      Q.   After the New York Times article
21   came out, you did spend time as a plain
22   clothes officer again; is that right?
23      A.   Yes.
24      Q.   And that's called, is that the
25   TPU unit?
```

```
                                                     Page 293
 1           M. OPROMALLA
 2      A.   That's correct.
 3      Q.   And as part of that plain
 4   clothes patrol, you patrolled the men's
 5   room; is that right?
 6      A.   The men's room is included in
 7   the patrol of The Port Authority, yes.
 8      Q.   Taking all of those subsequent
 9   plain clothes patrols together after the
10   article came out, did you ever make
11   another arrest in a men's bathroom for
12   public lewdness or exposure of a person?
13      A.   I did not.
14      Q.   During the time that you were
15   subsequently on those plain clothes
16   patrols, did you ever observe any of the
17   indicators that would have led you to
18   believe that someone may have been
19   engaging in public lewdness or exposure of
20   a person?
21      A.   As I stated before -- as I
22   stated before, I didn't spend a lot of
23   time in plain clothes due to the
24   renovations.  After they renovated the
25   bathrooms, it became a harder condition to
```

74 (Pages 290 - 293)