# EXHIBIT 5

Page 1

```
 1
 2    UNITED STATES DISTRICT COURT
 3    FOR THE SOUTHERN DISTRICT OF NEW YORK
 4    ------------------------------------x
 5    CORNELL HOLDEN, MIGUEL MEJIA, and
      JEFFREY K. REED, on behalf of
 6    themselves and others similarly situated,
 7                      Plaintiffs,
 8    -against-            1:17-cv-02192-JGK-RL
 9    THE PORT AUTHORITY OF NEW YORK AND
      NEW JERSEY; THE PORT AUTHORITY POLICE
10    DEPARTMENT; and MICHAEL OPROMALLA,
      SHAUN KEHOE, JOHN TONE, JORDAN ESPOSITO,
11    MICHAEL DEMARTINO, RICHARD AYLMER and
      OFFICERS JOHN DOE 1-100, sued in their
12    individual capacities as officers of
      the Port Authority Police Department,
13
                        Defendants.
14
      ------------------------------------x
15
                        October 29, 2018
16                      10:28 a.m.
17
18        Videotaped Deposition of VIJAY
19    SEETARAM, taken by Plaintiffs, pursuant
20    to Notice, at the offices of Winston &
21    Strawn LLP, 200 Park Avenue, New York,
22    New York, before ERIC J. FINZ, a
23    Shorthand Reporter and Notary Public
24    within and for the State of New York.
25
```

Page 2

1
2  A P P E A R A N C E S:
3  WINSTON & STRAWN LLP
    Attorneys for Plaintiffs
4     200 Park Avenue
      New York, New York 10166
5
   BY:  CESIE C. ALVAREZ, ESQ.
6       (calvarez@winston.com)
        MICHELLE TUMA, ESQ.
7       (mtuma@winston.com)
8          -AND-
9  LEGAL AID SOCIETY
      199 Water Street
10    New York, New York 10038
11 BY:  CYNTHIA CONTI-COOK, ESQ.
        (cconti-cook@legal-aid.org)
12
13
   THE PORT AUTHORITY OF NEW YORK AND
14 NEW JERSEY
    Attorneys for Defendants
15    150 Greenwich Street
      New York, New York 10006
16
   BY:  KATHLEEN GILL MILLER, ESQ.
17
18
19 ALSO PRESENT:
20
     BENJAMIN RUTKIN-BECKER
21
     DEVERELL WRITE, Videographer
22
23
24
25

Page 3

1
2         IT IS HEREBY STIPULATED AND
3  AGREED by and between the attorneys for
4  the respective parties herein that filing
5  and sealing be and the same are hereby
6  waived.
7         IT IS FURTHER STIPULATED AND
8  AGREED that all objections, except as to
9  the form of the question, shall be
10 reserved to the time of the trial.
11        IT IS FURTHER STIPULATED AND
12 AGREED that the within deposition may be
13 signed and sworn to before any officer
14 authorized to administer an oath with the
15 same force and effect as if signed and
16 sworn to before the Court.
17
18
19
20
21
22
23
24
25

Page 4

1         VIJAY SEETARAM
2         THE VIDEOGRAPHER:  We are
3  going on the record at 10:28 a.m.
4  on October 29, 2018.
5         Please note that the
6  microphones are sensitive and may
7  pick up whispering and private
8  conversations.  Please place all
9  cell phones away from the
10 microphones as they can interfere
11 with the deposition audit crow.
12 Audio and video recording will
13 continue to take place unless all
14 parties agree to go off the record.
15        This is media unit 1 of the
16 video recorded deposition of Vijay
17 Seetaram, taken by counsel for the
18 plaintiff, in the matter of Cornell
19 Holden, et al., versus The Port
20 Authority of New York and New
21 Jersey, et al.  This case is filed
22 in the U.S. District Court, for the
23 Southern District of New York.
24        We are here at the offices of
25 Winston & Strawn, located at 200

Page 5

1         VIJAY SEETARAM
2  Park Avenue, New York, New York.
3  My name is Deverell Write
4  representing Veritext Legal
5  Solutions.  The court reporter is
6  Eric Finz from Veritext Legal
7  Solutions.
8         I'm not authorized to
9  administer an oath, I'm not related
10 to any party in this action, nor am
11 I financially interested in the
12 outcome.
13        At this time will counsel
14 state their appearances and
15 affiliation for the record.
16        MS. CONTI-COOK:  On behalf of
17 Cornell Holden and Miguel Mejia
18 from Legal Said Society.
19        THE WITNESS:  Good morning.
20        MS. ALVAREZ:  My name is Cesie
21 Alvarez, from Winston & Strawn on
22 behalf of plaintiffs.
23        MS. TUMA:  On behalf of
24 plaintiffs, I'm Michelle Tuma with
25 Winston & Strawn.

