# EXHIBIT 6

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CORNELL HOLDEN and MIGUEL )
MEJIA on behalf of )
themselves and all others )
similarly situated, )
)
Plaintiffs, )
)
vs. ) No.
) 1:17 Civ. 02192
THE PORT AUTHORITY OF NEW )
YORK AND NEW JERSEY, et )
al., )
)
Defendants. )
------------------------- )

October 5, 2018
10:18 a.m.

Deposition of JOHN TONE, held at the offices of Winston & Strawn LLP, 200 Park Avenue, New York, New York, before Laurie A. Collins, a Registered Professional Reporter and Notary Public of the State of New York.

Page 2

1
2 A P P E A R A N C E S:
3
4   WINSTON & STRAWN LLP
5   Attorneys for Plaintiffs
6      1700 K Street, N.W.
7      Washington, D.C. 20006-3817
8   BY:  DANIEL R. McNEELY, ESQ.
9          dmcneely@winston.com
10         - and -
11  WINSTON & STRAWN LLP
12     200 Park Avenue
13     New York, New York 10166-4193
14  BY:  CESIE C. ALVAREZ, ESQ.
15         calvarez@winston.com
16         - and -
17          - AND -
18  THE LEGAL AID SOCIETY
19     199 Water Street
20     New York, New York 10038
21  BY:  CYNTHIA CONTI-COOK, ESQ.
22
23
24
25

Page 3

1
2 A P P E A R A N C E S (continued):
3
4   THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY
5   Attorneys for Defendants
6      150 Greenwich Street, 24th Floor
7      New York, New York 10006
8   BY:  THOMAS R. BROPHY, ESQ.
9
10 ALSO PRESENT:
11   BENJAMIN RUTKIN-BECKER (Legal Aid Society)
12   DEVERELL WRITE, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2          S T I P U L A T I O N S
3     IT IS HEREBY STIPULATED AND AGREED, by and
4  among counsel for the respective parties hereto,
5  that the filing, sealing, and certification of the
6  within deposition shall be and the same are hereby
7  waived;
8     IT IS FURTHER STIPULATED AND AGREED that all
9  objections, except as to form of the question,
10 shall be reserved to the time of the trial;
11    IT IS FURTHER STIPULATED AND AGREED that the
12 within deposition may be signed before any Notary
13 Public with the same force and effect as if signed
14 and sworn to before the Court.
15
16
17
18
19
20
21
22
23
24
25

Page 5

1
2          THE VIDEOGRAPHER:  We're going on the
3     record at 10:17 a.m. on October 5th, 2018.
4          Please note that the microphones are
5     sensitive and may pick up whispering and
6     private conversations.
7          Please place all cell phones away from
8     the microphones as they can interfere with the
9     deposition audio.
10         Audio and video recording will continue
11    to take place unless all parties agree to go
12    off the record.
13         This is Media Unit 1 of the video-
14    recorded deposition of John Tone taken by
15    counsel for the plaintiff in the matter of
16    Cornell Holden, et al., versus The Port
17    Authority of New York and New Jersey, et al.
18    This case is filed in the U.S. District Court
19    for the Southern District of New York.  We are
20    here at the offices of Winston & Strawn,
21    located at 200 Park Avenue, New York, New
22    York.
23         My is Deverell Write, representing
24    Veritext Legal Solutions.  The court reporter
25    is Laurie Collins, from Veritext Legal

Page 18

1     Tone
2          Then you graduated in what of 2014?
3     A.   January of 2014.
4     Q.   Okay.  All right.  Thank you.
5          While you were at the academy, were you
6  trained on how to conduct plainclothes policing in
7  the police academy?
8     A.   No.
9     Q.   When you graduated from the police
10 academy, what was your first position at The PAPD?
11    A.   Police officer.
12    Q.   Is that still your position?
13    A.   Yes.
14    Q.   Since starting at The PAPD, have you
15 been employed there continuously?
16    A.   Yes.
17    Q.   When you started was there a primary
18 location you were stationed at?
19    A.   Yes.
20    Q.   And what was that?
21    A.   The Port Authority Bus Terminal.
22    Q.   Are you still stationed there?
23    A.   Yes.
24    Q.   Have you been stationed anywhere else
25 in the interim?

