# EXHIBIT 9

Page 1

1

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4

5    CORNELL HOLDEN and MIGUEL  )

     MEJIA on behalf of         )

6    themselves and all others  )

     similarly situated,        )

7                               )

              Plaintiffs,       )

8                               )

              vs.               )    No.

9                               )    1:17 Civ. 02192

     THE PORT AUTHORITY OF NEW  )

10   YORK AND NEW JERSEY, et     )

     al.,                       )

11                              )

              Defendants.       )

12   ------------------------   )

13

14

15

16                   October 1, 2018

17                   10:30 a.m.

18

19         Deposition of JOHN F. FITZPATRICK, held

20      at the offices of Winston & Strawn LLP, 200

21      Park Avenue, New York, New York, before

22      Laurie A. Collins, a Registered Professional

23      Reporter and Notary Public of the State of New

24      York.

25

Page 2

1
2 A P P E A R A N C E S :
3
4    WINSTON & STRAWN LLP
5    Attorneys for Plaintiffs
6       200 Park Avenue
7       New York, New York 10166-4193
8    BY:  ROSS M. KRAMER, ESQ.
9          rkramer@winston.com
10        EMILY C. ELLIS, ESQ.
11          eellis@winston.com
12          - and -
13      THE LEGAL AID SOCIETY
14         199 Water Street
15         New York, New York 10038
16      BY:  CYNTHIA CONTI-COOK, ESQ.
17
18
19
20
21
22
23
24
25

Page 3

1
2 A P P E A R A N C E S (continued):
3
4    THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY
5    Attorneys for Defendants
6       150 Greenwich Street, 24th Floor
7       New York, New York 10006
8    BY:  THOMAS R. BROPHY, ESQ.
9
10 ALSO PRESENT:
11    BENJAMIN RUTKIN-BECKER (Legal Aid Society)
12    DEVERELL WRITE, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1
2       S T I P U L A T I O N S
3    IT IS HEREBY STIPULATED AND AGREED, by and
4 among counsel for the respective parties hereto,
5 that the filing, sealing, and certification of the
6 within deposition shall be and the same are hereby
7 waived;
8    IT IS FURTHER STIPULATED AND AGREED that all
9 objections, except as to form of the question,
10 shall be reserved to the time of the trial;
11    IT IS FURTHER STIPULATED AND AGREED that the
12 within deposition may be signed before any Notary
13 Public with the same force and effect as if signed
14 and sworn to before the Court.
15
16       *   *   *
17
18
19
20
21
22
23
24
25

Page 5

1
2       THE VIDEOGRAPHER:  We are going on the
3 record at 10:30 a.m. on October 1st, 2018.
4       Please note the microphones are
5 sensitive and may pick up whispering and
6 private conversation.
7       Please place all cell phones away from
8 the microphones, as they can interfere with
9 the deposition audio.
10       Audio and video recording will continue
11 to take place unless all parties agree to go
12 off the record.
13       This is Media Unit 1 of the
14 video-recorded deposition of John F.
15 Fitzpatrick taken by counsel for the plaintiff
16 in the matter of Cornell Holden, et al.,
17 versus The Port Authority of New York and New
18 Jersey, et al.  This case is filed in the
19 United States District Court for the Southern
20 District of New York.  We're here at the
21 offices of Winston & Strawn, located at 200
22 Park Avenue, New York, New York.
23       My name is Deverell Write, representing
24 Veritext Legal Solutions.  The court reporter
25 is Laurie Collins from Veritext Legal

2 (Pages 2 - 5)

