# EXHIBIT 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

CORNELL HOLDEN, MIGUEL MEJIA,
MALCOM RUSSELL, and MARCOS POLONIA,
on behalf of themselves and all others similarly
situated,

                              **Plaintiffs,**              **17 Civ. 2192 (JGK)**

       -against-                               **PLAINTIFFS' EXPERT
REPORT**

THE PORT AUTHORITY OF NEW YORK AND
NEW JERSEY; THE PORT AUTHORITY
POLICE DEPARTMENT; and MICHAEL
OPROMALLA, SHAUN KEHOE, JOHN TONE,
JORDAN ESPOSITO, MICHAEL DEMARTINO,
RICHARD AYLMER, PAUL MILLER, JOHN
FITZPATRICK, MARK MONTERO, VIJAY
SEETARAM, MELVIN CRUZ, MARTIN
JAYCARD, PAUL O'DELL and OFFICERS
JOHN DOE 1-100, sued in their individual
capacities and official capacities as officers of the
Port Authority Police Department,

                              **Defendants.**
-------------------------------------------------------------------X


## <u>OPENING EXPERT REPORT OF JOHN F. PFAFF, PH.D.</u>

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     COMPENSATION ............................................................................................. 1

III.    QUALIFICATIONS ........................................................................................... 1

IV.     PREVIOUS EXPERT TESTIMONY ................................................................ 2

V.      SUMMARY OF FINDINGS ............................................................................. 2

VI.     CONCLUSION ................................................................................................. 26

I, John F. Pfaff, hereby declare as follows:

## I.     INTRODUCTION

1.      I am submitting this report regarding issues of interest to Plaintiffs in this litigation against the Port Authority of New York and New Jersey, the Port Authority Police Department, Michael Opromalla, Shaun Kehoe, John Tone, Jordan Esposito, Michael DeMartino, Richard Aylmer, Paul Miller, John Fitzpatrick, Mark Montero, Vijay Seetaram, Melvin Cruz, Martin Jaycard, Paul O'Dell, and Officers John Doe 1-93.

2.      Specifically, this report provides my opinion on the statistical anomalies found in the arrest records of the Port Authority Police Department ("PAPD") from the relevant period—from January 1, 2014 to the present.  I understand that Plaintiffs allege that the PAPD engaged in a pattern and practice of unlawful arrests.  In forming my opinions, I have reviewed numerous materials, as cited in my report and listed in Exhibit A.

## II.     COMPENSATION

3.      Plaintiffs have engaged me as an expert in this matter.  I am being compensated at an hourly rate of $300.00 for my work on this case.  My opinions are objective, and compensation for my services is not contingent on my opinion or the outcomes of this action.

## III.     QUALIFICATIONS

4.      I received both my J.D. and a Ph.D. in Economics from the University of Chicago.  Through the duration of my educational and professional career, I have worked extensively with criminal justice statistics.  My curriculum vitae, attached as Exhibit B, reflects my experience in these matters.

1

5.      I am a Professor Law at Fordham University School of Law.  My research comprises of quantitative analyses of matters related to criminal justice, especially criminal sentencing.   My recent work emphasizes the previously underappreciated role that prosecutorial discretion has played in driving up prison populations.  In 2017, I published *Locked In: The True Causes of Mass Incarceration*, which seeks to understand the causes of the unprecedented 40-year boom in U.S. incarceration rates.

6.      Prior to coming to Fordham, I was the John M. Olin Fellow at the Northwestern University School of Law and clerked for Judge Stephen F. Williams on the U.S. Court of Appeals for the D.C. Circuit.

## IV.     PREVIOUS EXPERT TESTIMONY

7.      A list of the cases in which I have testified as an expert at trial or by deposition in the preceding years is provided in the attached Exhibit C.

## V.     SUMMARY OF FINDINGS

## Insights from the Port Authority Police Arrest Data

8.      The PAPD has provided Plaintiffs with several datasets covering arrests made at the Port Authority Bus Terminal ("PABT").  The primary dataset is arrest-level data covering all arrests over the years 2014-2017 ("PAPD TB&T Arrests Data").  Three other datasets provided by the PAPD cover all arrests made in 2013 (with far less detail than the 2014-2017 data) ("2013-2014 Data"), all bathroom arrests for 2014-2016 ("Restroom Statistics"), and narrative accounts of all public masturbation arrests for 2014-2017 ("Narratives").  This report shares my impressions of what this data tells us about the nature of public lewdness arrests at the PABT during that time.

9.      The data provided by the PAPD are not detailed enough to enable me to draw firm conclusions about what drove public lewdness arrests in 2014.  But a few facts are notable:

- The arrests for public lewdness appear to be idiosyncratic, in potentially important ways.  They appear to take place at different times of the day than other arrests— and at times when one would expect public masturbation to be *less* frequent, not more (morning and evening rush hours).  Those arrested also tended to be older and less likely to be Black than those arrested for other offenses.  These results certainly suggest that the spike in public lewdness arrests was the result of intentional policy choices, not incidental to routine police patrols and stops.

- The arrests for public lewdness were driven by a small cohort of officers, with just five officers making 70% of the public lewdness arrests in 2014.  There does not appear to be any policy barring such behavior, nor any meaningful oversight to prevent such issues from arising.[1]

**Basic Overview of Public Lewdness Arrests**

10.     To start, it may help to provide an overview of some central facts about trends in arrests for "public lewdness" at the PABT.  To be clear, the focus of this litigation is arrests made for the more specific offense of public masturbation at urinals, but none of the data produced by the PAPD provide a unique identifier for this.  Instead, the closest

---

[1] *See, e.g.*, Fitzpatrick Tr. at 69, 70-71, 74, 88-91; Miller Tr. at 28-29; DeMartino Tr. at 70.

proxy is arrests for "public lewdness," [2] which appear to track arrests for public masturbation pretty closely.[3]

11. There are two limitations in the PAPD TB&T Arrests Data to highlight. First, and most important, there is no data for overall arrests for October 2014—troublingly, the month the story of the public masturbation stings broke. The PAPD has not explained yet why this data is missing. It is clearly not the case that no arrests happened in October 2014. Not only is this simply implausible, but the Restroom Statistics dataset reports arrests for public lewdness during that October. Second, there is no data for the last two weeks of December 2014. Thus, all estimates for 2014 are lower bounds, given the missing data. That said, they are still likely reasonable approximations of what occurred in 2014.[4]

12. With those caveats in mind, the main story is simply this: at least in comparison to 2013 and 2015-2017, 2014 saw a sharp spike in arrests for public lewdness. There were 9 arrests for public lewdness in 2013 (1.2% of 750 total arrests), but then at least 60 in 2014 (13% of 448). Arrests for

---

[2] The PAPD TB&T Arrests Data does not use consistent terms for many of the offenses it records. What I define as "public lewdness" shows up in the PAPD TB&T Arrests Data as "public lewdness," "lewdness," "pub lewd," "public," "public lewd," "public  lewd" (two spaces as opposed to one), "publiclewd," and "pubuc [sic] lewdness." In the less-detailed 2013 data, "public lewdness" is referred to as "lewdness & public exposure," "public lewd., res arrest. arrest, exposure of psn, trespass," "public lewdness & exposure of person," "public lewdness & trespass," "public lewdness, exposure," and "public lewdness, exposure, trespass, open container."

