**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
————————————————————————

**CORNELL HOLDEN AND MIGUEL MEJIA,**

                         **Plaintiffs,**          **17-cv-2192 (JGK)**

                                      **OPINION AND ORDER**

**- against -**

**THE PORT AUTHORITY OF NEW YORK AND**
**NEW JERSEY; THE PORT AUTHORITY**
**POLICY DEPARTMENT; AND MICHAEL**
**OPROMALLA, SHAUN KEHOE, JOHN TONE,**
**JORDAN ESPOSITO, MICHAEL DEMARTINO,**
**RICHARD AYLMER, PAUL MILLER, JOHN**
**FITZPATRICK, PAUL O'DELL, AND**
**OFFICERS JOHN DOE 1-97, SUED IN**
**THEIR INDIVIDUAL AND OFFICIAL**
**CAPACITIES AS OFFICERS OF THE PORT**
**AUHTORITY POLICY DEPARTMENT,**

                           **Defendants.**

————————————————————————

**JOHN G. KOELTL, District Judge:**

The plaintiffs, Cornell Holden and Miguel Mejia, have brought this action pursuant to 42 U.S.C. § 1983 against the Port Authority of New York and New Jersey (the "Port Authority"), the Port Authority Police Department (the "PAPD"), and Michael Opromalla, Shaun Kehoe, John Tone, Jordan Esposito, Michael DeMartino, Richard Aylmer, Paul Miller, John Fitzpatrick, and Paul O'Dell (collectively, the "Officer Defendants"), in their individual and official capacities, as officers of the PAPD, for alleged violations of the plaintiffs' rights guaranteed by the Fourth and Fourteenth Amendments of the United States Constitution. Specifically, the plaintiffs have

1

alleged (1) false arrest in violation of the Fourth Amendment,
(2) impermissible discrimination on the basis of sexual
orientation or gender non-conformity in violation of the Equal
Protection Clause of the Fourteenth Amendment, and (3)
infringement of a liberty interest protected by the Due Process
Clause of the Fourteenth Amendment.  In addition, the plaintiffs
have sought punitive damages. The plaintiffs allege that the
Officer Defendants targeted them, or failed to supervise
arresting officers who targeted them, for unlawful search,
seizure, and false arrest without probable cause, based on the
impermissible consideration of their perceived sexual
orientation or gender non-conforming presentation.  Further, the
plaintiffs claim that the Port Authority engaged in and
perpetuated a de facto custom or policy of failing to supervise,
train, or discipline officers assigned to plainclothes
patrolling of the Port Authority Bus Terminal (the "PABT") men's
bathrooms, resulting in the targeting of men perceived to be gay
or bisexual, men who have sex with men, or who are otherwise
gender non-conforming, for unlawful searches, seizures, false
arrests without probable cause.

The defendants have moved for partial summary judgment on
(1) all claims against the Port Authority, (2) all claims
against the non-arresting Officer Defendants, namely, Kehoe,
Esposito, DeMartino, Aylmer, Miller, O'Dell, and Fitzpatrick,

and (3) all claims based on alleged violations of the plaintiffs' rights guaranteed by the Fourteenth Amendment's Equal Protection Clause and Due Process Clause. The defendants also argue that the plaintiffs' request for punitive damages against the Port Authority should be dismissed.[1]

For the reasons that follow, the defendants' motion is **granted** with respect to the plaintiffs' claims against non-arresting Officer Defendants, claims based on the Fourteenth Amendment's Due Process Clause, and request for punitive damages against the Port Authority, and **denied** in all other respects.

**I.**

The following facts are taken from the Second Amended Complaint, declarations and exhibits filed in connection with the motions, and the parties' Local Rule 56.1 statements, and are undisputed unless otherwise noted.

**A.**

The defendant Port Authority is a bi-state government agency, created by a compact between, and authorized under the laws of, the States of New York and New Jersey. Defs.' 56.1 Stmt. ¶¶ 1-2. The Port Authority is authorized to maintain a Public Safety Department, the PAPD, that employs officers with statewide jurisdiction in New York. Defs.' 56.1 Stmt. ¶ 3.  The

---

[1]  The defendants have not moved for summary judgment on the plaintiffs' claims against Officers Opromalla and Tone for false arrest in violation of the plaintiffs' Fourth Amendment rights.

Port Authority owns and operates the PABT at 625 Eighth Avenue in New York, New York, which is patrolled by PAPD officers. Defs.' 56.1 Stmt. ¶ 4.  The individual Officer Defendants were officers and employees of the PAPD during the relevant period at issue.

The plaintiffs Cornell Holden and Miguel Mejia were arrested after using the men's restroom on the second floor of the PABT in 2014.

Holden was arrested on May 12, 2014 around 9 a.m., shortly after he exited the second floor PABT men's restroom.  Defs.' 56.1 Stmt. ¶¶ 21-22.  Holden is a black male who was 27 years old, lived in the Bronx, and worked in Long Island City at the time of the arrest. Defs.' 56.1 Stmt. ¶ 24; Declaration of Thomas Brophy, ECF No. 228, ("Brophy Decl."), Ex. M, at 81. Holden, who works as a baker, testified that on the morning of May 12, he was passing through the PABT on his way to a cake shop in Manhattan. Declaration of Seth Spitzer, ECF No. 232 ("Spitzer Decl."), Ex. 15, at 123; Ex. 20, at 3. Holden testified that he had entered the PABT men's bathroom, gone to the only vacant urinal, and that while at the urinal, he noticed a bald, Caucasian male wearing "regular clothing," later identified as Officer Opromalla in plain clothes, standing at the adjacent urinal. Brophy Decl. Ex. M, at 127, 135, 150. Holden testified that as he was finishing at the urinal, Officer

4

Opromalla "stepped back and looked past the divider" at Holden and then exited the bathroom. Spitzer Decl. Ex. 15, at 136. Holden reported that after he finished using the urinal, he realized that he was having a nosebleed, and remained in the bathroom until the bleeding stopped. Id. at 137. After Holden left the bathroom, he was approached by two plainclothes officers, defendants Opromalla and Kehoe, who, according to Holden's testimony, asked him if he got "the wrong impression about anyone in the bathroom" and about "what happened in the bathroom." Id. at 143-44. Holden was then placed under arrest, and when he asked for an explanation, the officers told him that he was "seen doing a lewd act in the bathroom." Id. at 146. Officer Opromalla, who had identified Holden as having committed a lewd act, later told Holden that he was "standing by the urinal . . . erect" and that he "kn[e]w what he did." Spitzer Decl. Ex. 15, at 150-151.

Holden testified that, while in PABT custody, he overheard certain PAPD officers congratulate Officer Opromalla on the arrest and heard a male PAPD officer joke about Officer Opromalla "having a date . . . tonight" and describe Officer Opromalla as a "gay whisperer," which Holden understood as a reference to Officer Opromalla's ability to "catch" gay men. Id. at 156-59.

The parties dispute the degree of involvement of Officer Kehoe in Holden's arrest, but the parties agree that Officer Opromalla prepared the arrest paperwork and Officer Opromalla is listed as the "Arresting Officer" on Holden's Criminal Complaint Arrest Report ("CCR"). Spitzer Decl. Ex. 17; Brophy Decl. Ex. C, 207-11; Spitzer Decl. Ex. 4, at 210-13. It similarly appears undisputed that Officer Kehoe was outside of the bathroom at the time that Officer Opromalla reported observing Holden's behavior. Brophy Decl. Ex. C, at 205-06; Pls.' 56.1 Resp. Stmt. ¶¶ 29, 33. Holden's CCR, prepared by Officer Opromalla, stated that Opromalla "observed the defendant . . . expose his naked erect penis at the urinal and manipulate it in a back and forth motion in full public view." Spitzer Decl. Ex. 17, at PA 000018. The parties agree that Lt. O'Dell, Sgt. Miller, Sgt. DeMartino, and Sgt. Esposito were not present at Holden's arrest, but signed Holden's post-arrest paperwork. Defs.' 56.1 Stmt. ¶¶ 40-43; Pls.' 56.1 Resp. Stmt. ¶¶ 40-43.