Page 22

VIJAY SEETARAM

2  Q. And when did your application
3  become complete?
4  A. That would be appointment, so
5  appointment was, I started at the Police
6  Academy in August of 2013.
7  Q. When you were in the military,
8  were you ever disciplined?
9  A. No.
10 Q. You had honorable discharge?
11 A. Yes.
12 Q. Have you been discharged?
13 A. Yes, 2014.
14 Q. And between 2009 and 2013 when
15 you were in the reserves, were you ever
16 deployed again?
17 A. Not in combat theater, no.
18 Q. But where?
19 A. Africa.
20 Q. What was the deployment in
21 Africa?
22 A. It was a mission to help build
23 schools.
24 Q. How long was that?
25 A. 45 days or so.

Page 23

VIJAY SEETARAM

2  Q. And you began the Police
3  Academy in August 2013. Is that correct?
4  A. Yes.
5  Q. And how long is the Police
6  Academy training program?
7  A. Five and a half months.
8  Q. Did you get to know Officer
9  Opromalla in that time period?
10 A. No, ma'am.
11 Q. Did you get to know Officer
12 John Tone in that time period?
13 A. No, ma'am.
14 Q. Were they in that training
15 program with you?
16 A. They were my classmates, so
17 they would have to be, yes.
18 Q. You didn't interact with them
19 as classmates?
20 A. No, ma'am.
21 Q. How many people were in that
22 class?
23 A. I think it started at about
24 200, but I'm not sure how many total
25 applicants that were in that class.

Page 24

VIJAY SEETARAM

2  Q. You said that there is 200
3  people who started. Did people drop out
4  as the program progressed?
5  A. Yes.
6     MS. MILLER: Objection.
7     You may answer.
8  A. Yes.
9  Q. About how many people dropped
10 out?
11 A. That I do not know.
12 Q. What did your training at the
13 Police Academy consist of?
14 A. Considered of the people law
15 of New York and New Jersey, constitution,
16 physical fitness, rifle -- pistol
17 shooting, swimming. Emergency medical
18 response.
19 Q. Did any portion of the
20 training instruct you on how to conduct
21 yourself in plainclothes?
22 A. In the Police Academy?
23 Q. Yeah.
24 A. No.
25 Q. Did any portion of the

Page 25

VIJAY SEETARAM

2  training cover constitutional rights?
3  A. Yes.
4  Q. In what aspects?
5     MS. MILLER: Objection.
6     You may answer.
7  A. Just a rundown of the
8  amendments of the constitution and what
9  the constitution is. What's covered
10 under the law.
11 Q. Did it cover the limitations
12 of policing under the constitution?
13    MS. MILLER: Objection.
14    You may answer.
15 A. Yes.
16 Q. In what way?
17 A. I mean, what you can and
18 cannot do as a police officer. Everyone
19 has their rights, you can't go against
20 them.
21 Q. Okay. Can you give me an
22 example?
23    MS. MILLER: Objection.
24    You may answer.
25 A. Example of what, breaking the

7 (Pages 22 - 25)

Page 26

VIJAY SEETARAM

1
2  constitution?
3     Q.   Yeah.
4     A.   I take my firearm out and
5  shoot into a crowd without any cause or
6  alarm.
7     Q.   Were you given any training at
8  the Police Academy regarding
9  discrimination?
10    A.   Yes.
11    Q.   Can you describe it?
12    A.   Just treat everyone neutral.
13    Q.   Did it give you any training
14 on how to be aware of your own internal
15 biases that you may not initially be
16 aware of?
17       MS. MILLER:  Objection.
18       You may answer.
19    A.   I'm a little confused what
20 you're asking me.  If they gave me any
21 training on how to not be biased?
22       MS. MILLER:  Excuse me.  If
23    you don't understand the question,
24    just say I don't understand the
25    question.

Page 27

VIJAY SEETARAM

1
2     Q.   Yes, that's what I'm asking.
3     A.   Can you repeat that, I'm
4  sorry?
5     Q.   Sure.
6          Did they give you any training
7  on how to not be biased?
8     A.   How to not be biased?  No.
9        MS. MILLER:  Objection.
10       You may answer.
11    Q.   Were you trained on how to
12 make arrests at the Police Academy?
13    A.   Yes.
14    Q.   Were you trained on how to
15 articulate probable cause?
16    A.   Yes.
17    Q.   Were you trained on how to
18 testify?
19    A.   No.
20    Q.   When did you graduate from the
21 Police Academy?
22    A.   January 2014.
23    Q.   And what was your first
24 position at the police department of The
25 Port Authority?