Page 19

1     Tone
2     A.   No.
3     Q.   So I'm going to ask you some questions
4  now that refer to the relevant time period.
5  That's generally January 1st, 2014, through August
6  18th, 2017.  So just realize that that's sort of
7  the time scope we're going for these questions.
8          MR. BROPHY:  I'm sorry, can you repeat
9     that?
10         MR. McNEELY:  I'm couching the next set
11    of questions as being limited to the time
12    period of January 1st, 2014, through August
13    18th, 2017.
14    Q.   And I believe you said you were an
15 officer that entire time already.  That's correct?
16    A.   Yes.
17    Q.   During that time was there a particular
18 patrol you regularly worked?
19    A.   No.
20    Q.   Where did you typically patrol or where
21 all did you patrol?
22    A.   We would patrol the facility of the bus
23 terminal.
24    Q.   Okay.
25         And does that involve like the entire

Page 20

1     Tone
2  facility or do you -- in one patrol or do you
3  divide it up?
4     A.   It would depend on what you were
5  assigned for the day.
6     Q.   Okay.
7          What are some of those assignments?
8     A.   Just post assignments, what your area
9  of responsibility would be.
10    Q.   Would that be like the first floor, the
11 second floor, or is it more narrow than that?
12    A.   It could be more narrow than that.
13    Q.   Could you give me some examples?
14    A.   Yeah.  It would be different floors in
15 either the north wing or the south wing.  In some
16 instances they would be shared.
17    Q.   Okay.
18         Do you ever go as limited as, say, like
19 the entrance or the bathroom?
20    A.   No.
21    Q.   So you said there was not any specific
22 location you were primarily stationed at?
23    A.   The only exception would be a security
24 booth.
25    Q.   A security booth?

Page 21

1     Tone
2     A.   Yeah, if you were in a security booth,
3  you would be in a fixed location.
4     Q.   Okay.
5          Have you been stationed at the bus
6  terminal for the entire time you've been with
7  PAPD?
8     A.   Yes.
9     Q.   So you've never worked at, like, JFK or
10 World Trade Center or any of those places?
11    A.   Yes, I have, yes.
12    Q.   Okay.
13         How long?  Just --
14    A.   Maybe a couple hours, you know, they
15 send us to another command or...
16    Q.   Never like for a period of days or
17 weeks?
18    A.   No.
19    Q.   I'm not sure I got the answer to this.
20 So was there a location that you were primarily
21 stationed at within The PABT?
22         MR. BROPHY:  Note my objection.
23         You can answer.
24    A.   Within the confines of The Port
25 Authority Bus Terminal.

6 (Pages 18 - 21)

Page 94

1           Tone
2       MR. BROPHY: Objection.
3       Go ahead.
4    A.   It would be, you know, the act of
5  possibly an arm moving or two individuals looking
6  at each other, acting in a strange manner, and
7  then from there you would observe the act.
8    Q.   Okay.
9    A.   Yes.
10   Q.   So you would still need to observe it
11 to make the arrest even --
12   A.   Yes.
13   Q.   -- if you have suspicion.
14       And these urinals have partitions;
15 correct?
16   A.   Yes.
17   Q.   And you've said you have never looked
18 over or around -- well, I said -- I think you said
19 you didn't look over. Have you ever looked around
20 a urinal partition?
21   A.   Define "around."
22   Q.   Lean back, look around, try to see
23 what's going on next to you.
24       MR. BROPHY: Note my objection.
25       Go ahead.