Fitzpatrick

2 officer?
3    A.   You're capturing the crime stat because
4 of a pickup arrest by the police officer.  He sees
5 the bag snatch, he sees the person lighting a
6 crack pipe, he sees the sale of K2 on the steps of
7 42nd Street.  It is an observation arrest.  Nobody
8 reported it.  He saw it and took action.
9        So I couldn't give you a percentage,
10 but a good percentage of the crimes that we
11 capture at the bus terminal were because of the
12 police work that was being done.
13    Q.   Would you keep track of the crimes that
14 were most frequently reported in whatever manner
15 at the bus terminal?
16        MR. BROPHY:  Note my objection.
17        You can answer.
18    A.   They had no way of capturing those
19 stats when I got there.  They were working on a
20 system when I was leaving that was going to
21 perform that function.
22    Q.   So did any of your Excel spreadsheets
23 show what the most frequent crimes were at the bus
24 terminal?
25    A.   In regard to arrests made, they would.

Fitzpatrick

1 And I'm thinking back now, and I'm sure there
3 were -- one -- I'll give you an example.  One
4 spreadsheet was per arrest.  So for every arrest
5 that was made:  name, date of birth, crime
6 committed, and on.  From that I could come up with
7 the spreadsheets that show, well, we had 350
8 arrests for whatever crime.  You get the idea.
9        I'm trying to remember if I had a
10 spreadsheet that had crimes with an unnamed
11 suspect, you know.
12    Q.   What do you mean?
13    A.   In other words, a report of a crime
14 where the suspect wasn't in custody and it was
15 just...
16    Q.   When you came over to The Port
17 Authority, was public lewdness a major problem at
18 the bus terminal?
19    A.   A major problem?  I mean...
20    Q.   Was it a problem at the bus terminal?
21    A.   Again, not to sound -- every crime is a
22 problem.  But a major problem?
23    Q.   Was it a common occurrence at the bus
24 terminal?
25    A.   I'm sure it was.

Fitzpatrick

2    Q.   When you say you're sure it was, did
3 you learn from someone at The Port Authority that
4 that was a common occurrence?
5    A.   No.
6    Q.   When you came over, were you briefed by
7 someone on what the most common issues were with
8 regard to law enforcement at the bus terminal?
9    A.   I would say no.  I was briefed in many
10 regards as to many things that exist at the bus
11 terminal but more so relationships and duties an
12 responsibilities with the bus carriers and the
13 civilian side of the bus terminal.  That came
14 pretty quickly, pretty easily.
15        I turned my attentions to -- and there
16 was some introduction to the crime that we saw,
17 but it wasn't anything I didn't expect.  It was
18 very similar to Penn Station.
19    Q.   So I think you had said earlier that
20 public lewdness in the men's restrooms was a
21 common condition when you worked with the MTA; is
22 that right?
23    A.   You know, I don't know how we can
24 define the word "common."  But did it occur?  Yes.
25    Q.   Did there come a time after you joined

Fitzpatrick

1 The Port Authority that you learned that that was
2 occurring in The Port Authority Bus Terminal men's
3 restrooms?
4    A.   Yes.
5    Q.   And how did you learn that?
6    A.   There were arrests made for the
7 offenses, yeah.
8    Q.   Did you consider that a quality-of-life
9 crime?
10    A.   It's not listed as a quality-of-life
11 crime.  Is it -- yeah, I did not consider it a
12 quality-of-life crime.
13    Q.   What steps did you take to combat
14 public lewdness at The Port Authority Bus
15 Terminal?
16        MR. BROPHY:  Note my objection.
17        You can answer.
18    A.   Well, the direct answer to that
19 question would be none.
20    Q.   Why would that be none?
21    A.   The expansive answer would be --
22    Q.   Yeah, please.
23    A.   -- no more or no less than I would take
24 for every other crime at the bus terminal.