[3] The PAPD TB&T Arrests Data does not classify arrests more finely than "public lewdness" and provides no narrative accounts of the arrest. A separate dataset of sealed arrest files, "Narratives," contains narrative accounts for many public lewdness arrests in 2014. Comparing the sealed arrest file to the PAPD TB&T Arrests Data suggests that at least 85% of all public lewdness arrests were for public masturbation, and perhaps even more.

[4] The reports of the stings broke at the beginning of October 2014, and even in November 2014—a month with full data—there are zero public lewdness arrests. This at least suggests that the news story had an immediate effect on the number of public lewdness arrests.

public lewdness promptly fell to 17 in 2015 (3% of 586), 16 in 2016 (2% of 652), and 7 in 2017 (1% of 840 arrests)[5].

13.     Figure 1 provides more detail on arrests for public lewdness, breaking them out by month.  There are some intermittent public lewdness arrests in 2013, but April 2014 witnessed a sharp increase in such arrests, which rose through August and remained high (if a bit lower) in September.  While the failure of the PAPD to provide complete data means we do not know what happened in October, by November there appears to have been no public lewdness arrests, and they remained relatively low for 2015-2017.

---

[5] In a letter to Plaintiffs dated November 1, 2018, the PAPD claimed that there were only 2 public lewdness arrests in 2017. Its own PAPD Data provides the larger estimate.

## Fig. 1: Monthly Arrests, Public Lewdness



PAPD never provided Oct. 2014 data and only provided Dec. 2014 data for 12/2 - 12/10.
The 2014-2017 data is from the PAPD Data, the 2013 data from the more-limited 2013 dataset.

14.    Figure 2 puts the trends in public lewdness arrests in broader context, comparing them to trends in total arrests by month.  The key insight in Figure 2 is that the rise in public lewdness arrests does not appear to have been the product of a broader increase in enforcement.  In fact, the increase appears to have come during a period of relatively *few* arrests.  Given the limited data here, it is not possible to test any causal claim rigorously, but it is certainly possible that the focus on public lewdness was *due*, at least in part, to that decline in arrests in the middle of 2014 (fewer incidents that demanded a response freed up time to pursue more discretionary policies).  It is also possible that the focus on public lewdness came from the addition of several new graduates from the PAPD academy who started patrolling the bus terminal in January 2014;[6] their arrival helped alleviate a staffing shortage, thus making it easier for the PAPD to focus on low-level arrests like those for public lewdness.

---

[6] *See* Opromalla Tr. at 48; Seetaram Tr. at 27; Tone Tr. at 18. Officers Opromalla, Seetaram, and Tone all graduated from academy in January 2014. *See also* Bryan Tr. at 174; Miller Tr. at 127. Sergeant Miller chose officers for plainclothes assignments "[s]traight out of the academy" and Chief Bryan stated that an "influx of new officers from the academy" is one possible explanation for the increase in public lewdness arrests in 2014.

## Fig. 2: Monthly Arrests, All Crimes vs. Public Lewdness



PAPD never provided Oct. 2014 data and only provided Dec. 2014 data for 12/2 - 12/10.
The 2014-2017 data is from the PAPD Data, the 2013 data from the more-limited 2013 dataset.

15.     However, Figure 2, which compares public lewdness arrests to all arrests in the PABT, may take too aggregated a perspective.  As Figure 3 demonstrates,[7] almost all the arrests for public lewdness occurred at what the PAPD TB&T Arrests Data calls "Post 3."[8]  While there are no descriptions for what "Post 3" refers to, the phrase commonly appears in most descriptions associated with the controversial third-floor bathroom.[9]

---

[7] From this point forward, I will focus on the years 2014-2017, dropping 2013. The 2013 data used above came from a much more limited file on arrests that included only the date of the arrest and the offense, but none of the other information I use below (such as the time of the arrest, the arresting officer, the demographics of the person arrested, and so on).

[8] The PAPD TB&T Arrests Data has multiple entries relating to Post 3, like "Post 32" and "Post 35," but here I am referring specifically to arrests coded as occurring specifically at "Post 3."

[9] *See* Shindel Tr. at 91-92 (explaining that Post 3 is a designation for a police officer's post in the bus terminal, and that Post 3 includes the patrol of men's bathrooms).



Fig. 3: Monthly Arrests: All Pub. Lewd. vs. Post 3 Pub. Lewd.

PAPD never provided Oct. 2014 data and only provided Dec. 2014 data for 12/2 - 12/10.
Post 3 is the best approximation available for the relevant bathroom arrests.

16.     While the PAPD TB&T Arrests Data does not indicate if events specifically

occurred in the bathroom of interest, the PAPD also provided a different data file

10

specifically on arrests in bathrooms (the "Restroom Statistics" noted above). The Restroom Statistics data appears to track the data for "Post 3" in the PAPD TB&T Arrests Data. The Restroom Statistics data, for example, has 54 public lewdness arrests in 2014, which is exactly the same number of Post 3 public lewdness arrests in the PAPD TB&T Arrests Data.[10] Similarly, Figure 3A plots the time-of-day of public lewdness and non-public lewdness arrests for Post 3, while Figure 3B does the same using the Restroom Statistics data; the trends in the two graphs are quite similar. Accordingly, I feel comfortable treating Post 3 as the bathroom.



Post 3 is the best approximation available for the relevant bathroom arrests.

---

[10] Given that the PAPD TB&T Arrests Data is missing data from October, and that the bathroom data indicates that there were five public lewdness arrests in the Post 3 bathroom in October, the perfect alignment is actually surprising. But the results are close enough to suggest that they are measuring the same thing.



Fig. 3B: Hourly Bathroom Arrests: 2014-16

Data are from the dataset on all bathroom arrests, 2014-2016.
Bathroom data does not have "Public Lewdness" code. The closest analogue is "Sex Offense/No Victim."