It is undisputed that Officer Opromalla did not make explicit reference to Holden's sexuality during the arrest. Defs.' 56.1 Stmt. ¶ 45; Pls.' 56.1 Resp. Stmt. ¶ 45. Nevertheless, Holden, who identifies as a gay male, Defs.' 56.1 Stmt. ¶ 27; Brophy Decl. Ex. C; Spitzer Decl. Ex. 15, at 73, testified that he believed that it was clear from his appearance that he was gay. Spitzer Decl. Ex. 15, at 170. Holden testified

he had his hair in a mohawk and that he was wearing fitted denim pants, a black leather jacket, silver hoop earrings, a silver chain necklace, a silver name ring, a beaded bracelet, high-top sneakers, and a duffle bag with a Fred Perry logo. Spitzer Decl. Ex. 15, at 98-104, 170; Brophy Decl. Ex. M, at 98-106, 170. The charges against Holden were ultimately dismissed on December 9, 2014. Spitzer Decl. Ex. 15, at 41-42.

Mejia was arrested on July 9, 2014 at approximately 5:06 p.m., shortly after leaving the same PABT men's bathroom. Mejia is a white Hispanic male, who was 43 years old, living in Manhattan and employed at the Family Help Living Center at the time of his arrest in 2014. Defs.' 56.1 Stmt. ¶¶ 54-55; Brophy Decl. Ex. P, at 12, 16-18.  He was at the PABT in order to take a 5:12 p.m. bus to Clifton, New Jersey. Pls.' 56.1 Stmt. ¶ 57. Mejia testified that when he entered the PABT men's restroom, he went to the only vacant urinal. Id. at ¶ 63; Brophy Decl. Ex. P, at 124-25.

There are several discrepancies between the parties' accounts of the events leading up to Mejia's arrest. Mejia testified that while he was using the urinal, he noticed a "short" man to his right, who "smirked" at Mejia when Mejia looked at him. Spitzer Decl. Ex. 16, at 126-27, 156-57. Officer Tone testified that he entered the bathroom, in plain clothes, and while standing by the sinks, he noticed that Mejia was

7

looking at the man to his right, that Mejia "turned his body" towards the man, and that he saw Mejia's arm moving "rapidly." Declaration of Thomas Brophy, ECF No. 236 ("Brophy Reply Decl."), Ex. T, at 118, 127, 133.  Officer Tone reported that he "took a few steps" towards Mejia "where [he] was able to see the [alleged] criminal act." Brophy Decl. Ex. F, at 133. Officer Tone reported he was not aware if the other man saw Mejia's penis. Spitzer Decl. Ex. 6, at 139-40. The parties appear to agree that Officer Kehoe had remained outside of the bathroom, also in plain clothes. Brophy Decl. Ex. D, at 21-24; Ex. F, at 117; Pls.' 56.1 Resp. Stmt. ¶ 60.

The parties agree that Mejia was arrested by Officer Tone, with the assistance of Officer Kehoe, after Mejia left the men's bathroom. However, Mejia testified that he was arrested by three men, and specifically that the short man who "smirked" at him was a PAPD Officer in plain clothes and assisted Officers Tone and Kehoe with the arrest.  Brophy Decl. Ex. P, at 156-157. Officer Tone, however, reported that he and Officer Kehoe made the arrest and were patrolling alone, without the assistance of a third officer, Spitzer Decl. Ex. 6, at 116-17, 141, and that, although he noticed Mejia and the man to Mejia's right staring at each other, he could not describe the man to Mejia's right. Brophy Decl. Ex. F, at 128.

Mejia testified that when he asked why he was under arrest, Officer Tone said, "[Y]ou know what you did." Spitzer Decl. Ex. 16, 156-61. Mejia was charged with "Public Lewdness" and "Exposure of a Person." Spitzer Decl. Ex. 18. Officer Tone prepared Mejia's CCR, reporting that while "working in the Tactical Plain Clothes Unit," in the second floor PABT men's room, Tone "observe[d] the defendant manipulating his naked erect penis in a back and forth motion in full public view in a public place." Id. Officer Tone is listed as the arresting officer on Mejia's CCR, and there is no mention of either Officer Kehoe or another plainclothes officer in Mejia's CCR. Brophy Decl. Ex. O. The parties agree that Sgt. DeMartino and Lt. Aylmer were not present at Mejia's arrest, but signed Mejia's post-arrest paperwork. Pls.' 56.1 Resp. Stmt. ¶¶ 70-71.

On November 17, 2014, Mejia was acquitted after a bench trial in New York criminal court, at which Officer Tone was the only officer to testify. Defs.' 56.1 Stmt. ¶¶ 73-74.

Mejia, who does not "identify" with a particular description of his sexual orientation, was previously married to a woman, has dated men, and was dating a man at the time of his arrest for over a year. Spitzer Decl. Ex. 16, at 33, 97-98. Mejia suggested that his appearance "could have" given "off the impression" that he was homosexual or otherwise gender non-conforming. Spitzer Decl. Ex. 16, at 208-09. On the date of the

arrest, Mejia had a shaved head, facial hair, tattoos on his arms, legs, and back, and was wearing an orange jersey with a basketball emblem, grey cargo shorts, black and grey sneakers, a wedding band, a gold necklace, and a virgin pendant, and was carrying a burgundy messenger bag. Defs.' 56.1 Stmt. ¶ 56; Spitzer Decl. Ex. 16, at 26-33, 42, 45-46, 64, 145.

**B.**

According to the crime statistics submitted by the defendants, of the 660 reported crimes at the PABT in 2014, 69 were for "SEXUAL OFFENSE / ALL OTHER," which the defendants appear to admit were all arrests in the PABT men's bathrooms for "Public Lewdness." Defs.' 56.1 Stmt. ¶ 16; Brophy Decl. Ex. I. Of the 69 arrests for Public Lewdness that occurred in the PABT men's bathroom in 2014, 7 occurred before Holden's arrest in May and 32 arrests occurred before Mejia's arrest in July. Defs.' 56.1 Stmt. ¶¶ 17-18; Brophy Decl. Exs. H & I.

In 2013, there were 749 arrests at the PABT, of which 9 were arrests for "SEXUAL OFFENSE / ALL OTHER" crimes across the entire PABT, not just in the PABT men's bathroom. Defs.' 56.1 Stmt. ¶ 19; Brophy Decl. Ex. K. According to the PAPD crime statistics, 2012 and 2011 similarly both had only 9 reports of "SEXUAL OFFENSE / ALL OTHER" across the entire PABT. Brophy Decl. Ex. I.

The parties dispute the characteristics of the 69 Public Lewdness arrestees in 2014. The plaintiffs have presented anonymous, sworn affidavits from men who claim to have been arrested in the PABT men's bathroom for Public Lewdness and who allege that they were targeted because of their perceived sexual orientation or gender presentation. Spitzer Decl. Exs. 21, 22, 23, 24, 25.[2]  The plaintiffs have also submitted two expert reports, from Drs. Pfaff and Pierceson, offering opinions that suggest the patterns of arrests in 2014 for Public Lewdness were driven by an "intentional policy choice," and note historic incidents of discrimination against the LGBTQ community by law enforcement.  Spitzer Decl. Ex. 11 at ¶¶ 20-21; Ex. 12 at ¶ 9. Dr. Pfaff's report notes that the population of lewdness arrests that occurred in the men's bathroom during 2014, including the plaintiffs' arrests, are "idiosyncratic," occurred at counterintuitive times, and do not match the age or racial characteristics of those arrested for other offenses.  Spitzer Decl. Ex. 12 at ¶ 9. Dr. Pfaff has opined that the data suggests that such arrests were driven by "intentional policy choices," and "not incidental to routine police patrols and stops." Id.