Page 28

VIJAY SEETARAM

1
2     A.   Police officer at The Port
3  Authority Bus Terminal.
4     Q.   And how long was that your
5  position?
6     A.   It's my current position as
7  well.
8     Q.   Okay.  So that's been your
9  position since January 2014?
10    A.   Yes, ma'am.
11    Q.   Have you applied for any
12 promotions?
13    A.   No, ma'am.
14    Q.   Are you eligible to apply for
15 promotions yet?
16    A.   No, ma'am.
17    Q.   When will you be eligible?
18    A.   Whenever the next rotation of
19 promotions come out.
20    Q.   And do you plan to apply for a
21 promotion?
22       MS. MILLER:  Objection.
23       You may answer.
24    A.   Yes, ma'am.
25    Q.   And what promotion do you plan

Page 29

VIJAY SEETARAM

1
2  to apply for?
3     A.   Sergeant's test when it comes
4  out.
5     Q.   When you were assigned to the
6  Port Authority Bus Terminal, was there a
7  location that you were primarily
8  responsible for?
9     A.   Every day you have an
10 assignment.  So given the day, the
11 assignment changes where your
12 responsibility is.
13    Q.   Did you get any training after
14 you left the Police Academy?
15    A.   Yes, ma'am.
16    Q.   What type of training?
17    A.   On job training.
18    Q.   What does that mean?
19    A.   It means you go throughout the
20 patrol with senior officers to learn how
21 to interact with the building, common
22 problem areas.
23    Q.   How often does the on-the-job
24 training occur?
25    A.   Every day you will have senior

Page 30

VIJAY SEETARAM

1  officers assigned to you.
2  Q. Every day since January 2014 you've been assigned to work next to senior officers?
3  MS. MILLER: Objection.
4  You may answer.
5  A. No, after about six months you start.
6  Q. So every day for about six months after you leave the academy?
7  MS. MILLER: Objection.
8  You may answer.
9  A. After you leave the academy, you have your on job training, where you're actively working. And then about six months you start getting your own post. And you could still call for additional units to ask for any questions you may have.
10 Q. In the six months following your assignment to The Port Authority Bus Terminal, what senior officers did you work with?
11 A. Officer Vincent Caruso,

Page 31

VIJAY SEETARAM

Officer Fairbanks, it changed every day. Officer Tommy Campbell, Officer Chris Howe.
Q. Anyone else?
A. Every day I had a different officer. These are the ones that come to the top of my head.
Q. Were they senior officers or sergeants?
A. Senior officers.
Q. So they were police officers as well?
A. Yes, ma'am.
Q. Did you also receive on-the-job training from any sergeants?
A. No, ma'am.
Q. And what type of areas in the building did the senior officers take you to to do on-the-job training?
MS. MILLER: Objection.
You may answer.
A. The entire building. And the surrounding premises.
Q. Did they take you to the men's

Page 32

VIJAY SEETARAM

bathrooms?
A. Not particularly. Just an area in the building.
Q. What do you mean just an area in the building?
A. They covered the entire building. So they never took me to a particular place.
Q. They never took you to a particular place to describe certain types of conditions?
A. No.
Q. Did the senior officers during the on-the-job training do any training on plainclothes policing?
A. Yes.
Q. What type of training?
A. How to wear your gear, tactics.
Q. And how is plainclothes policing gear or tactics different than when you're in uniform?
A. In uniform you're in full uniform, you're already identified as a

Page 33

VIJAY SEETARAM

police officer. In plainclothes I'm walking around like this, you would have no idea I'm a police officer. Identifying yourself, how to get to all your equipment, because that belt is not around you. Those are the kind of tactics and training they would give us.
Q. Did they give you any training on how to conduct yourself in plainclothes in relation to the privacy of patrons at The Port Authority Bus Terminal?
MS. MILLER: Objection.
You may answer.
A. No, ma'am.
Q. The relevant time period for this litigation is 2014 through 2017. So unless I say otherwise, most of my questions will be about this time period. Okay?
A. Yes, ma'am.
Q. During this time period, were you an officer at The Port Authority Bus Terminal?