Page 95

1           Tone
2    A.   No.
3    Q.   How close do you have to get to someone
4  before you can tell if they're masturbating?
5        MR. BROPHY: Objection.
6        You can answer.
7    A.   Whatever distance allows you to see the
8  act occurring.
9    Q.   Is that 5 feet?
10       MR. BROPHY: Objection.
11       Go ahead.
12   A.   I've never measured, never taken a
13 measurement.
14   Q.   Can you tell from across the room or do
15 you have to be pretty close?
16   A.   At times you can see it from across the
17 room.
18   Q.   If they're standing far enough back?
19   A.   Yeah, in --
20   Q.   Or in the middle of the room?
21       MR. BROPHY: Go ahead. I'm sorry.
22   A.   As I stated, sometimes they're in the
23 middle of the bathroom.
24   Q.   Okay. So reminder that the relevant
25 time period is whatever 2014 to 2017, did your

Page 96

1           Tone
2  assignments to patrol the restrooms increase or
3  decrease after the relevant time period? Like
4  2017 to present, have they increased or gone down?
5        MR. BROPHY: Note my objection.
6        You can answer.
7    A.   No.
8    Q.   No? They've stayed about the same?
9    A.   Yes.
10   Q.   Thinking back to like October 7th,
11 2014, did your assignments to patrol the restrooms
12 change after that date?
13   A.   On a specific date?
14   Q.   Or around October 2014.
15   A.   Not to my recollection.
16   Q.   What about, say, March of 2017?
17   A.   Not to my recollection, no.
18   Q.   Have the amount of public lewdness
19 arrests that you've made in the restrooms
20 increased or decreased after 2014?
21   A.   That I don't know.
22   Q.   Say after 2017?
23   A.   I don't have the stats. They're not
24 given to us.
25   Q.   Do you need a break?

Page 97

1           Tone
2    A.   We can take a break.
3        MR. McNEELY: Let's take about a
4  15-minute break. We'll go off the record.
5        THE VIDEOGRAPHER: The time on the
6  video monitor is 11:38 p.m. We're off the
7  record. This ends Media 1.
8        (Recess taken from 11:38 to 11:50.)
9        THE VIDEOGRAPHER: We are back on the
10 record. The time on the video monitor is
11 11:50 a.m. This starts Media 2.
12   Q.   All right.
13       Mr. Tone, or Officer Tone, whichever
14 you prefer, when patrolling The Port Authority Bus
15 Terminal restrooms for public lewdness during the
16 relevant time period, 2014 to 2017, you said you
17 were in plainclothes.
18       MR. BROPHY: Note my objection.
19       You can answer.
20   Q.   At least at one point in time.
21       MR. BROPHY: Note my objection.
22       Go ahead.
23   A.   Yes.
24   Q.   Why did you do plainclothes patrol?
25       MR. BROPHY: Objection.

25 (Pages 94 - 97)

Page 98

1  Tone
2       You can answer.
3    A. It was the post assigned to me at roll
4  call.
5    Q. Do you know why they assign
6  plainclothes patrols, your supervisors?
7       MR. BROPHY: Objection.
8       Go ahead.
9    A. No.
10   Q. Is there any way when you're patrolling
11 in plainclothes for individuals using the restroom
12 to know you're an officer?
13      MR. BROPHY: Note my objection.
14      You can answer.
15   A. No.
16   Q. And did you wear plainclothes
17 intentionally so no one would know you were an
18 officer?
19      MR. BROPHY: Objection.
20      You can answer.
21   A. It was the post that was assigned to
22 me.
23   Q. And you had no idea why they assigned
24 that post?
25   A. No.

Page 99

1  Tone
2    Q. No one's ever communicated the purpose
3  of a plainclothes post?
4    A. It's picked at roll call by the
5  supervisors, and we're instructed what to do.
6    Q. Do you have any suspicions as to why
7  they assign you to patrol in plainclothes?
8       MR. BROPHY: Note my objection.
9       You can answer.
10   A. Suspicions? No.
11   Q. Like do you have any beliefs as to why
12 you're assigned to patrol in plainclothes?
13   A. No.
14   Q. So you just think it's like casual
15 jeans Friday or something?
16      MR. BROPHY: Objection.
17      You can answer.
18   A. I don't know what you mean by "casual
19 jeans Friday."
20   Q. I mean, is it just for the officers'
21 enjoyment that you can dress in plainclothes?
22      MR. BROPHY: Objection.
23      Go ahead.
24   A. That question I can't answer because,
25 as I stated, it's the post that we're assigned.