Page 62

Fitzpatrick

1
2    Q.   Well, as the captain you told us that
3  one of the things that you addressed were crime
4  stats and reduction.
5    A.   Right.
6    Q.   Did you target a reduction in the crime
7  stats for public lewdness?
8    A.   I targeted crime reduction for any
9  crime stat.
10    Q.   Okay.  So let's focus on the crime
11  stats for public lewdness.  What directions did
12  you give to combat that in particular?
13    A.   Okay.  We had plainclothes police
14  officers on patrol in the bus terminal, as you
15  know, I'm sure.  We had conditions teams that I
16  had started that initiative as well to combat just
17  what we spoke of before:  quality-of-life offenses
18  inside and surrounding the bus terminal.
19    Q.   What are -- I didn't mean to interrupt
20  you.  Go ahead.
21    A.   That's pretty much it, actually.
22    Q.   What are conditions teams?
23    A.   A supervisor -- between three and five
24  police officers that wouldn't be post driven.
25  They would have the freedom to roam around and

Page 63

Fitzpatrick

1
2  look for offenses anywhere from open alcohol
3  container within the bus terminal, urinating,
4  smoking marijuana, that type of stuff.
5    Q.   Would public lewdness or exposure in
6  the restrooms be one of the conditions that they
7  were looking for?
8    A.   Absolutely.
9    Q.   Absolutely?
10    A.   Specifically or -- no, not
11  specifically.
12    Q.   So --
13    A.   Their instruction was to comb the bus
14  terminal in its entirety and any violation of law
15  that they were duty bound to take action and make
16  arrest they would do so.
17    Q.   And these were plainclothes officers?
18    A.   The conditions teams were uniformed
19  officers.
20    Q.   So when I asked you what you put in
21  place to combat public lewdness, you mentioned
22  plainclothes officers and conditions teams.  So
23  how did the conditions teams combat public
24  lewdness?
25    A.   Neither one of those teams or --

Page 64

Fitzpatrick

1
2  neither one of those entities were put into effect
3  to combat public lewdness alone.  They were to
4  reduce crime within The Port Authority Bus
5  Terminal in general.
6      If they went to the bathroom and they
7  saw people smoking marijuana, snorting cocaine,
8  using a hypodermic needle, sharing a hypodermic
9  needle, engaging in public lewd, washing
10  themselves in the sink -- I could go on all day,
11  but they were supposed to take some action.
12    Q.   So those were uniformed officers.  You
13  said that there were also plainclothes police
14  officers that were part of the way you were
15  combating public lewdness; is that right?
16    A.   No.
17    Q.   What were the plainclothes officers
18  used for?
19    A.   They also were to address crime in
20  general within The Port Authority Bus Terminal.
21    Q.   Was one of the things that the
22  plainclothes officers did to patrol the restrooms?
23    A.   Yes.
24    Q.   And what were they looking for in the
25  restrooms?

Page 65

Fitzpatrick

1
2    A.   Any violation of law they could
3  observe.
4    Q.   Was it your idea to institute
5  plainclothes patrols or was there already
6  happening when you joined The Port Authority?
7    A.   It wasn't happening.  Supposedly it had
8  been in the past.  I did not see conditions teams.
9  I did not see plainclothes teams.  I didn't see
10  anything but cop-in-a-box type of policing.
11    Q.   So did the decision to institute
12  conditions teams and plainclothes patrolling come
13  from you or from someone above you at The Port
14  Authority?
15    A.   It came from me.  I would have had to
16  have cleared it, I'm sure.  The Port Authority,
17  again, is a unique animal.  Every time you try to
18  effect change, you're facing a union and -- but I
19  would have had to have cleared several hurdles to
20  get them cleared.
21    Q.   Were those conditions teams and
22  plainclothes patrolling something that you brought
23  over with you from your time with the MTA?
24    A.   Yes.
25    Q.   Were you the person who instituted

17 (Pages 62 - 65)

Page 70

Fitzpatrick
1
2 some sort of incident or emergency-type situation
3 for them to go.  They would have to receive a call
4 to go in.  They wouldn't as a matter of rule go in
5 and search the restroom.
6      Q.   So male plainclothes officers wouldn't
7 enter female restrooms; and family plainclothes
8 officers would not enter the men's restrooms?
9      A.   Correct.
10     Q.   Was that something --
11     A.   Well, they shouldn't.
12     Q.   Was that a specific instruction that
13 they were given?
14     A.   I don't recall.
15          MR. BROPHY:  Note my objection.
16          You can answer.
17     Q.   Were plainclothes officers instructed
18 not to interact with the public in the restrooms?
19          MR. BROPHY:  Note my objection.
20          You can answer.
21     A.   Were they instructed not to interact?
22     Q.   Either to interact or not to interact?
23 Was there any instruction given about how they
24 should deal with the public in the men's
25 restrooms?