17.    Given that public lewdness arrests are concentrated in Post 3, it makes sense to rerun Figure 2, but restricting ourselves to public lewdness and non-public lewdness arrests just in Post 3; this is Figure 4.  As Figure 4 makes clear, the rise in public lewdness arrests does not appear to be the product of a broader increase in Post 3 arrests either.  The total number of arrests at Post 3 was fairly stable over 2014; the total number of non-public lewdness arrests declined in the middle of the year, as public lewdness arrests rose.  It is, of course, possible that the decline in non-public lewdness arrests was *due to* the rise in public lewdness arrests: perhaps the increased police presence deterred crime, although such an argument seems hard to square with Defendants' accounts of the officers (who, given that they were in plain clothes, apparently often seemed like suspicious lurkers until

12

they revealed who they were).[11] It is also possible that the increased attention given to public lewdness arrests diverted PAPD officers from making arrests for other offenses.

## Fig. 4: Monthly Post 3 Pub. Lewd, Non-Pub. Lewd Arrests



PAPD never provided Oct. 2014 data and only provided Dec. 2014 data for 12/2 - 12/10.
Post 3 is the best approximation available for the relevant bathroom arrests.

---

[11] *See* Second Amended Class Action Complaint, ¶ 78; *see also* Montero Tr. at 70-72, 158; Miller Tr. at 27-28; Bryan Tr. at 165-66; Seetaram Tr. at 43.

18.     In short:  public lewdness arrests in 2014 were concentrated in Post 3, and the evidence does not suggest that the increase in Post 3 public lewdness arrests was the product of a broader crackdown on other offenses in Post 3.  Something else was driving this increase in public lewdness arrests.

19.     While it is impossible with this data to say what that "something else" is, it is possible to highlight how the arrests for public lewdness differ from those for other crimes, which at least suggests further that something besides "routine practices" drove the mid-2014 spike.

**The Timing of Public Lewdness Arrests**

20.     To start, arrests for public lewdness took place at different times of the day than those for other offenses, and in a way that seems unlikely to reflect underlying trends in offending.  Recall Figure 3A above, which plots arrests in 2014 for public lewdness and non-public lewdness offenses at Post 3 by the hour of the day.  It is immediately clear in Figure 3A that the two types of arrests follow different time trends.  While both show a slight increase right before the afternoon rush hour (non-public lewdness arrests happened most often between 3 and 4 p.m., and public lewdness arrests between 4 and 5 p.m.), the afternoon spike is much more concentrated for public lewdness offenses, and public lewdness arrests also have a morning rush-hour spike that is mostly not present in the non-public lewdness data as well.

21.     Now, there is an important caveat for Figure 3A:  given the number of public lewdness arrests (60) and Post 3 arrests (103) made in 2014, Figure 3A is not showing us what an *average* day looked like, but what the total for *all days* looked like.  In other words, over the course of *all of* 2014, there was one non-public lewdness arrest and five public lewdness arrests between 9 and 10 in the morning at Post 3.

14

22. Even with that caveat, however, the results in Figure 3A are surprising. I would expect that public masturbation would happen *less often* during the morning and afternoon rush, not *more*.[12] If this were solicitation for sex, then perhaps we would expect spikes during the busiest times of the day, but for masturbation the timing seems less credible (and again, almost all public lewdness arrests appear to be for public masturbation).

23. Moreover, the steady trickle of arrests in the morning as well as the late afternoon suggests that PAPD officers enter and leave the bathroom all day long—which pushes back against the claim that the two peaks are just the mechanistic result of when officers are in the bathroom to make arrests more broadly.[13]

24. The timing for public lewdness arrests holds across days of the week as well, with one notable exception. As Figure 5 demonstrates, there were almost no public lewdness arrests made over the weekend; they were only made during the week. This could, of course, just reflect lower staffing levels on the weekends or different behavior of those in the PABT on the weekends versus the during the week.[14] It is not clear to me, however, why we should expect to see more masturbation in the PABT during the week, when it is crowded, than on the weekends when it should have fewer people passing through, which further suggests that some sort of choice by officers or the enforcement incentives that they faced drove the rise in these arrests.

---

[12] *See* Bryan Tr. at 90-91, 126. Chief Bryan explained that he would be more likely to observe public lewdness activity in non-rush hour times because areas would be "more deserted." Later, Chief Bryan clarified that the men he had observed masturbating at urinals did so at non-rush hour times.

[13] *See* Montero Tr. 70-72; *see also* Bryan Tr. at 216. "[O]fficers that I know of, basically in my tenure as a supervisor there, were not assigned to target or monitor bathroom urinals for public lewdness acts. When officers patrolled the public restroom, as they patrolled other areas in the Bus Terminal, if they came across an individual masturbating at the urinal, then that's when they would establish the probable cause to make the arrest."

[14] *See* Shindel Tr. at 99-100.



Fig. 5: Post 3 Lewdness Arrests in 2014, by Hour of Day

Post 3 is the best approximation available for the relevant bathroom arrests.

**The Races and Ages of Those Arrested**

25.    Another interesting feature of the public lewdness arrests is that those arrested were older and less likely to be Black than those arrested for all other offenses, compared to other arrests at Post 3 or in the PABT more broadly.

26.    In 2014, 30% of those arrested in Post 3 for public lewdness were Black, compared to 57% of those arrested there for non-public lewdness offenses, a statistically significant difference.[15]  We do not see this sort of racial disparity between Post 3 and the rest of the PABT for other crimes: for non-public lewdness offenses, 57% of those arrested in Post 3 in 2014 were Black, compared to 54% elsewhere in in the PABT, a statistically insignificant difference.

---

[15] I use the 5% level of significance here.

16

27.     Both Whites and Hispanics[16] were arrested at a greater rate for public lewdness in Post 3, although the effect was stronger for Hispanics.  Whites made up 27% of those arrested for non-public lewdness offenses, but 31% of those arrested for public lewdness; Hispanics comprised 16% of those arrested for non-public lewdness offenses and 28% of those arrested for public lewdness crimes.  While neither of those differences is statistically significant, the relative decline in arrests of Blacks is offset much more by an increase in the share of Hispanics than of Whites.

28.     Those arrested for public lewdness tended to be older as well.  The average age of those arrested for non-public lewdness offenses in 2014 in Post 3 was 40, vs. 49 for those arrested there for public lewdness crimes, a difference that was again statistically significant.  Like with race, this does not appear to reflect broader differences in those who were arrested in Post 3:  for non-public lewdness crimes, the average age of someone arrested in Post 3 was 40.3, versus 39.8 for those outside Post 3 (an insignificant difference).  When breaking things down by race, the age difference was significant for Blacks (40.5 versus 49.6) and Hispanics (35.9 versus 47.8), but not for Whites (42.5 versus 48.7), although in all three cases, those arrested for public lewdness were older on average.