---

[2] The plaintiffs have also presented an affidavit from Marcos Polonia, previously a named plaintiff in this case, with details of his arrest in 2014, including allegations that he was targeted based on his apparent sexual orientation.  Polonia dropped his claims prior to his deposition, but stated he "plan[ned] to continue to participate as a class member." Spitzer Decl. Ex. 35.

During the relevant period at issue, the PAPD engaged in plainclothes policing of the PABT, including the men's restrooms, through a "Tactical Patrol Unit" ("TPU"). Spitzer Decl. Ex. 1; Ex. 2, at 98; Ex. 9, at 65. There is some evidence in the record to suggest that, during 2014, the TPU was involved in combating certain "Quality of Life" complaints and issues. Spitzer Decl. Ex. 1; Ex. 9, at 62; Ex. 32, at 158-61. There is conflicting testimony regarding whether the PAPD engaged in "sweeps" for "Quality of Life" crimes or issues. See, e.g., Spitzer Decl. Ex. 2, at 94; Ex. 9, at 118-21; Ex. 10, at 144-46. However, the plaintiffs have produced a Port Authority Public Safety Memorandum from May 2, 2014, that includes among "Achievements/Initiatives" that PAPD officers at the PABT "collaborated with the NYPD during Quality of Life sweep[s]," including "two 24 hour sweeps," Spitzer Decl. Ex. 1, at 9-10, as well as a "Buckslip" from June 22, 2015 about a 24-hour "Quality of Life Joint Operation" between NYPD and PAPD to conduct "zero tolerance sweeps" inside and around the Port Authority, Spitzer Decl. Ex. 7.

The parties agree that "Public Lewdness" and "Exposure of a Person" in a public place are misdemeanor crimes, prohibited by N.Y. Penal Law §§ 245.00 and 245.01, respectively, and that masturbation in a public place is a crime under N.Y. Penal Law §§ 245.00 and 245.01. Pls.' 56.1 Stmt. ¶¶ 6-8. But there is

some disagreement among the Officer Defendants as to whether
"Public Lewdness" or "Exposure of a Person" would be considered
Quality of Life issues, and, as such, appropriate targets of any
potential "Quality of Life" initiative. For example, when asked
about how officers under his supervision were to know which
"Quality of Life" issues warranted attention, Captain
Fitzpatrick testified that he "d[i]dn't think you have to define
it," because "Police know exactly what they're looking for."
Brophy Decl. Ex. B, at 176. At least two officers testified that
they personally considered either "Exposure of a Person" or
"Public Lewdness" to be a "Quality of Life" issue, but did not
know whether "Public Lewdness" or "Exposure of a Person" was
considered a Quality of Life offense according to PAPD policy.
Brophy Reply Decl. Ex. EE, at 78, 183; Spitzer Decl., Ex. 10, at
143-46. See also Brophy Decl. Ex. F, at 104, 106.

The Officer Defendants have testified that the PAPD did not
use arrest quotas in 2014, either generally or in connection
with the TPU. Defs.' 56.1 Stmt. ¶ 9; Brophy Decl. Ex. C, at 124,
292; Ex. D, 58-60; Brophy Reply Decl. Ex. Z, at 267-69. The
plaintiffs dispute the absence of quotas by pointing to the May
2014 Memorandum sent by Michael Fedorko, the Port Authority's
Director of Public Safety, which included among a list of
"Achievements/Initiatives" that:

> Day tour team utilized [Defendant Opromalla] on 4/28/14 and 4/29/14 to apprehend four (4) different male subjects from the men's room on the Suburban Concourse.  These subjects were observed performing a lewd act in a public place. Subjects subsequently charged with Public Lewdness.

Spitzer Decl. Ex. 1.

Patrolling the men's bathroom was considered a part of at least one of the TPU patrol posts. Officer Opromalla reported that "the first day [he] worked plain clothes [he] was informed by a supervisor" of the "activities and behavior that go on in [the PABT men's bathroom]." Spitzer Decl. Ex. 4, at 83. Opromalla testified that Captain Fitzpatrick specifically "explained that [Public Lewdness] was an ongoing condition and that he wanted [Opromalla] to continue to enforce the laws specifically regarding this condition." Spitzer Decl. Ex. 4, at 85. However, there is no evidence that Captain Fitzpatrick explicitly mentioned gay men or instructed Opromalla to target gay or gender non-conforming men for Public Lewdness arrests. Pls.' 56.1 Stmt. ¶ 47. Officer Opromalla also reported that Sergeant Miller "informed [him] of what to look for in regard[] to public lewdness" and that "if you wait at the urinal for long enough, someone may start engaging in that behavior." Spitzer Decl. Ex. 4, at 171.  Officer Opromalla testified that he would remain in the PABT men's room for as long as ten minutes at a time to wait for such behavior to occur. Id. at 172.

The PAPD maintains its own police academy, where PAPD officers are trained, including Officers Tone and Opromalla. The parties agree that the Officer Defendants received sensitivity and diversity training, including with regards to LGBTQ individuals. Defs.' 56.1 Stmt. ¶ 5; Brophy Decl. Ex. A. However, the plaintiffs assert that the training was inadequate and have introduced expert testimony from Dr. Pierceson regarding its alleged deficiencies. Spitzer Decl. Ex. 11. The plaintiffs have sought to introduce evidence regarding Martinez v. Port Auth. of N.Y. & N.J., a case in which a jury found the PAPD liable for having an "unconstitutional policy or practice that resulted in a deprivation of the plaintiff's constitutional rights by arresting men perceived to be gay, or arresting men without probable cause" at the PATH concourse men's restroom. Martinez v. Port Auth. of N.Y. & N.J., No. 01-cv-721, 2005 WL 2143333, at *4 (S.D.N.Y. Sept. 2, 2005), aff'd, 445 F.3d 158 (2d Cir. 2006).  In Martinez, the plaintiff was the first of seven men arrested for Public Lewdness within a 2.5-hour period by PAPD officers. Id. at *5. Dr. Pierceson, in particular, has discussed in his report that he has concluded that the PAPD's training is particularly deficient, given the notable absence of any discussion or scenarios in the training slides regarding profiling of LGBTQ individuals or plainclothes policing in bathrooms.

15

Certain Officer Defendants testified that PAPD officers received no training specific to plainclothes policing. See, e.g., Spitzer Decl. Ex. 3, at 119-20; Ex. 9, at 70-71; Ex. 10, at 47-48, 131-32; Brophy Decl. Ex. F, at 163; Brophy Reply Decl., Ex. CC, at 98. However, certain PAPD officials have testified they do believe plainclothes police requires unique instruction. See, e.g., Spitzer Decl. Ex. 26, at 70-71; Brophy Reply Decl. Ex. V, at 57; Defs.' 56.1 Resp. Stmt. ¶ 8.