9 (Pages 30 - 33)

Page 46

```
 1              VIJAY SEETARAM
 2      Q.   How many of those are
 3   misdemeanors?
 4      A.   I don't know.  I would have to
 5   look.
 6      Q.   Do you know if you've mostly
 7   made arrests for misdemeanors or
 8   felonies?
 9      A.   No, I don't.
10      Q.   How many arrests did you make
11   in your first year as a police officer at
12   Port Authority?
13      A.   I don't recall.  I'd have to
14   look at the numbers.
15      Q.   How many arrests have you made
16   in the past year?
17      A.   2017?
18      Q.   Sure.
19      A.   '18?
20      Q.   2018.
21      A.   Ten.
22      Q.   Do you know how many you made
23   in 2017?
24      A.   No, ma'am.
25      Q.   How many of your arrests were
```

Page 47

```
 1              VIJAY SEETARAM
 2   for public lewdness?
 3      A.   I don't recall, ma'am.
 4      Q.   Was the majority of the
 5   arrests that you've made for public
 6   lewdness?
 7      A.   Not to my knowledge, ma'am.
 8      Q.   In 2014, was the majority of
 9   the arrests that you made for public
10   lewdness?
11      A.   I don't recall.  I'd have to
12   look at the arrests for 2014.
13      Q.   How were you trained to patrol
14   the men's bathrooms in plainclothes?
15      A.   There was no different
16   training.  The men's bathroom or a
17   hallway or anything, it's the same type
18   of patrolling.  There is no specialty
19   training for those areas.
20      Q.   When you would patrol in this
21   plainclothes, would you typically go
22   inside of the men's restrooms?
23      A.   In plainclothes or uniform I
24   would go into the men's restrooms.
25      Q.   Why?
```

Page 48

```
 1              VIJAY SEETARAM
 2      A.   Because it's a common area for
 3   any kind of crime to occur.  Just like
 4   anywhere else in the building.
 5      Q.   Just like women's restrooms?
 6      A.   Yes.
 7      Q.   Would you go into women's
 8   restrooms when you were on plainclothes
 9   patrol?
10      A.   No.  In plainclothes I would
11   have to announce myself as a police
12   officer, walk in.  In uniform, yes, I
13   would go into women's restrooms.
14      Q.   I see.  When you were in
15   plainclothes you would go into women's
16   restrooms but announce yourself first?
17      A.   Yes.
18      Q.   And when you were in uniform
19   you would just walk into women's
20   restrooms?
21      A.   Because I'm in uniform.
22      Q.   You wouldn't announce yourself
23   first?
24      A.   Police coming in.
25   Plainclothes it's kind of
```

Page 49

```
 1              VIJAY SEETARAM
 2   counterproductive to do that.
 3      Q.   How often would you walk into
 4   women's restrooms in plainclothes?
 5      A.   As often as I'd walk into a
 6   men's restroom, but announce.
 7      Q.   And when you walked into men's
 8   restrooms in plainclothes, what actions
 9   did you take to patrol the bathrooms?
10      A.   I'd stand by the sink and just
11   look around, maybe sure nobody is
12   screaming or yelling or anything unusual
13   going on.  And I'd walk out.
14      Q.   And other than people
15   screaming or yelling, was there anything
16   else that qualified as being unusual?
17      A.   Yes.
18      Q.   Like what?
19      A.   People snorting cocaine, by a
20   sink.  Or people, a lot of arguments
21   happen in there.
22      Q.   And how many times did you
23   arrest people for standing at the urinals
24   masturbating in men's bathrooms?
25      A.   I'd have to look at the
```

Page 62

1  VIJAY SEETARAM
2  Q. And how many movements would
3  make you suspicious?
4  A. If I saw somebody's arm moving
5  back and forth vigorously, it would make
6  me curious.
7  Q. And for how long would you
8  have to observe such vigorous movements
9  before you would decide you needed to get
10 a closer look?
11 A. About two minutes.
12 Q. So you would stand in the
13 bathroom and watch someone at a urinal
14 for as many as two minutes before
15 approaching them for a closer look?
16 A. At the sink, yes.
17 Q. And how would you maintain
18 your cover for two minutes as a
19 plainclothes officer?
20 A. There is no need to maintain
21 cover if I'm not in uniform.
22 Q. So standing at a sink in the
23 men's restroom watching another patron at
24 a urinal doesn't reveal your cover as a
25 plainclothes police officer?