Page 100

1  Tone
2    Q. Okay.
3       Never been given any indication as to
4  why you're assigned that?
5    A. No.
6    Q. Okay.
7       Why was it -- do you think -- do you
8  know why it was necessary for you to conceal that
9  you're an officer?
10      MR. BROPHY: Note my objection.
11      You can answer.
12   A. Because some crimes don't happen when
13 you're walking around in uniform.
14   Q. Okay. And which are those?
15   A. Could be any number of things. It
16 could be drug sales, thefts, robberies.
17   Q. Is public lewdness one of those crimes?
18   A. Public lewdness is a crime, yes.
19   Q. No, is that one of the crimes that
20 don't happen when officers are in uniform?
21      MR. BROPHY: Objection.
22      You can answer.
23   A. It does happen in uniform as well.
24   Q. Okay. So I think you said some crimes
25 don't happen when you're walking around in

Page 101

1  Tone
2  uniform. So if the goal at The Port Authority is
3  to prevent and deter crime, shouldn't you always
4  be in uniform?
5       MR. BROPHY: Note my objection.
6       You can answer.
7    A. That's not my decision.
8    Q. Okay.
9       Who assigns you to patrol in
10 plainclothes?
11   A. As I stated before, it would either be
12 the tour commander or the sergeant.
13   Q. Okay. So is that assigned at roll call
14 or do you get a heads-up before you show up to
15 work?
16   A. Usually it would be at roll call. You
17 would have to go back downstairs, change out of
18 uniform.
19   Q. So it would be just whatever clothes
20 you wear to work that day, or do you keep like a
21 plainclothes outfit at work in case you get that
22 assignment?
23   A. I would just wear what I wore into work
24 that day.
25   Q. Is there ever a situation where you

26 (Pages 98 - 101)

Page 114

1              Tone
2    A.   I meant the third level.
3    Q.   Okay. So is there one level that's
4  below ground that's like a basement?
5    A.   It's -- that's a tough question to
6  answer so -- it's -- one side of it is; one side
7  isn't.
8    Q.   Yeah, that's kind of where I'm getting
9  at, just trying to make sure we're talking about
10 the same floor.
11        So what was your assignment? Was it
12 listed as third level or was it listed as like
13 south third floor?
14   A.   My assignment was plainclothes.
15   Q.   Plainclothes. Okay. So plainclothes
16 could be anywhere throughout the premises; or
17 earlier you had said patrols might be north
18 building, south building, second floor, north.
19 I'm just trying to figure out where you were
20 stationed that day.
21   A.   Plainclothes has the entire two
22 buildings.
23   Q.   Okay.
24        Can you describe the third level for me
25 so we're a little clear as to which one we're

Page 115

1              Tone
2  talking about? Is it third level from the
3  underground up or street level is level one and
4  then it's two above that?
5        MR. BROPHY: Note my objection.
6        You can answer if you can.
7    A.   In which building?
8    Q.   South. I believe you were in the south
9  building, you said.
10   A.   So south building?
11   Q.   Yeah.
12   A.   Okay. It was --
13   Q.   Whichever building you were in when the
14 arrest occurred.
15   A.   There's a lower level you can enter
16 from either Ninth Avenue or the subway. Then you
17 would come up to the second level, which is where
18 all the main ticketing facilities are.
19   Q.   Okay.
20   A.   Then the third level to the bus ramps.
21   Q.   Okay. So that's where we're talking
22 about here, the third level at the bus ramps?
23   A.   Well, the entrance to the bus ramps.
24   Q.   Okay.
25        And on -- as of July 9th, 2014, how

Page 116

1              Tone
2  long had you been an officer?
3    A.   Approximately six months.
4    Q.   And this was your first job as an
5  officer?
6    A.   Yes.
7    Q.   Were you patrolling with anyone else
8  that day?
9    A.   Yes.
10   Q.   Do you remember who?
11   A.   Yes.
12   Q.   Okay. And who was that?
13   A.   Officer Kehoe.
14   Q.   All right.
15        And he's still employed at The PAPD;
16 correct?
17   A.   Yes.
18   Q.   And what were you patrolling for that
19 day?
20   A.   We were patrolling for any infractions,
21 any law violations.
22   Q.   No emphasis on quality-of-life issues?
23   A.   No.
24   Q.   And going back, why were you patrolling
25 the men's room?