Page 71

Fitzpatrick
1
2          MR. BROPHY:  Note my objection.
3          You can answer.
4      A.   No.
5      Q.   Were there any techniques for
6 patrolling in plainclothes in the restrooms that
7 were given to those plainclothes officers?
8          MR. BROPHY:  Note my objection.
9          You can answer.
10     A.   Not that I can recall.
11     Q.   Were there certain conditions that
12 those officers were instructed to look for in the
13 restrooms?
14          MR. BROPHY:  Note my objection.
15          You can answer.
16     A.   Crimes?  Other than crimes?
17     Q.   Well, any particular crimes they were
18 instructed to look for in the restrooms?
19          MR. BROPHY:  Objection.
20     A.   No.  They walk into -- they were
21 instructed to make an arrest for any and all
22 crimes that present themselves.  If you have
23 probable cause to making a crime -- I'm sorry, you
24 have probable cause to make an arrest for a crime,
25 you're duty bound to make the arrest on the spot.

Page 72

Fitzpatrick
1
2          So if they walk into a bathroom and
3 they see an arrest -- I mean see a crime in
4 progress, I would expect them to make the arrest,
5 but they didn't have to be told that.
6      Q.   Would you expect them to walk into a
7 restroom and approach the urinals as part of their
8 plainclothes patrol?
9          MR. BROPHY:  Objection.
10         Go ahead.
11     A.   I wouldn't see why they would or
12 shouldn't.
13     Q.   I will show you -- do we have copies of
14 Holden starting at PA 1?
15         I'd like to show you an exhibit that
16 I'd like to mark as defendants' -- Plaintiffs'
17 Exhibit 1, please.
18         (Discussion off the record.)
19         (Fitzpatrick Exhibit 1, arrest
20 paperwork for Holden, Bates-stamped PA 1 to
21 49, marked for identification.)
22     Q.   Do you recognize this document?
23         MR. BROPHY:  Counsel, for the record,
24 this is Bates-stamped PA 1 to 49
25 consecutively; is that correct?

Page 73

Fitzpatrick
1
2          MR. KRAMER:  Yes.
3          MR. BROPHY:  Thank you.  And there are
4 certain portions of it blocked out as well.
5          MR. KRAMER:  Yes.
6          MR. BROPHY:  Thank you.
7      Q.   So, Mr. Fitzpatrick, do you recognize
8 what this is?
9      A.   Yes.
10     Q.   What do you recognize it to be?
11     A.   It appears to be arrest paperwork -- it
12 doesn't appear to be; it is arrest paperwork.
13     Q.   And is it arrest paperwork for an
14 arrest made, if you look at 03, by Police Officer
15 Michael J. Opromalla?
16     A.   Yes.
17     Q.   And the date of the arrest would be May
18 12th, 2014?
19     A.   Yes.
20     Q.   And if you look at page 05, does it
21 appear that the person arrested was named Cornell
22 Holden?
23     A.   It does.
24     Q.   And do you see on page 5 where it has
25 the section titled the factual basis for these

19 (Pages 70 - 73)