29.     The data here does not allow me to delve deeper into *why* we see these differences in the race and age of those arrested.  It does not appear, however, that the PAPD were using public lewdness arrests to target young Black men, or young(er) men of color more broadly.  Given the history of police targeting gay men,[17] however, it is possible that this reflects an effort by the PAPD to profile those who they believe are gay.

---

[16] The PAPD TB&T Arrests Data treats Hispanic as a race, not an ethnicity: a defendant is classified as White, Hispanic, Black, Asian, or Other.

[17] *See* Pierceson Report, pp. 5–8.

30.     All told, regardless of the cause, the race and age data again suggest that the public lewdness arrests in 2014 were driven by a different policy than the rest of the arrests—unless, as seems quite unlikely, those who masturbate in public are disproportionately older Hispanic men.

**The Potential Importance of a Few Officers**

31.     The PAPD may argue that any increase in public lewdness arrests in 2014 was not the product of centralized policy but the result of "rogue" decisions made by a handful of individual officers.  While it is clear that certain officers drove the process, each of these officers mattered more at different times, so it is important to take a close look at the numbers.

32.     The central issue here is that while nearly 100 PAPD officers made at least 1 arrest in 2014, just 5 officers—Kehoe, Opromalla, Seetaram, Tone, and Trubia (KOSTT)—made 70% of all public lewdness arrests (42 out of 60), despite making only 19% of all arrests in total (85 out of 448), and only 11% of all non-public lewdness arrests (43 out of 388).  All told, just slightly less than half of all arrests made by KOSTT were for public lewdness (49%), with Opromalla's 73% the most extreme.  For all other officers, the average share of arrests that were for public lewdness was about *ten times* lower, at approximately 4% to 5%.  With one small exception, no non-KOSTT officer had as large a fraction of public lewdness arrests as the KOSTT officers.[18]

---

[18] At 40%, two non-KOSTT officers had slightly larger fractions than Tone, whose 36% was the lowest fraction of public lewdness arrests among the KOSTT officers. But these two officers made very few total arrests.

33.     Figures 6 and 7 show the outsized role that KOSTT played.[19]  Figure 6 compares KOSTT to officers who made at least one public lewdness arrest in 2014, and Figure 7 compares them to those who made at least two total arrests but no public lewdness arrests that year.[20]  As is immediately clear, the KOSTT officers generally made more arrests *just* for public lewdness crimes alone than most other officers' total arrests for *all* crimes.



This is a graph for arrests for all officers who made at least one lewdness arrest in 2014.

---

[19] The other officers are represented by numbers for ease of reference. Their names can be provided upon request.
[20] The officers are divided across two graphs for ease of reference.



Fig. 7: Pub. Lewd and Non-Pub. Lewd Arrests: 2014

**Pub. Lewdness Arrests** ■ **Non-Pub. Lewdness Arrests** ■

This graph compares KOSTT to offs who made NO pub. lewd. arrests but at least 2 total arrests in 2014.
There are another 44 officers (out of 96 total: 46%) who made one non-pub. lewd arrest in 2014.

34.     The outsized role KOSTT officers played in making public lewdness arrests

is confined to 2014.  KOSTT officers handled a smaller fraction of public lewdness arrests

in later years, with their share of public lewdness arrests falling from 70% in 2014 to 35%

in 2015 (6 out of 17), 21% in 2016 (3 out of 14), and 0% in 2017 (0 out of 7).  This decline

does not seem to reflect a broader drop in productivity—KOSTT's share of non-public

lewdness arrests remained relatively stable, at 11% in 2014, 8% in 2015 (46 out of 569),

10% in 2016 (51 out of 497), and 13% in 2017 (106 out of 833), but simply a move away

from public lewdness arrests.  As a result, public lewdness arrests made up smaller shares

of the arrests made by KOSTT officers, falling from 49% of their arrests in 2014 to 11.5%

in 2015 (6 out of 52), 5.6% in 2016 (3 out of 54—with all three being made by a single officer, Seetaram), and 0% in 2017.  Figure 8 depicts these trends.



Fig. 8: Annual Pub. Lewdness Arrests, by Officer

This graph covers officers who made at least one lewdness arrest in at least one year.

35.     Not surprisingly, given that most public lewdness arrests in 2014 took place in Post 3, KOSTT officers made a lot of arrests in Post 3 that year.  Similarly, the decline in public lewdness arrests corresponds to an overall decline in Post 3 arrests by KOSTT officers, as Figure 9 demonstrates.  Note, though, that there is no real change in non-public lewdness arrests by KOSTT officers in Post 3 over most of this time:  the KOSTT officers made 6 non-public lewdness arrests there in 2014, 5 in 2015, 6 in 2016, and 4 in 2017.



**Fig. 9: Post 3 Arrests, by Arresting Officer**

Post 3 is the best approximation available for the relevant bathroom arrests.

36.     The key question, of course, is why the KOSTT officers were involved in so many bathroom incidents in 2014.  It could reflect formal orders, or it could reflect discretion they had about where to deploy during their shifts. Figure 10 tries to disentangle these possibilities by looking at Post 3 arrests (both public lewdness and non-public lewdness) for the KOSTT officers at the monthly level.

24



Fig. 10: Monthly Post 3 Incidents in 2014, by Officer

Post 3 is the best approximation available for the relevant bathroom arrests. PAPD never provided Oct. 2014 data, provided Dec. 2014 data just for 12/2 - 12/10.

37.     What stands out in Figure 10 is the difference across the five officers: Opromalla, for example, was consistently involved in public lewdness arrests across the middle of 2014, while Seetaram was particularly active in August but not thereafter.  Kehoe, Tone, and Trubia do not show consistent patterns.[21]  The variation in Figure 10 certainly does not rule out centralized directives—perhaps the order was to crack down on public lewdness, and the officers each responded in slightly different ways.

38.     The data here make it clear that KOSTT played a major role in driving public lewdness arrests, but their impact was not uniform, with different officers pushing up these arrests in different months and at different rates.

## VI.   CONCLUSION

39.     Two main points stand out in the data here.  The first is that public lewdness arrests look qualitatively different than other arrests.  They take place at different, and surprising, times, in ways that are inconsistent with the other arrests taking place at the same times and in the same places.

40.     The second is that these arrests are driven by a small number of officers, and these officers appear to target Post 3 public lewdness at different times and to different degrees.  PAPD could suggest that the officers were acting on their own rather than following a centralized policy—although that, of course, raises questions about why the PAPD turned a blind eye to their behavior.