Both Officers Tone and Opromalla have testified that the PAPD has never taken a disciplinary action against them, nor have they been the subject of an internal investigation. Brophy Decl. Ex. C, at 292; Ex. F, at 218. While the parties agree that Officer Opromalla was never formally disciplined, Officer Opromalla never made another plainclothes arrest in 2014 after he was named in a New York Times article about arrests made by plainclothes officers at the Port Authority, Spitzer Decl. Ex. 4, at 293. Capitan Fitzpatrick stated that it "was suggested maybe to take Opromalla out of plainclothes." Spitzer Decl. Ex. 9, at 105. Captain Fitzpatrick testified that, to the degree he remembers anything about his response to the New York Times article, it was instructing Officers: "If you see probabl[e] cause for arrest, no matter what it is, make the arrest." Id.

II.

The standard to be applied to a motion for summary judgment is well-established. Courts are instructed to grant a motion for "summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Cartrett, 477 U.S. 317, 322-23 (1986).[3] "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994). The Court's "duty, in short, is confined at this point to issue-finding," and "does not extend to issue-resolution." Id.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The substantive law governing the case will identify those facts that are material and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will

---

[3] Unless otherwise noted, this Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

properly preclude the entry of summary judgment." <u>Anderson v.
Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

In determining whether summary judgment is appropriate, a
court must resolve all ambiguities and draw all reasonable
inferences against the moving party. <u>See</u> <u>Matsushita Elec. Indus.
Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986). "Summary
judgment should be denied if, when the party against whom
summary judgment is sought is given the benefit of all
permissible inferences and all credibility assessments, a
rational factfinder could resolve all material factual issues in
favor of that party." <u>Soto v. Gaudett</u>, 862 F.3d 148, 157 (2d
Cir. 2017). If the moving party meets its burden, the nonmoving
party must produce evidence in the record and "may not rely
simply on conclusory statements or on contentions that the
affidavits supporting the motion are not credible." <u>Ying Jing
Gan v. City of New York</u>, 996 F.2d 522, 532 (2d Cir. 1993).

### III.

The defendants have moved for summary judgment on the
plaintiffs' Section 1983 claims against the Port Authority,
based on the alleged violation of the plaintiffs' rights under
the Fourth and Fourteenth Amendments.

The defendants argue that the plaintiffs have failed to
establish either a policy or custom of unconstitutional conduct
or that the Port Authority's training and supervision are

constitutionally inadequate. The defendants primarily contend
that the plaintiffs cannot establish that the Port Authority had
an unconstitutional policy, custom, or practice without a
certified class, and that the plaintiffs have failed to allege
more than a "single incident," which is insufficient as a matter
of law, to support municipal liability for a Section 1983 claim.
Both arguments are without merit.

The Port Authority is treated as a municipal entity for
purposes of Section 1983 liability. Mack v. Port Auth. of N.Y. &
N.J., 225 F. Supp. 2d 376, 382 & n.7 (S.D.N.Y. 2002).
"[M]unicipalities may be sued directly under [Section] 1983 for
constitutional deprivations inflicted upon private individuals
pursuant to a governmental custom, policy, ordinance,
regulation, or decision." Batista v. Rodriguez, 702 F.2d 393,
397 (2d Cir. 1983) (citing Monell v. Dep't of Soc. Servs., 436
U.S. 658, 690-91 (1978)). Under Monell and its progeny,
municipalities are subject to liability for Section 1983 claims,
not under a theory of respondeat superior, but rather on the
basis that their policies or customs inflicted the alleged
injuries. Id.

To hold a municipality liable under Section 1983 for the
unconstitutional actions of its employees, a plaintiff is
required to plead and prove three elements: (1) the existence of
an official policy or custom that (2) causes the plaintiff to be

subjected to (3) a denial of a constitutional right. Batista,
702 F.2d at 397; Bertuglia v. City of New York, 133 F. Supp. 3d
608, 649 (S.D.N.Y. 2015), aff'd sub nom. Bertuglia v. Schaffler,
672 F. App'x 96 (2d Cir. 2016). The plaintiff may show the
existence of such a policy or custom by identifying any of the
following: (1) an express policy or custom; (2) an authorization
of a policymaker of the unconstitutional practice; (3) failure
of the municipality to train its employees, which exhibits a
"deliberate indifference" to the rights of its citizens; or (4)
a practice of the municipal employees that is "so permanent and
well settled as to imply the constructive acquiescence of senior
policymaking officials." Corley v. Vance, 365 F. Supp. 3d 407,
438 (S.D.N.Y. 2019), aff'd sub nom., Corley v. Wittner, 811 F.
App'x 62 (2d Cir. 2020).

In this case, the plaintiffs have primarily sought to
establish that the Port Authority failed to train, supervise, or
discipline PAPD officers, thereby allowing unconstitutional
policing practices to occur and continue.

To plead a Monell claim based on a failure to train, a
plaintiff must plead (1) that "a policymaker [of the
municipality] knows 'to a moral certainty' that her employees
will confront a given situation," (2) "that the situation either
presents the employee with a difficult choice of the sort that
training or supervision will make less difficult or that there

is a history of employees mishandling the situation," and (3)
"that the wrong choice by the city employee will frequently
cause the deprivation of a citizen's constitutional rights."
Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992).
A municipality is deliberately indifferent where it fails to act
when it has "actual or constructive notice," generally from "[a]
pattern of similar constitutional violations by untrained
employees," that its training program is "deficient."
Hernandez v. United States, 939 F.3d 191, 207 (2d Cir. 2019). A
plaintiff, therefore, "must demonstrate that the municipal
action was taken with deliberate indifference as to its known or
obvious consequences." Id. As the Supreme Court explained in
Connick v. Thompson, a "pattern of similar constitutional
violations by untrained employees is 'ordinarily necessary' to
demonstrate deliberate indifference for purposes of a failure to
train." 563 U.S. 51, 62 (2011).

The plaintiffs have presented evidence that there are
genuine issues of material fact as to whether the PAPD
adequately trained its plainclothes officers to avoid arresting
men without probable cause, while conducting plainclothes
policing patrols of bathrooms, or to avoid bias regarding sexual
orientation and gender presentation. There are genuine issues of
material fact regarding whether PAPD officers were instructed to
emphasize arrests for "Quality of Life" issues, whether Officers

21

were given sufficient instruction as to what constituted such "Quality of Life" issues, and whether these policy choices caused officers to target certain individuals, based on their perceived sexual orientation or gender presentation.

For municipal liability based on a failure to supervise, "the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts," after the supervisor has notice of past violations. Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir. 1980). However, under this theory of Monell liability, "even if a policy can be inferred from omissions of a municipality, such as where it acquiesces in a pattern of illegal conduct, such a policy cannot be inferred from the failure of those in charge to discipline a single police officer for a single incident of illegality"; instead, there must be "more evidence of supervisory indifference, such as acquiescence in a prior pattern of conduct." Lucente v. County of Suffolk, 980 F.3d 284, 306 (2d Cir. 2020) (quoting Turpin, 619 F.2d at 201-02).

In this case, the plaintiffs have alleged and proffered evidence to establish that the PAPD officers engaged in a pattern of policing specifically targeting men perceived as gay, bisexual, or otherwise gender non-conforming for arrest without probable cause on charges for Public Lewdness after using the

PABT men's restrooms. The plaintiffs have alleged that the PAPD
undertook a policy or custom of policing for "Quality of Life"
issues, using inadequately trained and supervised plainclothes
police officers, with deliberate indifference to the potential
for unconstitutional search, seizure, and arrests without
probable cause, potentially based on impermissible bases. To
support their case, the plaintiffs point to the "idiosyncratic"
uptick in 2014 Public Lewdness arrests in connection with
plainclothes police patrols of men's bathrooms, evidence that
suggests the PAPD engaged in occasional "Quality of Life
sweeps," the nearly identical language used in the plaintiffs'
CCRs to describe the alleged behavior of the arrestee, an e-mail
listing the arrest of four men under similar circumstances
within 48 hours as an "achievement," and alleged inadequacies in
the training of the Officer Defendants. There are also plainly
credibility determinations required to settle conflicting
testimony regarding the plaintiffs' arrests.