Page 63

1  VIJAY SEETARAM
2  MS. MILLER: Objection.
3  You may answer.
4  A. I don't -- I can't speak for
5  everyone else in the restroom. But me
6  personally, a gentleman standing at the
7  sink, it's a gentleman standing at the
8  sink.
9  Q. Would you pretend to use the
10 sink?
11 A. No.
12 Q. Would you use the -- was there
13 a mirror on top of the sink?
14 A. Yes.
15 Q. Would you use the mirror to
16 make observations at the urinals?
17 A. No.
18 Q. And so after ten minutes you
19 would -- sorry. I misspoke.
20     After two minutes of making
21 observations is when you would decide to
22 get a closer look to confirm whether a
23 man was fully erect. How would you do
24 that?
25 A. After that I would walk closer

Page 64

1  VIJAY SEETARAM
2  to the gentleman to see if he was
3  masturbating with an erection.
4  Q. And when you did that, have
5  you ever tried to make eye contact with
6  that gentleman?
7  A. No.
8  Q. And have you ever exposed
9  yourself in order to entice action from
10 that gentleman?
11 A. No, ma'am.
12 Q. Have you ever exposed yourself
13 in a public bathroom before?
14 A. No, ma'am.
15 Q. In order to entice a man to
16 expose himself, have you ever taken any
17 actions as a plainclothes police officer?
18 A. No, ma'am.
19 Q. Do you know of any officers
20 who have ever walked into the bathroom
21 and specifically tried to make
22 observations from urinals?
23 A. No, ma'am.
24 Q. Do you know of any officers
25 who have walked into bathrooms and

Page 65

1  VIJAY SEETARAM
2  specifically taken any actions to entice
3  men to expose themselves?
4  A. No, ma'am.
5  Q. Were you ever trained to act
6  differently in any way in plainclothes
7  versus uniform?
8  A. No.
9  Q. Were you ever told that
10 wearing plainclothes can be advantageous
11 for making arrests because you are more
12 likely to observe crime happening?
13 A. Sorry, can you define
14 "advantageous"?
15 Q. That assist more likely people
16 will commit crime in front of you not
17 knowing you are a police officer.
18 A. Have I ever been told that
19 you're asking?
20 Q. Yeah.
21 A. No.
22 Q. Have you ever been told that
23 you were being deployed in plainclothes
24 because people don't recognize you?
25 A. No.

17 (Pages 62 - 65)

Page 94

```
 1            VIJAY SEETARAM
 2        You may answer.
 3    A.   No, there is no physical
 4   evidence collected.
 5    Q.   Would you describe public
 6   lewdness as a quality of life crime?
 7    A.   No.
 8    Q.   Why not?
 9        MS. MILLER:  Objection.
10        You may answer.
11    A.   Quality of life is more like
12   hustlers and trespass, things of that
13   nature.  Like solicitors.  Not
14   necessarily public lewdness.
15    Q.   Did you ever participate in
16   quality of life sweeps while you were at
17   The Port Authority Police Department?
18    A.   No, ma'am.
19    Q.   Do you know what a quality of
20   life sweep is?
21    A.   No.
22    Q.   Have you ever heard of the
23   term "sweep" in the context of policing?
24    A.   No, ma'am.
25    Q.   As you sit here today, do you
```

Page 95

```
 1            VIJAY SEETARAM
 2   recall arresting a man name Marcos
 3   Polonia?
 4    A.   No, ma'am.
 5    Q.   Do you remember making an
 6   increased number of arrests for public
 7   lewdness in August 2014?
 8    A.   No, ma'am.
 9    Q.   Was public lewdness in
10   bathrooms particularly by men who were
11   masturbating at urinals more prevalent in
12   2014?
13    A.   I couldn't say.
14    Q.   Some crimes are particularly
15   seasonal in nature.  Is public lewdness a
16   crime that happens at one time of year
17   more often than another?
18        MS. MILLER:  Objection.
19        You may answer.
20    A.   I couldn't attest to that or
21   say anything on that.
22    Q.   Do you get the impression that
23   the men you arrest for public lewdness
24   are commuters?
25        MS. MILLER:  Objection.
```

Page 96

```
 1            VIJAY SEETARAM
 2        You may answer.
 3    A.   No, they could be anybody.
 4    Q.   Do you know who Officer
 5   Michael Opromalla is?
 6        MS. MILLER:  Objection.
 7        You may answer.
 8    A.   Yes, ma'am.
 9    Q.   How do you know him?
10    A.   He's a co-worker.
11    Q.   How long has he been your
12   co-worker?
13    A.   Two years, three years.
14    Q.   And he was also a classmate of
15   yours in 2013.  Is that right?
16    A.   Yes.
17    Q.   You didn't know him then?
18    A.   No, ma'am.
19    Q.   You never interacted with him
20   prior to 2014?
21    A.   No, prior to that, no.
22    Q.   And when did you get to know
23   Mr. Opromalla?
24    A.   I don't really know him that
25   well.  We're opposites.  In terms of work
```