Page 117

1              Tone
2    A.   We were patrolling all the buildings.
3    Q.   So why were you in the men's room that
4  day?
5    A.   Because it's part of that -- it's part
6  of the patrol area.
7    Q.   But you weren't looking for anything
8  specific?
9    A.   No.
10   Q.   Not the homelessness issue you had
11 discussed earlier?
12   A.   Nothing specific.
13   Q.   Okay.
14        And do you recall what you did when you
15 entered the restroom? You started to talk about
16 looking under the stalls.
17   A.   I entered the bathroom. I was checking
18 underneath the stalls to make sure nobody was
19 sleeping on the floor, intoxication, anything like
20 that.
21   Q.   And was Mr. -- or -- Mr. Kehoe with you
22 or was he in the bathroom or was he outside?
23   A.   He was outside.
24   Q.   Okay.
25        And why did you enter alone?

30 (Pages 114 - 117)

Page 138

1               Tone
2  on the other side.
3      Q.  So opposite the stalls.
4          Do you know how many urinals there
5  were?
6      A.  No, I do not.
7      Q.  Similar number of urinals to stalls or
8  more?
9      A.  No, I don't know the answer.  We could
10 contact engineering.
11     Q.  So do the sinks take up about the same
12 amount of room as the bathroom space or is it more
13 bathrooms than sinks?
14         MR. BROPHY:  Note my objection.
15         You can answer.
16     A.  Again, not being the engineer of the
17 bathroom, I can only speculate that it was a
18 little smaller.
19     Q.  So Mr. Mejia is at the urinal, he's
20 turned to his right, I believe you said, towards
21 this man next to him, and you've taken a few steps
22 from the sinks towards the stalls, and you're a
23 few feet away from Mr. Mejia.  At this point you
24 say you can see his penis and the other man, but
25 you can't see the other man's penis.

Page 139

1               Tone
2          Was the other man urinating, do you
3  know?
4      A.  No, I do not know.
5      Q.  And you're a few feet away from
6  Mr. Mejia.  Is this the point where you arrested
7  him?
8      A.  No.
9      Q.  Okay.
10         So what happened next?
11     A.  After the crime was observed, I exited
12 the bathroom.
13     Q.  Okay.
14     A.  Communicated to my partner that I
15 witnessed a crime.
16     Q.  And which crime are we talking about
17 here?
18     A.  Public lewdness.
19     Q.  What specific act?
20     A.  Masturbating in public.
21     Q.  Was he also charged with exposure?
22     A.  I don't have the paperwork in front of
23 me.
24     Q.  Do you know if the other person saw his
25 penis?

Page 140

1               Tone
2      A.  No, I do not.
3      Q.  I think you said you don't know which
4  sink you were at, but do you recall which sink you
5  were at before you stepped away towards Mr. Mejia?
6          MR. BROPHY:  Objection.
7          Go ahead.
8      A.  It would be a guess at this point.
9      Q.  So you observed the crime, and you were
10 then -- what happened next after you observed the
11 crime?
12     A.  I exited the bathroom, spoke to my
13 partner, told him I observed a crime, we waited
14 for the individual to exit the bathroom.
15     Q.  Why didn't you immediately arrest him?
16     A.  Because to perform an arrest inside the
17 restroom is not safe for the officers or anyone
18 else involved.
19     Q.  Okay.
20         So Mr. Mejia comes out of the bathroom.
21 What did you say to him?
22     A.  We stated to him that he was under
23 arrest.
24     Q.  Did he say anything to you?
25     A.  He just stated, What did I do?