Page 102

Fitzpatrick

1          Fitzpatrick
2     Q.   During the time that you worked at The
3  Port Authority Police Department, do you remember
4  any other articles coming out that were critical
5  of The Port Authority Police Department's policing
6  techniques?
7     A.   Sitting here now, no.  If there were, I
8  just don't remember.  I do -- I remember this
9  after you put it in front of me, but I don't
10  remember any others right now.
11     Q.   So it's fair to say, isn't it, that
12  this made an impression on you when it came out
13  and this is something that you wanted to deal
14  with?
15          MR. BROPHY:  You can answer.
16  Objection.
17     A.   I just wanted -- the statement that was
18  made or --
19     Q.   This article.  When this article was
20  published, that this was significant to you?
21     A.   I will answer it this way:  Any time I
22  even think that someone might have been
23  arrested -- and believe me, I know -- for
24  something they didn't do, it's -- yeah, it's a
25  cause of concern for me.

Page 103

Fitzpatrick

1          Fitzpatrick
2     Q.   Does that refresh your recollection
3  that you may have had a meeting with one of your
4  superiors after you read this article?
5     A.   I may have, but, again, I don't
6  remember if I did or who it was with.
7     Q.   Do you remember meeting with Officer
8  Opromalla after this article was published?
9     A.   I met with Officer Opromalla.  I
10  couldn't tell you if it was before or after this
11  or -- I just -- again, you know, I had a lot of
12  people under my command and a lot of meetings.
13  But I have definitely spoken to Michael, because
14  he was in plainclothes a lot.
15     Q.   Do you remember talking to him about
16  this article?
17     A.   I really don't specifically.  I very
18  well may have.  I just don't remember if I did.
19     Q.   Do you remember having a conversation
20  with Officer Opromalla about the statement in here
21  that he was being referred to as the gay
22  whisperer?
23     A.   Personally between myself and the
24  police officer?
25     Q.   Uh-huh.

Page 104

Fitzpatrick

1          Fitzpatrick
2     A.   I just don't remember.  I'm not saying
3  it didn't happen.  I just don't remember the
4  conversation.
5     Q.   Do you know an officer named Officer
6  Kehoe?
7     A.   Yes.
8     Q.   Would it refresh your recollection that
9  you may have spoken to Officer Opromalla and
10  Officer Kehoe after this article was published?
11     A.   It would not refresh my memory any more
12  than -- although Kehoe is a delegate, so that
13  makes sense.
14     Q.   And by "delegate" what do you mean?
15     A.   He's a Police Benevolent Association
16  representative at the command.  So he would sit in
17  on a meeting with any type of supervision.
18     Q.   Do you remember Officer Kehoe raising
19  the issue that he had safety concerns for Officer
20  Opromalla following the publication of this
21  article?
22     A.   Safety concerns.  Regarding?
23     Q.   Because Officer Opromalla was
24  personally named in this article.
25     A.   I remember -- I don't remember talking

Page 105

Fitzpatrick

1          Fitzpatrick
2  to Officer Opromalla.  I do remember that it was
3  suggested maybe to take Opromalla out of
4  plainclothes.  That could be.  I'm not sure if it
5  was because of this or because he was named.  It
6  would make sense.
7     Q.   What other reason could it have been?
8     A.   I don't know.  Like I said, it just
9  makes sense.
10     Q.   Do you remember now making the decision
11  to take him out of plainclothes?
12     A.   If he was taken out of plainclothes, it
13  would have been my decision to make.  Actually,
14  strike that.
15          It would have been the sergeant at roll
16  call's decision to make or the tour commander's
17  decision to make.  But if they ran that past me,
18  that's nothing I would have objected to one way or
19  the other.
20     Q.   You understand this article to be
21  alleging misconduct on behalf of The Port
22  Authority Police Department.  Is that fair to say?
23     A.   Yes.
24     Q.   What did you do in response to that
25  allegation of misconduct?