---

[21] Recall that October is missing in Figure 10, and December is incomplete.

John F. Pfaff, Ph.D.

DATE:  New York, New York
       March 29, 2019

## OPENING EXPERT REPORT OF JOHN F. PFAFF, PH.D.

## March 29, 2019

## EXHIBIT A: MATERIALS CONSIDERED

(1) Plaintiffs' Second Amended Class Action Complaint, Dated November 28, 2018, ECF No. 117.

(2) Deposition Transcripts

    a. Raymond Bryan, taken October 24, 2018 (with exhibits 1-7)

    b. Michael DeMartino, taken June 29, 2018 (with exhibits 1-10)

    c. Diannae Ehler, taken October 26, 2018 (with exhibits 1-3)

    d. John Fitzpatrick, taken October 1, 2018 (with exhibits 1-4)

    e. Paul Miller, taken October 30, 2018 (with exhibits 1-11)

    f. Mark Montero, taken February 6, 2019 (with exhibits 1-14)

    g. Vijay Seetaram, taken October 29, 2018 (with exhibits 1-9)

    h. Ronald Shindel, taken February 14, 2019 (no exhibits marked)

    i. John Tone, taken October 5, 2018 (with exhibits 1-12)

(3) Port Authority Document Productions

    a. Restroom Statistics (referred to within report as "Restroom Statistics"), Bates Nos. PA000986, PA006410

    b. TB&T Arrest Spreadsheets, (referred to within report as "PAPD TB&T Arrests"), Bates Nos. PA006431, PA006512, PA006476, PA008666

    c. 2013-2014 PAPD Arrest Data (referred to within report as "2013-2014 data" and "the more limited 2013 data."), Bates Nos. PA008865-PA008878

    d. TB&T Arrest Spreadsheets, Bates Nos. PA006431; PA008656-PA008669

    e. Bus Terminal Port Authority Police Department Daily Activity Report, Bates Nos. PA006213; PA006216; PA006219; PA006226; PA006233; PA006236; PA006239; PA006242; PA006255; PA006260; PA006263; PA006283; PA006312; PA006334; PA006338; PA006335; PA006320;

PA006336; PA006337; PA006328; PA006346; PA006343; PA006344; PA006345; PA006364; PA006360; PA006364; PA006365; PA006368; PA006367; PA006370; PA006372; PA006380; PA006390; PA006393

    f.  Port Authority Policy (sic) Department, Port Authority Bus Terminal Crime Statistics, Bates Nos. PA10496- PA10500

    g.  Port Authority Police Department, Redacted Arrest Reports (referred to within report as "Narratives"), Bates Nos. PA001538 -  PA003718

(4) Correspondence

    a.  November 1, 2018 Letter from Plaintiffs to Defendants

## OPENING EXPERT REPORT OF JOHN F. PFAFF, PH.D.

## March 29, 2019

### EXHIBIT B: CURRICULUM VITAE

### John Francis Pfaff

Fordham Law School
212.636.7661
150 West 62nd Street
jpfaff@law.fordham.edu
New York, NY  10023

**Education**

**PhD, University of Chicago**, Department of Economics (2005)
- Dissertation: *The Continued Vitality of Structured Sentencing Following* Blakely*: The Effectiveness of Voluntary Guidelines*
- Fields of Study: Law and Economics, Economics of Crime, Game Theory, Public Choice
- Dissertation Committee: Gary Becker (chair), Bernard Harcourt, Steven Levitt, Eric Posner

**JD with Honors and Order of the Coif, University of Chicago School of Law** (2003)
**AB with Honors in Economics and General Honors, University of Chicago** (1997)
- National Merit Scholar
- Phi Beta Kappa

**Professional Experience**

**Fordham Law School**
Professor of Law                                                                                      2013 - present
Associate Professor of Law                                                                   2005 – 2013

**Northwestern University School of Law**
John M. Olin Fellow in Law                                                                   2004 – 2005

**United States Court of Appeals for the District of Columbia Circuit**
Clerk for the Hon. Stephen F. Williams                                            2003 – 2004

**Fellowships, Honors, and Awards**

**Fordham Law School**
Defining Wisdom Grant Recipient                                                    2008 – 2010
Faculty Fellowship Leave                                                                    Spring 2013

**University of Chicago, Department of Economics**
National Science Foundation Graduate Research Fellowship        1998 – 2002
Recipient, Wayne C. Booth Graduate Student Prize for Excellence in Teaching       2003

**University of Chicago Law School**
Bradley Foundation Economics Fellowship                                     2002 – 2003
                                                                                                            1999 – 2001
Olin Foundation Fellowship in Law and Economics                      1999 – 2001
University of Chicago Law Review, Vols. 69 – 70                          2002 – 2003

## Publications

### Scholarly Publications

### Books

LOCKED IN: THE TRUE CAUSES OF MASS INCARCERATION AND HOW TO ACHIEVE REAL RE-
FORM, Hachette Book Group (2017)
SENTENCING LAW AND POLICY, Foundation Press (2015)

### Articles and Book Chapters

*Juvenile Private Prisons*, with Jeffrey Butts, __ CRIMINOLOGY AND PUBLIC POLICY __
(forthcoming 2019)
"Theories of Mass Imprisonment," in CRIMINAL JUSTICE THEORY: EXPLANATIONS AND EF-
FECTS, edited by Cecilia Chouhy et al. (forthcoming 2019).
*29th Annual Reckless-Dinitz Lecture: Moving Past the Standard Story: Rethinking the
Causes of Mass Incarceration*, __ OHIO ST J CRIM L __ (forthcoming 2019)
*Prosecutors Matter: A Response to Bellin's Review of* Locked In, U MICH L REV ONLINE
(2018)
*Criminal Punishment and the Politics of Place*, 45 FORDHAM URBAN L J 571 (2018)
"Prosecutorial Guidelines," in REFORMING CRIMINAL JUSTICE, Vol. 3, edited by Erik Luna
(2017)
"The Need for Prosecutorial Guidelines," in POLICING AND PUNISHMENT: PHILOSOPHICAL
PROBLEMS AND POLICY SOLUTIONS, edited by Chris Suprenant (2017)
*The Complicated Economics of Prison Reform*, 114 MICH L REV 951 (2016) (invited book
review)
*Federal Sentencing in the States: Some Thoughts on Federal Grants and State Imprison-
ment*, 66 HASTINGS L J 1567 (2015) (invited symposium piece)
*The War on Drugs and Prison Growth: Limited Importance, and Limited Legislative Op-
tions*, 52 HARV J LEGIS 173 (2015) (invited symposium piece)
*Escaping from the Standard Story: Why the Conventional Wisdom on Prison Growth is
Wrong, and Where We Can Go From Here*, 26 FED SENT RPTR 265 (2014)
*Waylaid by a Metaphor: A Problematic Account of Prison Growth*, 111 MICH L REV 1087
(2013) (invited book review)
*The Micro and Macro Cause of Prison Growth*, 28 GA STATE L REV 1237 (2011) (invited
symposium piece)
*The Myths and Realities of Correctional Severity: Evidence from the National Corrections
Reporting Program*, 13 AM L & ECON REV 491 (2011) (peer review)
*The Durability of Prison Populations*, 2010 U CHI LEGAL FORUM 73 (invited symposium
piece)
*The Future of Appellate Sentencing Review:* Booker *in the States*, 93 MARQUETTE LAW
REVIEW 683 (2009) (invited symposium piece)
*The Challenge of Designing Quality Guidelines for Observational Research*, AUSTRALA-
SIAN EVALUATION SOCIETY CONFERENCE PROCEEDINGS (2009).