In sum, considering the evidence in the light most
favorable to the plaintiffs, the plaintiffs have presented
sufficient evidence such that a reasonable factfinder could find
that the PAPD failed to train or to supervise and discipline
plainclothes officers, despite awareness of past issues, that
this failure was done with deliberate indifference to the
consequences, and that this failure to train or to supervise and

23

discipline was a proximate cause of the plaintiffs being unlawfully subjected to arrest without probable cause and to arrest in violation of their rights to equal protection.

The defendants argue that the plaintiffs cannot maintain their Section 1983 claims without having been certified as a class, citing to Chin v. Port Auth. of N.Y. and N.J., 685 F.3d 135, 150 (2d Cir. 2012).  However, Chin was a case involving a private plaintiff seeking to bring an employment discrimination claim under Title VII, based on a theory that the employer had engaged in a "pattern or practice" of discrimination.  The Court of Appeals for the Second Circuit, based on the text of Title VII and Supreme Court precedent, determined that the "pattern or practice" method of proving a Title VII claim was not available to private litigants outside of the class action context. Id. at 149.  As such, the passage cited and the reasoning of Chin are irrelevant to the Section 1983 claims at issue here, because the Chin court was exclusively focused on Title VII and the way in which private plaintiffs could pursue a "pattern or practice" claim under that statute.  That case has no relevance to the efforts by private plaintiffs to establish Monell liability. Indeed, in the Section 1983 context, courts have routinely permitted claims against municipalities brought by individual plaintiffs that can establish the existence of a municipal policy, without the certification of a class.  See, e.g.,

Lucente, 980 F.3d at 308-310 (finding three plaintiffs had established sufficient issues of material fact to preclude summary judgment on municipality's indifference to pattern of sexual assaults and harassment of female inmates).

Second, the defendants argue that a plaintiff must show a "pattern" of similar constitutional violations, that policymakers had "notice" of the potential for constitutional violations absent adequate training or supervision, and that the plaintiffs have failed to demonstrate either. The defendants assert that the plaintiffs have failed to provide sufficient evidence to establish that the other 2014 "Public Lewdness" arrests were made without probable cause or involved persons targeted because of their perceived sexual orientation or gender presentation.

However, the plaintiffs have introduced expert testimony to support their claim that the plaintiffs' arrests were part of a notable and "idiosyncratic" pattern of arrests with historical roots connected to law enforcement Public Lewdness arrests in men's bathrooms. Accordingly, there are genuine issues of material fact as to whether a "pattern" of similar violations occurred, such that a reasonable jury could conclude that the alleged false arrests of Holden and Mejia were not mere isolated incidents. See, e.g., Lucente, 980 F.3d at 309-10; Cordero v. City of New York, 282 F. Supp. 3d 549, 565 (E.D.N.Y. 2017).

Further, with regard to the "notice" requirement for the plaintiffs' claims regarding the PAPD's failure to train – the 2004 jury verdict in Martinez case, 2005 district court decision, and subsequent affirmance by the Court of Appeals, should have provided PAPD officials with sufficient notice of the real potential for constitutional violations that could arise when police officers in plain clothes undertake arrests in men's bathrooms and the potential for invidious discrimination based on perceived sexual orientation or gender presentation. The plaintiffs allege that the PAPD has failed to update its training, which features outdated terminology and no practical instructions, despite the constitutional violations for which the PAPD was previously found liable. The defendants' argument that Martinez is too remote or dissimilar from the plaintiffs' claims here to provide sufficient notice to PAPD management is unpersuasive.  Martinez may be too remote to be probative for any of the individual Officer Defendants who were not involved in the arrests at issue in Martinez.  However, the incidents at issue in Martinez and present here are similar—and a reasonable jury could find that the PAPD's failure to update its training materials after Martinez amounted to an unconstitutional failure to train, sufficient to subject the PAPD to liability for the plaintiffs' Section 1983 claims.

26

Further, the plaintiffs have plausibly alleged that the PAPD engaged in a plainclothes policing initiative without adequate supervision of the officers involved. At a minimum, the discrepancies in the testimony of PAPD officers, regarding whether "Public Lewdness" or "Exposure of a Person" were "Quality of Life" issues or appropriate targets for plainclothes policing, underscore that there are triable issues of fact as to whether the PAPD supervision regarding bias and constitutional restrictions on plainclothes policies was unconstitutionally deficient. Pls.' 56.1 Stmt. ¶ 11; Spitzer Decl. Ex. 2, at 94; Ex. 4, at 84; Ex. 9, at 63; Ex. 10, at 145-46; Brophy Decl. Ex. F, at 104, 106; Brophy Reply Decl. Ex. EE, at 78, 183.

Because there are disputed issues of material facts with regard to the existence of a "pattern," and whether plainclothes officers were adequately trained and supervised, the issue of Monell liability should be decided by the jury on the theory of a failure to train or supervise.

## IV.

The defendants have moved for summary judgment on the plaintiffs' Section 1983 claims based on alleged violations of the plaintiffs' rights under the Equal Protection Clause of the Fourteenth Amendment, arguing that the Officer Defendants are entitled to qualified immunity and, in the alternative, that the

plaintiffs' equal protection claims lack sufficient factual support.

### A.

Qualified immunity protects government officials performing discretionary functions, such as arrests, "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); see also Plumhoff v. Rickard, 134 S. Ct. 2012, 2023 (2014). The Supreme Court has instructed that courts should generally follow a two-step inquiry when an official raises a qualified immunity defense: first determine whether "the official violated a statutory or constitutional right," and then determine if "the right was 'clearly established' at the time of the challenged conduct." Ricciuti v. Gyzenis, 834 F.3d 162, 167 (2d Cir. 2016) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)).

For the second prong of the inquiry, "[t]he dispositive question is whether the violative nature of particular conduct is clearly established," and, "must be undertaken in light of the specific context of the case, not as a broad general proposition." Mullenix v. Luna, 577 U.S. 7, 12 (2015). The "clearly established right . . . must be defined with specificity." City of Escondido v. Emmons, 139 S. Ct. 500, 503

28

(2019). For a right to be clearly established "do[es] not
require a case directly on point, but existing precedent must
have placed the statutory or constitutional question beyond
debate." al-Kidd, 563 U.S. at 741. In determining whether a
right is clearly established at the time of the conduct in
question, courts can consider Supreme Court decisions, decisions
of the Second Circuit Court of Appeals, and "a consensus of
cases of persuasive authority such that a reasonable officer
could not have believed that his actions were lawful." Wilson v.
Layne, 526 U.S. 603, 617 (1999). In addition, in this Circuit,
genuine, material disputes on factual issues that are relevant
to the qualified immunity analysis are to be put to the jury to
be decided through special interrogatories. Warren v. Dwyer, 906
F.2d 70, 76 (2d Cir. 1990); see also Jones v. Treubig, 963 F.3d
214, 225 (2d Cir. 2020).

The defendants assert that "neither the Second Circuit nor
the Supreme Court have held the Equal Protection Clause
prohibits discrimination based on sexual orientation or gender
non-conformity," and thus such principle was not "clearly
established" in 2014 at the time of the plaintiffs' arrests.
This assertion misstates the law.