Page 97

```
 1            VIJAY SEETARAM
 2   time.
 3    Q.   Could you tell me what you
 4   mean by that?
 5    A.   I traditionally work the
 6   afternoons, he didn't.
 7    Q.   Did your shifts overlap at
 8   all?
 9    A.   Not really, no.
10    Q.   How many times did you
11   interact with Officer Opromalla in 2014?
12        MS. MILLER:  Objection.
13        You may answer.
14    A.   I have zero idea how many
15   times I talked to him or...
16    Q.   Did you talk to him at all in
17   2014?
18    A.   Hi, bye, yes, how you doing.
19    Q.   Did you ever socialize with
20   Mr. Opromalla in 2014?
21    A.   No.
22    Q.   Have you ever socialized with
23   Mr. Opromalla?
24    A.   No.
25    Q.   He was also assigned to the
```

Page 158
1  VIJAY SEETARAM
2  Q. And what was the date of this
3  arrest?
4  A. August 7, 2014.
5  Q. So the same day as the arrest
6  that we just reviewed?
7  A. Yes, ma'am.
8  Q. And what time was this arrest?
9  A. 19:20.
10 Q. So is that about three hours
11 later?
12 A. From?
13 Q. Sorry. From the last arrest.
14 A. Yes, ma'am.
15 Q. And pointing your attention to
16 2669. Can you read the first two
17 sentences of the narrative into the
18 record, please, slowly for our court
19 reporter.
20 A. "At the time and place of
21 occurrence, undersigned officer was
22 assigned to plainclothes unit. During a
23 patrol of the men's restroom on the
24 second floor, undersigned officer
25 observed suspect manipulate his naked

Page 159
1  VIJAY SEETARAM
2  erect penis in a back and forth motion in
3  full public view while observing other
4  patrons."
5  Q. For all of the arrests that
6  we've described so far, were you in
7  plainclothes?
8  A. Yes.
9  Q. And what does "while observing
10 other patrons" mean?
11 A. It means he was looking around
12 the bathroom.
13 Q. Does it mean that he was
14 specifically trying to make eye contact
15 with other patrons?
16     MS. MILLER: Objection.
17     You may answer.
18 A. I can't attest to what he was
19 trying to do.
20 Q. From this factual narrative
21 can you tell which direction this man was
22 facing when he was allegedly masturbating
23 in a urinal?
24     MS. MILLER: Objection.
25     You may answer.

Page 160
1  VIJAY SEETARAM
2  A. No.
3  Q. Have you ever in the context
4  of making one of these arrests asked one
5  of the other patrons if they could see
6  the man that you believed was
7  masturbating at the urinal?
8     MS. MILLER: Objection.
9     You may answer.
10 A. No, ma'am.
11 Q. You can put that aside.
12    (Seetaram Exhibit 6 for
13    identification, arrest file,
14    production numbers PA 2700 through
15    PA 2717.)
16 BY MS. CONTI-COOK:
17 Q. I'm going to hand you what's
18 been marked as Exhibit 6.
19    MS. CONTI-COOK: It is
20 continuously Bates stamped 2700
21 through 2717.
22    We can go off the record while
23 you review.
24    THE VIDEOGRAPHER: The time on
25 the video monitor is 2:22 p.m., we

Page 161
1  VIJAY SEETARAM
2  off the record.
3    (Discussion off the record.)
4    THE VIDEOGRAPHER: We are back
5  on the record. The time on the
6  video monitor is 2:23 p.m.
7 BY MS. CONTI-COOK:
8  Q. Have you had a chance to
9  review Exhibit 6?
10 A. Yes, ma'am.
11 Q. What was the date and time of
12 this arrest?
13 A. The date is 8/8/2014. The
14 time, 16:55.
15 Q. What would you consider rush
16 hour in the afternoon to be at The Port
17 Authority Bus Terminal?
18 A. Anywhere from 14 to 2000.
19 Q. And in your experience, does
20 public lewdness happen more often at the
21 Bus Terminal during those hours than at
22 less busy times?
23    MS. MILLER: Objection.
24    You may answer.
25 A. I don't think there is any

41 (Pages 158 - 161)