Page 141

1               Tone
2      Q.  Okay.
3          And did you show him your badge?
4      A.  Yes, I did.
5      Q.  And did you handcuff him?
6      A.  Yes, he was handcuffed.
7      Q.  And so you told him he was under
8  arrest.  Did you tell him what for?
9      A.  It was explained to him that we would
10 explain it to him when we got back to the police
11 desk.
12     Q.  And where's the police desk?
13     A.  The police desk is located on the
14 second level.
15     Q.  Okay.
16         Was anyone besides Officer Kehoe with
17 you?
18     A.  No.
19     Q.  Okay.  And why was Officer Kehoe with
20 you that day?
21     A.  Because we were working as partners.
22     Q.  Okay.
23         Do you always work with a partner?
24     A.  No.
25     Q.  Was Officer Kehoe also in plainclothes?

Page 158

1        Tone
2    A.   Yes.
3    Q.   And do your partners typically take
4  shift notes?
5    A.   Yes.
6    Q.   And why do you take notes?
7    A.   To account for time throughout the day.
8    Q.   Do you need to report your time to
9  someone or is it just for your own records?
10   A.   Both?
11   Q.   Can you just read some of these notes
12 to me?  So it says 7/8/14 at the top, Tuesday, bus
13 terminal, tour post TPO.  What does the third line
14 say?
15   A.   It says radio and meal.
16   Q.   Okay.
17        And then sergeant, tour commander, and
18 then I believe it says 1445 roll call?
19   A.   Yes.
20   Q.   So that means 2:45 you did your roll
21 call, your shift started at 3?
22   A.   Yes.
23   Q.   And that shift was the TPU?
24   A.   Yes.
25   Q.   Okay.

Page 159

1        Tone
2        So then what does 1610, what does that
3  mean?
4    A.   That line means returning to the
5  quarters with two arrests.
6    Q.   Okay.  And what were those arrests, do
7  you know?
8    A.   No, I do not.
9    Q.   Then at I believe it says 2000 MTS for
10 PETS something.  What does that say?
11   A.   That stands for midtown south precinct
12 for the NYPD.  PETS is the system they use for
13 vouchering narcotics, among other things.
14   Q.   Okay.
15        It says for PETS voucher?
16   A.   Yes.
17   Q.   Does that mean at that time you
18 arrested someone for narcotics?
19   A.   That just means something needed to go
20 down and be vouchered.
21   Q.   Okay.  Then at 2100.
22   A.   Return to quarters for paperwork.
23   Q.   Okay.  And 2300?
24   A.   EOD, end of duty.
25   Q.   So was one of those two arrests

Page 160

1        Tone
2  Mr. Mejia?
3    A.   No.
4    Q.   Does it say arrest anywhere on these
5  notes?
6    A.   Yes.
7    Q.   Okay.  Where is that at?
8    A.   For the following day.
9    Q.   Okay.
10        So you took these notes for the
11 previous days?
12        MR. BROPHY:  Objection.
13   A.   These notes are for two days.
14   Q.   Oh, for two days.  Oh, okay.  Oh, 7/9
15 here at the bottom.  Gotcha.  Sorry.
16        At what line are Mr. Mejia's arrest on
17 this?
18   A.   Mr. Mejia's arrest would be on the line
19 for 1630.
20   Q.   Okay.  And can you read that line to
21 me?
22   A.   40 with a 16 to process arrest.
23   Q.   I'm going to switch to Exhibit 3
24 because it's a more legible copy.  So you see here
25 on the first page it says on page 2385 Miguel

Page 161

1        Tone
2  Mejia at the top and it says here he was arrested
3  for public lewdness and exposure of a person; is
4  that correct?
5    A.   Listed on this piece of paper are the
6  two penal charges that he was charged with.
7    Q.   And on the next page it spells them
8  out, what those numbers mean, on 2386?
9    A.   Yes.
10   Q.   Now, on page 2387 in Box 83, there's
11 additional details description.  Did you write
12 that?
13   A.   Yes.
14   Q.   And how did you know what to write in
15 this box?
16   A.   The narrative, you're talking about?
17   Q.   Yes.
18   A.   It was explained to us that there was a
19 specific narrative that the ADAs like to have on
20 their paperwork.
21   Q.   So how?
22   A.   Specific wording.
23   Q.   Okay.
24        And what is that wording?
25   A.   I don't know the exact wording.