27 (Pages 102 - 105)

Page 106

1        Fitzpatrick
2    A.   Now, if you -- if I were to tell you I
3 gathered all of my supervisors into a room and say
4 we have to make sure we have our Is crossed -- Ts
5 crossed, Is dotted, that would be reasonable.  If
6 you're asking me do I remember for sure it
7 happened, that would be a lie.
8    Q.   As a captain of The Port Authority
9 Police Department, you took allegations of
10 misconduct seriously; right?
11    A.   I did.
12    Q.   And this was a very public allegation
13 of misconduct by The Port Authority Police
14 Department; right?
15    A.   Yes.
16    Q.   So searching your memory, what actions
17 did you take following this serious public
18 allegation of misconduct?
19        MR. BROPHY:  Note my objection.
20        You can answer.
21    A.   I would -- look, you're asking me again
22 do I remember specifically.  What I would normally
23 do is address roll calls about what I had said
24 before, where I would give some sort of -- not so
25 much teaching, but I would address roll calls

Page 107

1        Fitzpatrick
2 about current issues.
3        If this came out in The Times, that
4 would certainly qualify as a current issue.
5    Q.   So what would you -- just what is roll
6 call?
7    A.   Before every tour when the officers get
8 their assignment, they stand muster and they're
9 inspected and given their assignment.  That's roll
10 call.
11    Q.   Who would spoke at roll call?
12    A.   It could be a variety:  the sergeant --
13 the patrol sergeant always spoke.  He conducted
14 roll call and inspection.  The tour commander may
15 or may not speak.  I may or may not speak.
16    Q.   So you said it's likely -- or correct
17 me if I'm wrong.  Is it likely that you would have
18 spoken at roll call about this article following
19 its publication?
20    A.   I may have, yeah.
21    Q.   Do you remember speaking about it?
22    A.   No.
23    Q.   What would you have said at roll call?
24        MR. BROPHY:  Objection.
25        You can answer.

Page 108

1        Fitzpatrick
2    A.   Probably -- I say this quite a bit:
3 Remember, whether you're in plainclothes or
4 uniform, you're in the limelight, people watch
5 what you do.  Make sure you -- again, I always get
6 that wrong too, Is dotted, Ts crossed, all that.
7 But it's always safety, make sure you're doing
8 your job right, the public's watching.
9        I certainly didn't believe that my
10 officers did anything wrong here.  As I'm sitting
11 here, I still -- I've been out for a while.  Until
12 you show me differently.
13        You know, I always tell people, you
14 know, nobody is really happy when they get
15 arrested.  That doesn't mean that people aren't
16 arrested unjustly.
17        But when I read a report, arrest
18 report -- and you asked me earlier do I read
19 arrest reports.  I read them all.  And I send them
20 back if I find the grammar is terrible or whatever
21 the case is.
22        If I'm dissatisfied about probable
23 cause for an arrest, I would remember it.  I just
24 don't remember this.
25    Q.   Do you remember after this article came

Page 109

1        Fitzpatrick
2 out talking to any officers who had made the
3 arrests for public lewdness during this time
4 frame?
5    A.   I do, actually.
6    Q.   Who do you remember talking to?
7    A.   I couldn't tell you who it was, but I
8 do remember the genuine sentiment -- general
9 sentiment around the command.  When this came out,
10 the morale went right into the toilet, which is
11 something I was afraid was going to happen when I
12 saw this.
13        Nobody really wanted to go out, and
14 they would say, The Port Authority is not going to
15 back us if something goes wrong or even if
16 somebody says something goes wrong, so we have to
17 shut it down, Cap, no hard feelings.
18        I think that's what Kehoe was talking
19 about.  That's why he didn't want Officer
20 Opromalla taking the chance of getting another
21 complaint.
22        The advice I gave is make arrests.  If
23 you see probably cause for arrest, no matter what
24 it is, make the arrest.  You're in the right.
25 Keep doing your job.  If you stop doing your job,

28 (Pages 106 - 109)