"Gary Becker," in PIONEERS IN LAW AND ECONOMICS, edited by Joshua Wright and Lloyd Cohen (2009)

*The Empirics of Prison Growth: A Critical Review and Path Forward*, 98 J CRIM L & CRIMINOLOGY 547 (2008) (peer review)

*The Vitality of Voluntary Guidelines in the Wake of* Blakely v Washington: *An Empirical Assessment*, 19 FED SENT RPTR 202 (2007)

*The Continued Vitality of Structured Sentencing Following* Blakely: *The Effectiveness of Voluntary Guidelines*, 54 UCLA L REV 235 (2006)

*The Continued Vitality of Structured Sentencing Following* Blakely: *The Effectiveness of Voluntary Guidelines*, Doctoral dissertation, University of Chicago, Department of Economics (2005)


## Popular Publications

"NYC Prosecutors are Stoking Fear About the Mass Bailout, but Their Arguments Don't Add Up," *The Nation*, October 2, 2018 (available on-line at https://www.thena-tion.com/article/nyc-prosecutors-are-stoking-fear-about-the-mass-bailout-but-their-ar-guments-dont-add-up/)

"Alabama's Prosecutors Could Be Its Biggest Reformers," *AL.com*, September 29, 2018 (available on-line at https://www.al.com/opinion/index.ssf/2018/09/alabamas_prose-cutors_could_be.html)

"The Incalculable Costs of Mass Incarceration," *The Appeal*, September 20, 2018 (availa-ble on-line at https://theappeal.org/the-incalculable-costs-of-mass-incarceration/)

"The Perverse Incentives of Punishment," *The Appeal*, May 18, 2018 (available on-line at https://theappeal.org/the-perverse-incentives-of-punishment-7c1e32b18d07/)

"South Carolina's Deadly Prison Riot Wasn't Inevitable—Policymakers Share the Blame," NBCNews-Think, April 20, 2018 (available on-line at https://www.nbcnews.com/think/opinion/south-carolina-s-deadly-prison-riot-wasn-t-inevitable-policymakers-ncna867821)

"Why Public Defenders Matter More than Ever in a Time of Reform," *The Appeal*, April 18, 2018 (available on-line at https://theappeal.org/why-public-defenders-matter-more-than-ever-in-a-time-of-reform-9b018e2184fe/)

"How Zombie Stats, Phantom Stats, and Frankenstats Paint a Misleading Picture on Crime," *The Appeal*, March 1, 2018 (available on-line at https://theappeal.org/how-zombie-crime-stats-phantom-stats-and-frankenstats-paint-a-misleading-picture-on-crime-fddb2c2070cd/)

"The Perverse Power of the Prosecutor," *Democracy Journal*, February 26, 2018 (available on-line at https://democracyjournal.org/arguments/the-perverse-power-of-the-prose-cutor/)

*A Smarter Approach to Federal Assistance with State-Level Criminal Justice Reform*, AEI Economic Perspectives, January 16, 2018 (available on-line at http://www.aei.org/pub-lication/a-smarter-approach-to-federal-assistance-with-state-level-criminal-justice-re-form/)

"The Case Against the Prosecution," *Wall Street Journal*, October 20, 2017 (available on-line at https://www.wsj.com/articles/the-case-against-the-prosecution-1508520601)

"The Supreme Court Justices Need Fact-Checkers," *New York Times*, October 18, 2017 (available on-line at https://www.nytimes.com/2017/10/18/opinion/supreme-court-justices-factcheckers.html)

"Cory Booker has a Plan to `Reverse' Mass Incarceration. It Won't Work." *Vox*, September 26, 2017 (available on-line at https://www.vox.com/the-big-idea/2017/9/26/16363230/mass-incarceration-cory-booker-reverse-bill)

"Mass Incarceration is a Local Affair," *Democracy Journal*, August 1, 2017 (available on-line at http://democracyjournal.org/arguments/mass-incarceration-is-a-local-affair/)

"The Never-Ending `Willie Horton Effect' is Keeping Prisons Too Full for America's Own Good," *Los Angeles Times* Op-Ed, May 14, 2017 (available on-line at http://www.latimes.com/opinion/op-ed/la-oe-pfaff-why-prison-reform-isnt-working-20170514-story.html)

"A Better Approach to Violent Crime," *Wall Street Journal*, January 27, 2017 (available on-line at https://www.wsj.com/articles/a-better-approach-to-violent-crime-1485536313)

"Donald Trump's Wild Portrayal of Crime is Just Not True," *The Nation*, September 27, 2016 (available on-line at https://www.thenation.com/article/donald-trumps-wild-portrayal-of-crime-is-simply-not-true/)

"A Mockery of Justice for the Poor," *New York Times* Op-Ed, April 29, 2016 (available on-line at http://www.nytimes.com/2016/04/30/opinion/a-mockery-of-justice-for-the-poor.html)

"Bill Clinton is Wrong About His Crime Bill. So Are the Protesters He Lectured," *New York Times Magazine*, April 12, 2016 (available on-line at http://www.nytimes.com/2016/04/12/magazine/bill-clinton-is-wrong-about-his-crime-bill-so-are-the-protesters-he-lectured.html)

"Why Do Prosecutors Go After Innocent People?" *Washington Post*, January 21, 2016 (available on-line at https://www.washingtonpost.com/news/in-theory/wp/2016/01/21/why-do-prosecutors-go-after-innocent-people/)

"For True Penal Reform, Focus on the Violent Offenders." *Washington Post* Op-Ed, July 26, 2015 (available on-line at https://www.washingtonpost.com/opinions/for-true-penal-reform-focus-on-the-violent-offenders/2015/07/26/1340ad4c-3208-11e5-97ae-30a30cca95d7_story.html)