First, the defendants' claim that the Court of Appeals for
the Second Circuit has not held that adverse discrimination
based on sexual orientation or gender non-conformity is

prohibited by the Equal Protection Clause is untrue. In 2012, the Second Circuit Court of Appeals in Windsor held that homosexuality is a "quasi-suspect" class and discriminatory treatment of the class is subject to "intermediate judicial review." Windsor v. United States, 699 F.3d 169, 185 (2d Cir. 2012), aff'd on other grounds, 570 U.S. 744 (2013). Courts in the Second Circuit have repeatedly recognized Windsor's application of intermediate scrutiny to sexual orientation-based classifications as the controlling law within this Circuit, dating back to before the relevant plaintiffs' arrests in 2014. See, e.g., Morgan v. Semple, No. 16-cv-225, 2020 WL 2198117, at *19 (D. Conn. May 6, 2020); Adkins v. City of New York, 143 F. Supp. 3d 134, 139 (S.D.N.Y. 2015); Toliver v. Fischer, No. 12-cv-0077, 2015 WL 403133, at *20 (N.D.N.Y. Jan. 29, 2015); Weslowski v. Zugibe, 14 F. Supp. 3d 295, 318 & n.7 (S.D.N.Y. 2014) (on March 31, 2014, stating "the Second Circuit has held that 'homosexuals compose a class that is . . . quasi-suspect,'" and that allegations of discrimination involving this class are "subject to heightened scrutiny.").

Moreover, whatever the level of scrutiny, it is clear beyond dispute–and was clear in 2014–that there is no basis to arrest people based on their sexual orientation. The plaintiffs have plausibly alleged and provided support for the proposition that the PAPD engaged in a de facto policy of discriminatory

policing that specifically targeted for arrest homosexual or gender non-conforming men.  The plaintiffs have further alleged a failure to train officers, despite previous well-documented failings in the past.  In combination, the plaintiffs have alleged the very policy decisions that the Supreme Court has long recognized serve no legitimate government interest and are insufficient to satisfy even rational basis review under the Equal Protection Clause. See, e.g., Romer v. Evans, 517 U.S. 620, 634-35 (1996). Cf. Lawrence v. Texas, 539 U.S. 558, 584, (2003) (O'Connor, J., concurring) ("[T]he State cannot single out one identifiable class of citizens for punishment that does not apply to everyone else, with moral disapproval as the only asserted state interest for the law."). Indeed, long before Windsor, courts in this Circuit have recognized that government discrimination based on "[s]exual orientation has been held to be a basis for an equal protection claim under Section 1983." Emblen v. Port Auth. of N.Y. & N.J., No. 00-cv-8877, 2002 WL 498634, at *7 (S.D.N.Y. Mar. 29, 2002); Quinn v. Nassau County Police Dep't, 53 F. Supp. 2d 347, 356-57 (E.D.N.Y. 1999); Tester v. City of New York, No. 95-cv-7972, 1997 WL 81662 at *6 (S.D.N.Y. Feb. 25, 1997).  Furthermore, courts have recognized that discrimination based on perceived sexual orientation can be sufficient to violate a plaintiff's rights under the Equal

Protection Clause, even if the plaintiff is not actually a member of the class. See Emblen, 2002 WL 498634, at *7.

Finally, given that anti-homosexual bias was one of the theories that provided the basis of the Martinez case's jury verdict, Defs.' 56.1 Resp. Stmt. ¶ 5, the specific rights at issue—not to be targeted for search, seizure, and arrest without probable cause, based on perceived sexual orientation or nonheteronormative gender presentation—were plainly "clearly established" with sufficient specificity.

To support their assertion, the defendants cite to dicta in an employment discrimination case from 2010, involving events occurring before 2008. Flaherty v. Massapequa Pub. Sch., 752 F. Supp. 2d 286, 295 (E.D.N.Y. 2010), aff'd, 462 F. App'x 38 (2d Cir. 2012). First, although the Flaherty Court noted that the area of law "remains somewhat unsettled" and rested its opinion on other grounds, the Court noted that "it is likely that a person perceived as homosexual is in a protected class for equal protection purposes." Id. Moreover, given that the Second Circuit's decision in Windsor was issued in 2012 and affirmed in 2013, the Flaherty case offers no support for the defendants.

The defendants also seek to rely on the decision of the Second Circuit Court of Appeals in Naumovski v. Norris, which found individual officials were entitled to qualified immunity for a claim of employment discrimination in violation of the

32

Equal Protection Clause, on the basis of sexual orientation arising from conduct that occurred between 2008-2010. 934 F.3d 200, 207-09 (2d Cir. 2019). Naumovski involved a single plaintiff, who brought an employment discrimination suit in 2011, prior to the decision in Windsor, and who made and then appeared to abandon the argument that she was discriminated against on the basis of sexual orientation. Naumovski, 934 F.3d at 218 & n.66. The Naumovski court explained that qualified immunity applied to the officials in that case because when the alleged conduct occurred, Windsor had not yet been affirmed by the Supreme Court. Accordingly, at that time "[i]t was, therefore, not yet clear that all state distinctions based on sexual orientation were constitutionally suspect." Id. at 219.

By contrast, the events here all took place after the decision of the Court of Appeals in Windsor and after it was affirmed by the Supreme Court and the plaintiffs here have alleged animus and systemic discrimination. Therefore, the individual Officer Defendants are not entitled to qualified immunity for the plaintiffs' Equal Protection Clause claims.

**B.**

In the alternative, the defendants argue that the plaintiffs' Equal Protection Clause claim lacks factual support. The defendants argue that the plaintiffs have failed to demonstrate that the arresting officers were aware of the

plaintiffs' sexual orientation or gender nonconformity, or that
the plaintiffs were intentionally discriminated against or
treated worse than "similarly situated" individuals.

To prevail on a claim of selective enforcement, the
plaintiffs must show (1) that they were treated differently from
other similarly situated individuals, and (2) that such
differential treatment was based on "'impermissible
considerations such as race, religion, intent to inhibit or
punish the exercise of constitutional rights, or malicious or
bad faith intent to injure a person.'" Harlen Assocs. v.
Incorporated Vill. of Mineola, 273 F.3d 494, 499 (2d Cir. 2001).

Here, the plaintiffs have alleged that defendants violated
their rights to equal protection when the plaintiffs were
subjected to arrest without probable cause, which the plaintiffs
allege was the result of a deliberate targeting of gay or gender
non-conforming men by the PAPD officers.  The plaintiffs have
presented evidence to show that the population of lewdness
arrests that occurred in the men's bathroom during 2014, of
which the plaintiffs' arrests are a part, were "idiosyncratic,"
occurred at counterintuitive times, and do not match the age or
racial characteristics of those arrested for other offenses, and
that the arrests were likely driven by "intentional policy
choices," and "not incidental to routine police patrols and
stops." Spitzer Decl. Ex. 12, at 9. The plaintiffs have

34

presented evidence to suggest there is a history in New York of
policing men's bathrooms in order to target gay or gender non-
conforming men, and that the idiosyncratic arrests in 2014 were
part of that pattern. Id., Ex. 11 ¶¶ 7-9. Moreover, if credited,
the plaintiffs' testimony about the way they were allegedly
targeted in the bathroom although they were not engaged in any
unlawful activity, combined with the evidence of their allegedly
gender non-conforming dress, could support an inference that
they were singled out because of their perceived sexual
orientation or gender presentation and not for any legitimate
reason. Defs.' 51.6 Stmt. ¶ 15; Spitzer Decl. Ex. 15, at 125-36;
Ex. 16 at 126-27.