|  | Page 170 |  | Page 172 |
|---|---|---|---|
| 1 | Tone | 1 | Tone |

Page 170

1       Tone
2           MR. McNEELY: We'll call this Exhibit
3       4.
4           (Tone Exhibit 4, transcript of trial
5       testimony dated 11/17/14, marked for
6       identification.)
7       Q.  And this is a transcript of your prior
8   trial testimony.
9           Do you recall making statements under
10  oath at your trial?
11      A.  Yes.
12      Q.  Do you recall on that day testifying
13  that you were patrolling with Officer Kehoe?
14      A.  Yes.
15      Q.  So why was that detail omitted from
16  your report that was in Exhibit 3?
17      A.  It was not put in because it wasn't
18  relevant at that time.
19      Q.  How was it not relevant?
20      A.  I was the individual that placed him
21  under arrest.
22      Q.  Okay.
23          Do you recall testifying at this trial
24  that Mr. Mejia exposed his penis to another
25  restroom patron and masturbated towards him?

Page 171

1       Tone
2       A.  Yes.
3       Q.  So why did you omit that from the
4   report?
5       A.  I think that I omitted details from the
6   report because I was a new officer, I was
7   inexperienced.  Having the chance to do it now, I
8   would do it differently.
9       Q.  So you weren't trained in terms of how
10  to fill out paperwork for lewdness prior to this
11  incident?
12          MR. BROPHY: Note my objection.
13          You can answer.
14      A.  No, I was not trained.
15      Q.  Are there any other pertinent details
16  you recall from Mr. Miguel Mejia's arrest that are
17  omitted either intentionally or unintentionally
18  from the paperwork?
19          MR. BROPHY: Note my objection.
20      A.  No.
21      Q.  I'm going to hand you Exhibit 5.
22          MR. BROPHY: Counsel, for the record,
23      this is a transcript dated November 17th,
24      2014.  I believe the trial went on the next
25      day.  This is only for that day.

Page 172

1       Tone
2           MR. McNEELY: Oh, no, it's only the
3       first day that he testified.
4           MR. BROPHY: Right.
5           MR. McNEELY: Officer Kehoe's testimony
6       is not there.
7           MR. BROPHY: For the record, just so
8       that it's clear it's only for November 17th,
9       2014.  And it appears to be only Officer
10      Tone's testimony; is that correct?
11          MR. McNEELY: No, the front part should
12      have other testimony.
13          MR. BROPHY: Okay.  It looks like there
14      are proceedings and then an opening and then
15      Officer Tone's testimony; is that correct?
16          MR. McNEELY: I believe that's correct.
17      It's the full first-day transcript.
18          MR. BROPHY: Thank you.
19          (Tone Exhibit 5, arrest record 14B306,
20      Bates-stamped beginning 2177, marked for
21      identification.)
22      Q.  So we're in Exhibit 5 -- so this is
23  Exhibit 5.  It's arrest record number 14B306
24  starting on 2177.  And if you turn to page 2178, I
25  believe you'll see your name under "arresting

Page 173

1       Tone
2   officer"; is that correct?
3       A.  Yes, that is correct.
4       Q.  At the bottom next to your signature?
5       A.  Yes.
6       Q.  And then can you tell me who the tour
7   commander is there at the bottom?
8       A.  No, I cannot.
9       Q.  And then at the top in Box 13, you will
10  see the time of the occurrence.  I believe it says
11  1610 to 1615.
12      A.  Yes.
13      Q.  So 4:10 to 4:15.
14          So what does that signify?  Is
15  when you observed or when you entered the bathroom
16  or -- and what happened at 4:15?  Is that when the
17  arrest was made or when they were taken to
18  precinct, or is that how long you observed the
19  conduct?  I'm just curious for my own benefit.
20      A.  Well, without reviewing the document,
21  that time could be from the initial observation.
22      Q.  To what?
23      A.  To when it was ended.
24      Q.  Okay.
25          The observation was ended or the arrest