Page 118

1           Fitzpatrick
2 further after you read this?
3     A.   No.
4     Q.   Does The Port Authority Police
5 Department conduct sweeps for the crime of public
6 lewdness at The Port Authority Bus Terminal?
7         MR. BROPHY:  Note my objection.
8         You can answer.
9     A.   No, I would adamantly say that is not
10 the case.
11     Q.   What are sweeps?
12     A.   We had spoken about this earlier.  A
13 sweep by the conditions team -- no, no -- yeah,
14 yeah.
15         When I use the term "sweep," obviously
16 not with a broom but figuratively you're going to
17 go out and cover the entirety of the bus terminal.
18 A lot of times they don't go through the entire
19 bus terminal because they already found -- you
20 have five police officers and you've two guys
21 lighting crack pipes out on 42nd Street and
22 another one smoking K2 on the corner, and, there
23 you go, the cops are gone.  If I have enough
24 personnel, maybe I will assign five more.
25         But the idea is to sweep the entirety

Page 119

1           Fitzpatrick
2 of the bus terminal, bathrooms, lower levels,
3 everywhere where the public has access, and you
4 combat every criminal activity that you observe.
5     Q.   So in all of the time that you were
6 with The Port Authority Police Department, you
7 don't recall there being any sweeps for the crime
8 of public lewdness or exposure?
9     A.   I don't ever remember targeting public
10 lewd.  If you're asking do we know that it happens
11 in the bathroom?  Of course it does.  They're not
12 going to do it on the main concourse.  If you go
13 into the bathroom, you know you're going to -- you
14 may very well see that crime, you may very well
15 see two guys hyping up, you may very well see
16 other crimes.
17     Q.   Do you remember any roll call
18 instructing officers to patrol for public lewdness
19 or exposure in the bathrooms?
20     A.   I may well have said patrol the
21 bathrooms but for any crime.  It wouldn't be for
22 just -- they're not going to go in there -- as a
23 matter of fact, I know that was an instruction:
24 You're going to make an arrest for any crime
25 observed.

Page 120

1           Fitzpatrick
2         You can't sit there and watch for one
3 crime to occur while another one happens.  That
4 doesn't make any sense.  The idea have to make
5 arrests to bring down the stats of the bus
6 terminal.
7     Q.   If a police officer entered a men's
8 room, either a plainclothes officer or uniformed
9 officer, and didn't see any crimes occurring, what
10 should that officer do?
11         MR. BROPHY:  Objection.
12         You can answer.
13     A.   You know, I don't quite know how to
14 answer the question.
15     Q.   Should the officer wait in the restroom
16 for a crime to occur?
17         MR. BROPHY:  Objection.
18         You can answer.
19     A.   He/she may, you know, if -- the best
20 way I could answer, I guess, is to say if outside
21 the doors they call Post 9, 42nd Street doors, is
22 a very busy area.  If the plainclothes go out
23 there and they don't see anything, you know,
24 immediately, yeah, I would like them to secret
25 themselves and wait for a drug deal or wait for

Page 121

1           Fitzpatrick
2 whatever may come across.
3     Q.   Did you ever instruct officers that
4 they should wait in men's rooms to see if a crime
5 would occur?
6     A.   No, no different from anywhere else.  I
7 think it would be a little more difficult to wait
8 inside a men's room.
9     Q.   Why would it be more difficult?
10     A.   Well, it's inherently a smaller area.
11     Q.   Would you think that there are any
12 privacy concerns to urinal -- to officers waiting
13 inside men's rooms?
14     A.   Privacy issues?
15         MR. BROPHY:  Objection.
16         You can answer.
17     A.   Just by their mere presence in the
18 bathroom?  I wouldn't -- I don't know about
19 privacy issues, but I would say I'm not getting
20 the bang for my buck policing-wise if I have guys
21 waiting in the bathroom.
22     Q.   So I'm not sure.  Before you said you
23 thought it would be good practice for them to wait
24 in the bathroom to see if something happened.  Now
25 you're saying --

31 (Pages 118 - 121)