"Reform School: Five Myths About Prison Growth Dispelled." *Slate*, February 19, 2009 (available on-line at http://www.slate.com/id/2211585/)

"It's the Media, Not Juveniles, Who Are Delinquent: A Panic About Names." *Huffington Post*, February 3, 2009 (available on-line at http://www.huffingtonpost.com/john-pfaff/its-the-media-not-juvenil_b_163642.html)

"Could an 'Explicit Wisdom Perspective' Advance Interdisciplinary Research?" *Defining Wisdom Network*, March 31, 2009 (available on-line at http://wisdomresearch.org/forums/t/287.aspx)

**Works in Progress/Under Review**

*Truth in Sentencing Laws and the Limited Role of the Federal Government* (working paper)

## Presentations

### Scholarly Presentations

*Locked In*, Brennan Center for Justice, June 2018

*Moving Past the Standard Story: Rethinking the Causes of Mass Incarceration*, 29th Annual Reckless-Dinitz Lecture, Ohio State University, April 2018

*Locked In*, Kings College, Manhattan, March 2018

*Locked In,* Columbia Law School student talk, March 2018

*Locked In*, John H. Schnatter Center for Free Enterprise, University of Louisville, February 2018

*Locked In*, NYU Law School, Law and Economics workshop, February 2018

*Locked In*, American University, February 2018

*Locked In,* NYC Bar Association Mass Incarceration Task Force, June 2017

*Truth in Sentencing Laws and the Limited Role of the Federal Government*, Fordham faculty retreat, May 2017

*Locked In*, Cato Institute Book Talk, April 2017

*Truth in Sentencing Laws and the Limited Role of the Federal Government*, Yale Law, Economics, and Organization Workshop, April 2017

*Locked In*, New York Public Library, April 2017

*Locked In*, Harvard Law School's Criminal Justice Policy Program, March 2017

*Locked In*, Fordham Law School, February 2017

*Locked In*, JusticeNerds talk at John Jay College, October 2016

*The Challenge of Prison Reform*, talk presented at the SMU Criminal Law Conference, April 2016

*The Complicated Economics of Prison Reform*, paper presented at Brooklyn Law School, February 2016

*The Impact of Federal Grants on County Punitiveness*, paper presented at the symposium on Federal Sentencing Reform at the Hastings Law School, February 2015

*Variations in County-Level Punitiveness*, paper presented at the William & Mary Law School Faculty Workshop, January 2015

*Variations in County-Level Punitiveness*, paper presented at the Faculty Scholarship Retreat, Fordham Law School, May 2014

*The War on Drugs and Prison Growth: Limited Importance, and Limited Legislative Options*, presentation at the Harvard Journal of Legislation's conference on drug policy, Harvard Law School, February 2014

*Variations in County-Level Punitiveness*, paper presented at the Criminal Law Colloquium, SMU Law School, January 2014

*Improving Our Use of Observational Data*, paper presented at the 2013 American Society of Criminology annual conference, Atlanta, Georgia, November 2013

*Variations in County-Level Punitiveness*, paper presented at the 2013 American Society of Criminology annual conference, Atlanta, Georgia, November 2013

*The Centrality of Prosecutors to Prison Growth: An Empirical Analysis*, paper presented at the American Association of Law School's 2013 Mid-Year Conference on Criminal Justice, June 2013

*The Centrality of Prosecutors to Prison Growth: An Empirical Analysis*, paper presented at the 2012 American Society of Criminology annual conference, Chicago, Illinois, November 2012

*The Centrality of Prosecutors to Prison Growth: An Empirical Analysis*, paper presented at the 2012 American Law and Economics Association meeting, Stanford Law School, May 2012

*The Centrality of Prosecutors to Prison Growth: An Empirical Analysis*, paper presented at the 2012 Criminal Justice Roundtable, Columbia Law School, May 2012

*The Centrality of Prosecutors to Prison Growth: An Empirical Analysis*, paper presented at the faculty workshop at Florida State Law School, February 2012

*The Micro and Macro Causes of Prison Growth*, paper presented at the Georgia State University Law School's conference on "Criminal Justice System in a Time of Economic Meltdown: Crisis or Opportunity for Reform," January 27, 2012

*Quality Guidelines for Non-Randomized Studies*, poster presentation at the 2010 Annual Meeting of American Evaluation Association, November 10, 2010

*Quality Guidelines for Non-Randomized Studies*, paper presented at the 2010 Joint Colloquium of the Cochrane and Campbell Collaborations, October 19, 2010

*The Durability of Prison Populations*, paper presented at the University of Chicago Legal Forum's conference on Crime, Criminal Law, and the Recession, Chicago, October 24, 2009

*Assessing the Quality of Observational Studies*, talk given at the Australasian Evaluation Society 2009 International Meeting, Canberra, Australia, September 3, 2009

*The Future of Appellate Sentencing Review:* Booker *in the States*, paper presented at the Marquette University Law School's Criminal Appeals Conference, June 16, 2009

*Actuarial Science and Adversarial Law*, paper presented at the Fordham Law School faculty workshop series, May 7, 2009

*Model Uncertainty and the Effects of Incarceration on Crime: A Bayesian Analysis*, paper accepted for presentation at the annual meeting of the American Society of Criminology (presented by co-author Jeffrey Fagan), November 13, 2008

*Model Uncertainty and the Effects of Incarceration on Crime: A Bayesian Analysis*, paper presented at the annual meeting of the Association for Public Policy Analysis and Management, November 7, 2008

*The Myths and Realities of Correctional Severity: Evidence from the National Corrections Reporting Program*, paper presented at the University of Texas Law School's Law and Economics Workshop, October 27, 2008

*The Myths and Realities of Correctional Severity: Evidence from the National Corrections Reporting Program*, paper presented at the University of Michigan Law School's Law and Economics Workshop, September 25, 2008

*The Myths and Realities of Correctional Severity: Evidence from the National Corrections Reporting Program*, paper presented at the Conference on Empirical Legal Scholarship, September 12, 2008

*The Myths and Realities of Correctional Severity: Evidence from the National Corrections Reporting Program*, paper presented at the Fordham Scholarship Retreat, May 21, 2008

*Improving How the Law Uses Empirical Evidence*, work-in-progress presentation at the New York City Junior Faculty Colloquium, March 28, 2008

*The Empirics of Prison Growth: A Critical Review and Path Forward*, paper presented at the University of Chicago Colloquium on Criminal Justice, April 26, 2007