The defendants argue that the plaintiffs have both failed
to show the arresting officers knew of the plaintiffs' sexual
orientation or gender non-conformity. The defendants argue that
the plaintiffs have only pleaded subjective "feelings" or
"perceptions" of being discriminated against because of their
sexual orientation. But the plaintiffs have plausibly alleged
that their sexual orientation or gender non-conformity was
apparent from their appearance, and, if their testimony is
credited, in light of the circumstances of their arrests, a
reasonable factfinder could conclude that the arresting
officers' behavior within the bathroom suggests an attempt to
target based on those apparent characteristics. As such, the

defendants' arguments that the plaintiffs have failed to demonstrate they were treated worse than "similarly situated" individuals are unpersuasive. The plaintiffs have presented sufficient evidence such that a reasonable factfinder could conclude that the plaintiffs were treated differently from other PABT patrons in violation of their right to equal protection, and that such differential treatment was related to an impermissible consideration of their real or perceived sexual orientation.

Moreover, the question of whether the arresting officers were aware of the plaintiffs' sexual orientation is a question of fact that depends on an assessment of all the facts and that cannot be resolved in the defendants' favor on a motion for summary judgment. McClellan v. Smith, 439 F.3d 137, 148 (2d Cir. 2006) ("Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.") (quoting United States v. Rem, 38 F.3d 634, 644 (2d Cir. 1994)); cf. Savino v. Town of Se., 983 F. Supp. 2d 293, 303 (S.D.N.Y. 2013) (conflicting testimony demonstrated genuine issues of material fact existed for selective enforcement claim based on national origin), aff'd, 572 F. App'x 15 (2d Cir. 2014); Greenidge v. Costco Wholesale, No. 09-cv-4224, 2012 WL 1077455, at *3 (E.D.N.Y. Mar. 30, 2012) (genuine dispute over material facts existed because

of conflicting testimony regarding whether defendants were aware of plaintiff's pregnancy prior to her termination).

Finally, the plaintiffs have presented sufficient evidence from which a reasonable factfinder could conclude that the Port Authority both had a de facto policy that caused the targeting of gay or gender non-conforming men with unconstitutional police tactics and failed to train and supervise its officers appropriately.

**V.**

The defendants have moved for summary judgment on plaintiffs' Section 1983 claims against Officer Defendants Kehoe, Esposito, DeMartino, Aylmer, Miller, O'Dell, and Fitzpatrick, arguing that such claims are without legal or factual support and, because they were not raised in the initial complaint, they are time barred.  The plaintiffs argue that each of the non-arresting officers failed to ensure that the arresting officers had established necessary probable cause for the arrest of both plaintiffs and failed to supervise appropriately the plain-clothes policing tactics used in the PABT bathrooms. Further, the plaintiffs note that Captain Fitzpatrick, as the Commanding Officer, in particular, appears to have had a significant role in deciding and implementing the PAPD's official policies and strategic initiatives, including

37

the TPU and the alleged use of plainclothes officers to conduct
"Quality of Life" arrests.

## A.

The plaintiffs' claims against the non-arresting Officer
Defendants are time-barred.  The Court of Appeals has concluded
that Section 1983 claims based on events that occurred within
New York State have 3-year statute of limitations. Hogan v.
Fischer, 738 F.3d 509, 517 (2d Cir. 2013); Berman v. Perez, No.
17-cv-2757, 2018 WL 565269, at *2 (S.D.N.Y. Jan. 24, 2018).
Generally, "'John Doe' pleadings cannot be used to circumvent
statutes of limitations because replacing a 'John Doe' with a
named party in effect constitutes a change in the party sued."
Hogan, 738 F.3d at 517. As such, John Doe substitutions may
generally only occur after the statute of limitations has
passed, if the claims relate back to the original complaint and
the requirements of Fed. R. Civ. P. 15(c) are met. Id. The
Second Circuit Court of Appeals has also recognized that Rule
15(c)(1)(A) permits certain plaintiffs to take advantage of the
more lenient New York State relation-back standard for
substituting unknown defendants under N.Y. C.P.L.R. § 1024.
Under that standard, a claim against a John Doe defendant is
timely if (1) the plaintiff "exercise[d] due diligence, prior to
the running of the statute of limitations, to identify the
defendant by name," and (2) the party described the John Doe

38

party "in such form as will fairly apprise the party that [he] is the intended defendant." Hogan, 738 F.3d at 519.

In this case, the events occurred in May and July of 2014, and the plaintiffs' original complaint was filed on March 27, 2017, and named only Officers Opromalla, Tone, and Kehoe. It did not include Captain Fitzpatrick, even though Captain Fitzpatrick was quoted in the New York Times article that the plaintiffs' attached as an exhibit to the original complaint. The defendants note that the CCRs, which were provided on July 6, 2017, as part of the Rule 26 disclosures, provided the names of Esposito, DeMartino, Aylmer, Miller, Cruz, and O'Dell. Nevertheless, the plaintiffs did not file a First Amended Complaint, adding Esposito, DeMartino, and Aylmer, until three months later on October 6, 2017, and did not file the Second Amended Complaint, adding Miller, Cruz, and O'Dell, until November 28, 2018.

The claims against Captain Fitzpatrick are time-barred. He was known to the plaintiffs at the time they filed their First Amended Complaint, because he was quoted in the New York Times article attached to their original complaint, and they chose not to sue him. The plaintiffs failed to bring their claims against him within the statute of limitations period, and the plaintiffs cannot rely on New York's more lenient relation-back standard. Liverpool v. Davis, 442 F. Supp. 3d 714, 726 (S.D.N.Y. 2020)

(plaintiffs "failure to mention" a known defendant was "not the type of mistake contemplated by New York's relation-back rule"); see also Maurro v. Lederman, 795 N.Y.S.2d 867, 870 (Sup. Ct. 2005) ("An explicit prerequisite to the use of C.P.L.R. § 1024 is plaintiff's ignorance of the defendant's name.").

The plaintiffs also cannot rely on the more lenient standard of C.P.L.R. § 1024 for their claims against defendants Esposito, DeMartino, Aylmer, Miller, Cruz, and O'Dell, because the allegations in the original complaint against the John Doe defendants were so general that they did not provide notice to those defendants that they were intended defendants in this lawsuit.

## B.

The plaintiffs have also failed to demonstrate a sufficient factual basis for their claims against the Officer Defendants, other than Officers Opromalla and Tone.

The plaintiffs have failed to provide sufficient support for their claims against Officer Kehoe. Although Officer Kehoe was present for both plaintiffs' arrests, the parties agree that Officer Kehoe was standing outside the bathroom while Officers Tone and Opromalla went into the bathroom and that Officers Tone and Opromalla prepared the plaintiffs' respective arrest paperwork. In Mejia's case, Mejia does not appear to allege that Officer Kehoe was the alleged "short" plainclothes officer who

40

"smirked" at him, and Officer Tone was the only officer to testify at Mejia's trial. The plaintiffs note that Officer Kehoe was among the five officers responsible for the majority of the Public Lewdness arrests in 2014, Spitzer Decl. Ex. 12 ¶ 32, but there is no evidence in the record to establish a genuine issue regarding whether Officer Kehoe had reason to disbelieve the description of the plaintiffs' conduct given by Officers Tone and Opromalla.  The Court of Appeals has instructed that for purposes of making a probable cause determination, police officers are entitled to rely on the allegations of fellow police officers. Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000); Bernard v. United States, 25 F.3d 98, 102-03 (2d Cir. 1994). As such, there are no genuine issues regarding Officer Kehoe's personal involvement in the plaintiffs' alleged false arrests, because Officer Kehoe's mere presence at the scene is not a sufficient factual basis to establish liability. Minter v. City Of Westchester, No. 08-cv-7726, 2011 WL 856269 at *7 (S.D.N.Y. Jan. 20, 2011).

The plaintiffs have similarly failed to demonstrate a sufficient factual basis for their claims against the remaining non-arresting Officer Defendants, who served in supervisory capacities: Esposito, DeMartino, Aylmer, Miller, O'Dell, and Fitzpatrick.