*Public Law and Evidence Based Policy*, paper presented at Fordham Law School faculty workshop series, January 11, 2007

*The Continued Vitality of Structured Sentencing Following* Blakely*: The Effectiveness of Voluntary Guidelines*, paper presented at the University of Chicago Criminal Justice Roundtable, May 12-13, 2006

*The Continued Vitality of Structured Sentencing Following* Blakely*: The Effectiveness of Voluntary Guidelines*, paper presented at the Northwestern University School of Law faculty workshop, March 8, 2005

## Conference and Panel Participation

"Prosecutors and Defenders: Does the Adversarial System Produce Justice?" panel at the *Smart on Crime Innovations* Conference, John Jay College, October 2018

"The Age of the Plea Bargain," panel at *The Atlantic* Criminal Justice Forum, May 2018

"Solutions," panel at the *50 Years After the Kerner Commission* Symposium, sponsored by the Institute for New Economic Thinking, the Eisenhower Foundation, and the Roosevelt Institute, April 2018

Keynote Address, "The Role of Social Science in Criminal Justice," Massachusetts Continuing Legal Education, November 2017

Panelist, Where Is Criminal Justice Reform Going, Boalt Hall Law School and the Heritage Foundation, November 2017

Panelist, Criminal Justice Reform, Advancing Justice 2017, October 2017

Keynote Address, Annual meeting of the John Howard Association of Illinois, September 2017

Panelist, Criminal Justice Reform discussion, Kent Presents, July 2017

Roundtable participant, Federalist Society Junior/Senior Faculty Colloquium, June 2017

Keynote Address, "Redefining the Role of the Prosecutor Within the Community," Charles Hamilton Houston Institute for Race and Justice and Harvard Law School, June 2017

Panelist, *Criminal Justice Reform*, Reason, May 2017

Roundtable participant, *Criminal Law Roundtable*, Columbia Law School, May 2017

Panelist, *The Origins and the Scope of the Tragedy*, CUNY Murphy Institute conference on Confronting the Tragedy: Law Enforcement, Unionism and Communities of Color, April 2017

Panelist, *State of American Criminal Justice*, Cato Institute, December 2016

Panelist, *Overcriminalization and Mass Incarceration: Race and Justice Beyond the New Jim Crow*, Kings College, New York, September 2016

Roundtable participant, Criminal Justice Roundtable, Charles Koch Foundation, June 2016

Roundtable participant, *Rationing Criminal Justice*, Law & Society annual meeting, June 2016

Roundtable participant, Author Meets Critics, Law & Society annual meeting, June 2016

Roundtable participant, *Mass Incarceration: Causes and Solutions*, New York City Bar Association, May 2016

Roundtable participant, Drug Law and Policy Roundtable, Vanderbilt Law School, March 2015

Keynote Address, Third Annual Institutional Corrections Research Network/National Corrections Reporting Program Data Providers Meeting, sponsored by the Bureau of Justice Statistics, the National Institute of Corrections, and the Crime and Justice Institute, Denver, Colorado, April 2014

Panelist, *The Prison Industrial Complex*, Fordham Law School's Stein Scholars program, March 2014

Panelist, *The Coming Decarceration*, with Paul Butler, Marie Gottschalk, Patricia Ocen, Jonathan Simon, and Carol Steiker, held at the 2014 Annual Meeting of the American Association of Law Schools, January 2014

Moderator, *Jailing for Dollars: Moral Costs of Privatizing Justice*, 2013 Annual Conference of the Forhdam University Center for Ethics Education, April 23, 2013.

Commentator, *The Market for Mules: Risk and Compensation of Cross-Border Drug Couriers*, 2011 Conference on Empirical Legal Scholarship, November 4, 2011

Commentator, *Punitive Police? Agency Costs, Law Enforcement, and Criminal Procedure*, 2011 Criminal Justice Roundtable, Yale Law School, April 29, 2011

Commentator, *Building Criminal Capital vs. Specific Deterrence: The Effect of Incarceration Length on Recidivism*, 2010 Conference on Empirical Legal Studies, November 6, 2010

Respondent and Moderator, *The Government's Role in a Recession*, debate sponsored by the Fordham Chapter of the Federalist Society, February 25, 2008

Respondent and Moderator, "Lethal Injection in the Media: A Discussion with the Press," at *The Lethal Injection Debate: Law & Science*, Fordham Urban Law Journal, March 8, 2008

Panelist, *The 2007-2008 Term of the United States Supreme Court*, Fordham Chapters of the American Constitutional and Federalist Societies, November 7, 2007

Panelist, *The 2006-2007 Term of the United States Supreme Court*, Fordham Chapters of the American Constitutional and Federalist Societies, November 1, 2006

Panelist, *Scenes from the Drug War—From Hearne, Texas, to Our Own Back Yard: A Look at Race, Community, and New York Drug Policy*, Lois Stein Center for Law and Ethics, October 19, 2005

Respondent, "Factfinder' Judgment Concerning Forensic Identification Science Testimony," Conference on Empirical Legal Scholarship, November 2007 (cancelled when paper was withdrawn shortly before the conference)

Moderator, *Colloquium on Conditions of Confinement*, Conference sponsored by the Fordham Law Prisoners' Rights Advocates, Fordham Urban Law Journal and Lois Stein Center for Law and Ethics, October 24, 2008

Moderator, *Responding to Corporations, Investors, and Security Markets*, Eugene P. and Delia S. Murphy Conference, Fordham Law School, October 19, 2007

Moderator, *The Contemporary Regulatory State*, Fordham Urban Law Journal, February 23, 2006

Moderator, *Responding to Corporate Misconduct: New Ideas*, Eugene P. and Delia S. Murphy Conference, Fordham Law School, November 4, 2005

**Selected Media Appearances and Interviews**

I have been interviewed by, and my work has been quoted in, *The Economist*, the *New York Times*, *The New Yorker*, the *Washington Post*, the *Wall Street Journal*, *The Christian Science Monitor*, *Al-Jazeera America*, the *National Review*, TheAtlantic.com, Slate.com, and Vox.com, among others. I have also been interviewed by outlets such as NPR's *All Things Considered*, *Newshour* for the BBC World Service, *The Takeaway* on Public Radio International, and Slate.com's *The Grist*.

## <u>Other Professional Responsibilities</u>

Referee, *Criminology, Criminology & Public Policy, Journal of Law and Economics*, *Journal of Legal Studies*, *International Review of Law and Economics*, *American Law and Economics Review*, *Law and Social Inquiry*, *Law and Society Review, Journal of Empirical Legal Studies*

Co-chair of the Policy Committee for the Transition Team for Larry Krasner, the new district attorney for Philadelphia