Prior to the Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009), within the Second Circuit, "the personal involvement of a supervisory defendant [could have been] shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of [plaintiffs] by failing to act on information indicating that unconstitutional acts were occurring." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995). After Iqbal, there was considerable uncertainty as to whether each of the five Colon factors remained a sufficient basis for establishing individual liability for supervisors. See Reynolds v. Barrett, 685 F.3d 193, 205 & n.14 (2d Cir. 2012); Compare Brandon v. Kinter, 938 F.3d 21, 36 (2d Cir. 2019) (applying Colon factors without caveats), with Lombardo v. Graham, 807 F. App'x 120, 124 & n.1 (2d Cir. 2020) (noting that the Court need not reach the issue of whether all five Colon factors remain sufficient bases for liability). But the Court of Appeals for the Second Circuit has recently emphasized that

"there is no special rule for supervisory liability," after Iqbal, and thus, a "plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Tangreti v. Bachmann, 983 F.3d 609, 616 (2d Cir. 2020).  The plaintiffs cannot rely "on a separate test of liability specific to supervisors." Id. at 619.

Here, the plaintiffs' briefs appear to assert that the supervisory Officer Defendants individually participated through their failure to ensure that sufficient probable cause existed for the plaintiffs' arrest and for failing to supervise the plainclothes officers' policing of the PABT bathrooms and failing to ensure that arrests were not made based on impermissible bias.

However, the plaintiffs have failed to establish a sufficient basis for finding Lt. Aylmer, Sgt. DeMartino, Sgt. Esposito, Lt. O'Dell, and Sgt. Miller's own individual actions in connection with their review of post-arrest paperwork violated the Constitution.  The plaintiffs have not alleged that these officers had knowledge of the arrests before they occurred, and their involvement was solely in connection with the post-arrest paperwork. But officers are "entitled to rely on the allegations of fellow police officers" who were present "at the scene." See, e.g., Martinez v. Simonetti, 202 F.3d 625, 634-

35 (2d Cir. 2000).   The plaintiffs have presented no evidence
that Lt. Aylmer, Sgt. DeMartino, Sgt. Esposito, Lt. O'Dell, or
Sgt. Miller had any reason to know that Officers Tone or
Opromalla did not have probable cause for the arrests at the
time.   Both Officers Opromalla and Tone have admitted both to
making the arrests and completing the arrest paperwork, and
there is no evidence in the record to suggest genuine issues of
fact regarding whether the supervising officers personally
participated in making arrests without probable cause or
falsifying arrest records.

Similarly, the plaintiffs argue that Captain Fitzpatrick is
personally responsible for establishing a policy and practice
of, among other things, emphasizing "Public Lewdness" and
"Quality of Life" crimes, failing to supervise officers under
his command, and for directing Officer Opromalla to "continue to
enforce" Public Lewdness laws while assigned to plainclothes
policing.   At best, plaintiffs have presented evidence
suggesting Captain Fitzpatrick was indifferent to the risks of
unconstitutional false arrests or equal protection violations,
caused by the combination of the officers' lack of adequate
training, and his alleged emphasis on policing Public Lewdness.
But there is insufficient evidence in the record to show that
Captain Fitzpatrick was personally involved in the arrests of

the plaintiffs with an awareness that the arrests were made
without probable cause or based on an impermissible bias.

Thus, the plaintiffs have failed to adduce sufficient
evidence from which a reasonable jury could conclude that the
non-arresting officers were personally involved in any
constitutional violations.

## VI.

The defendants argue that the plaintiffs' general
allegations that their rights to "due process under the
Fourteenth Amendment" were violated because they were targeted
based on their perceived sexual orientation or gender non-
conformity fail to state a claim.  The defendants further assert
that the plaintiffs' claims that their liberty interests in
privacy were violated by the defendants' actions are not
cognizable.  The defendants have also contended that-to the
extent that the plaintiffs allege unlawful entrapment-such an
allegation is not an independent ground for civil liability.

To state a claim for a violation of a plaintiff's
substantive due process rights under the Fourteenth Amendment, a
plaintiff must allege some valid liberty or property interest,
upon which the defendants infringed. Harlen Assocs., 273 F.3d at
503.  While the Supreme Court has recognized that the Due
Process Clause protects certain substantive liberty interests in
privacy and bodily integrity, the plaintiffs here are not

45

challenging the Public Lewdness statute as being
unconstitutionally vague or otherwise facially invalid and are
instead only challenging its specific application to their
alleged unlawful search, seizure, and false arrest without
probable cause.  As a result, the plaintiffs' due process
allegations in their complaint sound in the Fourth Amendment's
prohibition against unreasonable searches and seizures. When
faced with similar claims, courts in this Circuit have been
instructed that the Fourth Amendment, rather than Fourteenth
Amendment's Due Process clause, should serve as the "guide for
analyzing these claims," given the more "explicit textual source
of constitutional protection." Russo v. City of Bridgeport, 479
F.3d 196, 209 (2d Cir. 2007) (quoting Graham v. Connor, 490 U.S.
386, 395 (1989)); Lauro v. Charles, 219 F.3d 202, 208 (2d Cir.
2000); Abreu v. City of New York, No. 17-cv-6179, 2018 WL
3315572, at *8 (S.D.N.Y. July 5, 2018); Ambrose v. City of New
York, 623 F. Supp. 2d 454, 474 & n.9 (S.D.N.Y. 2009).

Although the plaintiffs stated at oral argument that they
intend to pursue their substantive due process claims, their
brief only discusses invasion of privacy in the context of the
alleged violations of their Fourth Amendment rights.

Next, as the plaintiffs correctly note, their Second
Amended Complaint does not include a standalone "entrapment"
claim, and thus, the defendants' arguments that entrapment is

not an independent ground for liability under Section 1983 are irrelevant.

Therefore, the defendants are entitled to summary judgment dismissing the plaintiffs' claims based on alleged violations of the Fourteenth Amendment's Due Process Clause.

**VII.**

The defendants assert that neither the Port Authority nor the PAPD can be held liable for punitive damages. Although the Court of Appeals for the Second Circuit has not addressed the question, other courts in this district have applied to the Port Authority the Supreme Court's reasoning in City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 261 (1981), that municipalities should not be subject to punitive damages. Vernon v. Port Auth. of N.Y. & N.J., 154 F. Supp. 2d 844, 860 (S.D.N.Y. 2001) (collecting cases). While the Port Authority is a self-financing agency, funded by user fees, the wrongdoing of the Port Authority's officials should not be borne by the public generally. The combination of the Port Authority's liability for compensatory damages and individual officer liability for both compensatory and punitive damages should be sufficient to satisfy the goal of deterrence. Thus, the Court is persuaded to join the majority of courts to have considered the issue and find that the Port Authority—and the PAPD as one of its constituent agencies—is immune from punitive damages. See

47

Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346, 357 (3d Cir.

2001); Ryduchowski v. Port Auth. of N.Y. & N.J., No. 96-cv-5589,

1998 WL 812633, at *15 (E.D.N.Y. Nov. 19, 1998). In a letter,

filed after oral argument, the plaintiffs have conceded that

punitive damages are not available against the Port Authority.

ECF No. 249.

## CONCLUSION

The Court has considered all of the arguments of the

parties. To the extent not specifically addressed above, the

remaining arguments are either moot or without merit. For the

reasons explained above, the defendants' motion for summary

judgment is denied in part and granted in part. The Clerk is

directed to close Docket Nos. 201 & 226.


**SO ORDERED.**

**Dated:**      **New York, New York**
               **February 22, 2021**          ____/s/ John G. Koeltl____
                                                   **John G. Koeltl**
                                         **United States District Judge**